# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Case No. 3:17-cv-00023-MEM

CHRISTOPHER AND MICHELE PAIGE
*Appellants*

*and*

LERNER MASTER FUND,
MORGAN LEWIS,
JOHN GOODCHILD, ESQ.,
*Appellees*

## APPELLANTS' OPENING BRIEF
## IN THEIR APPEAL FROM THE FINAL JUDGMENT
## DENYING THEIR MOTIONS FOR SANCTIONS

From the United States Bankruptcy Court
Middle District of Pennsylvania
The Hon. John J. Thomas, United States Bankruptcy Judge
Case No. 5:11-bk-05957 - JJT (In re Paiges)
Adv.No. 12-ap-00067-JJT (LMF vs. Paige)

Christopher and Michele Paige
75-78 177th St.
Fresh Meadows, NY 11366
718.591.6355
Appellants, *pro se*

**DATED:** January 14, 2017

# I.  CORPORATE DISCLOSURE STATEMENT PURSUANT TO FED.R.BANKR.P. 8012

The Appellants, Christopher and Michele Paige, are natural persons not subject to Fed.R.Bankr.P. 8012.

The Appellee John Goodchild is a natural person not subject to the aforementioned Rule.

Upon information and belief, we believe that the Appellee Lerner Master Fund ("LMF") is a Delaware corporation; we believe that corporation is owned by Randy Lerner, his mother, and his sister.

Upon information and belief, we believe that the Appellee Morgan Lewis is a Pennsylvania corporation; we believe that corporation is owned by its partners, whose names we do not know.

A - 1

II.        TABLE OF CONTENTS

| # | Section Title | Page # |
|---|---|---|
| I. | CORPORATE DISCLOSURE STATEMENT PURSUANT TO FED.R.BANKR.P. 8012 | A - 1 |
| II. | TABLE OF CONTENTS | A - 2 |
| III. | TABLE OF AUTHORITIES | A - 5 |
| A. | Statutory Citations | A - 5 |
| B. | Caselaw | A - 5 |
| C. | Other Legal Authorities | A - 5 |
| IV. | JURISDICTIONAL STATEMENT | A - 6 |
| A. | The Bankruptcy Court's Original Jurisdiction | A - 6 |
| B. | The District Court's Appellate Jurisdiction | A - 6 |
| C. | The Relevant Filing Dates Establishing Timeliness of Appeal | A - 6 |
| D. | The Appellants' Assertion of Finality | A - 6 |
| E. | The Appellants' Statement Regarding Prior Appeals | A - 7 |
| V. | ISSUES PRESENTED FOR APPEAL | A - 8 |
| VI. | STATEMENT REGARDING ORAL ARGUMENTS PURSUANT TO FED.R.BANKR.P. 8019(a) | A - 16 |
| VII. | STANDARD OF REVIEW: An Abuse of Discretion Contrary to Law and Reason | A - 17 |
| VIII. | STATEMENT OF THE CASE: Statement of Facts, Procedural History, and Orders Appealed | A - 18 |
| IX. | SUMMARY OF THE ARGUMENT: In Litigation, Does Anything Go? Are Trial Perfectly-Acceptable Substitutes for Discovery? Does Ignoring Controlling Contrary Authority on Sanctions Constitute an "Abuse of Discretion"? | 1 |

| # | Section Title | Page # |
|---|---------------|--------|
| X. | **ARGUMENT: Does the Truth Still Matter, of Have Federal Courts Adopted the Law of the Jungle? And Assuming that a Claim is Non-Frivolous When Filed, Does that Relieve a Party and/or Its Attorneys of Any Further Obligation to Investigate Their Claims?** | 10 |
| A. | *On its face, the Bankruptcy Court's Opinion (Adv.Dkt. #349) inexplicably contradicts both itself and reason, simultaneously asserting that objective-reasonableness both is and is not an absolute legal defense to allegations of subjective bad-faith.* | 10 |
| B. | *The Bankruptcy Court's Opinion (Adv.Dkt. #349) contradicts its own prior rulings on the core issues in this adversary proceeding, thereby simultaneously asserting that an objectively-reasonable legal theory both is and is not an absolute legal defense to allegations of subjective bad-faith and that a fiduciary both can and cannot solicit a self-interested settlement.* | 20 |
| C. | *They lied repeatedly. Don't take my word for that proposition, take theirs!* | 23 |
| D. | *We clearly, unambiguously, and repeatedly stated that our Motions challenged the Appellees' integrity and honesty in investigating and prosecuting their allegations, not the merits of their Complaint (Adv.Dkt. #81).* | 24 |
| E. | *Laughably, Judge Thomas previously admitted that our Motions attacked the Appellees' honesty and integrity in investigating and prosecuting their claims, rather than the merits of their Complaints (Adv.Dkt. #1 & #81).* | 26 |
| F. | *Incredibly, however, the Bankruptcy Court's Opinion (Adv.Dkt. #349) utterly ignores the issues raised in our Motions as defined by the Bankruptcy Court!* | 27 |

A - 3

| # | Section Title | Page # |
|---|---|---|
| G. | *The Bankruptcy Court's error constitutes an abuse of discretion because it ignores the applicable authority, which clearly state that the merits of a party's complaint cannot justify or excuse that party's misconduct in its investigation and pursuit thereof.* | 27 |
| H. | *Unlike the unsuccessful movant in <u>Moeck v. Pleasant Valley School District</u>, our Motions rested upon a complete trial record, and the lies at issue related to dispositive issues.* | 29 |
| I. | *The Bankruptcy Court's Order (Adv.Dkt. #350) suggesting that threatening to rape and sodomize a woman while referring to her husband as a "faggot" is NOT evidence of "personal antipathy" shocks the conscience.* | 30 |
| J. | *The Bankruptcy Court's apparent exclusion of our direct evidence of the Appellees' bad-faith is patently-erroneous because evidence of bad-faith is not inadmissible merely because it damages the Appellee's case.* | 31 |
| XI. | **CONCLUSION & RELIEF SOUGHT: Justice** | 34 |
| XII. | **CERTIFICATES OF COMPLIANCE & SERVICE** | 53 |
| | **Copy of Not Yet Published 3rd Circuit Decision** | |

A - 4

III.        **TABLE OF AUTHORITIES**

| Authority | Page # |
|---|---|
| *Statutory Citations* | |
| Fed.R.Civ.P. 52 | 11 |
| Fed.R.Civ.P. 56 | 11 |
| *Caselaw* | |
| Brubaker Kitchens, Inc. v. Brown, 280 Fed. Appx. 174 (3rd Cir. 2008) | 2 |
| Bullock v. Bank Champaign, N.A. (In re Bullock), 133 U.S. 1754, 1759 (2013) | 20 |
| In re Farhid, 171 B.R. 94 (N.D. Cal. 1994) | 3 |
| Gaiardo v. Ethyl Corp., 835 F.2d 479 (3rd Cir. 1987) | 5, 15 |
| GFL Advantage Fund, LTD. v. Colkitt, 272 F.3d 189 (3rd Cir. 2001) | 17 |
| In re Gioioso, 979 F.2d 956 (3rd Cir. 1992) | 30 |
| In re Miller, 529 B.R. 73 (Bankr.E.D.Pa. 2015) | 15 |
| Moeck v. Pleasant Valley School District. (Please note this published case has not yet been assigned an official designation.) | 29 |
| Orange Theatre Corp. v. Rayhertz Amusement Corp., 130 F.2d 185 (3rd Cir. 1942) | 1 |
| Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181 (3d Cir. 2006) | 8 |
| Theokary v. Shay (In re Theokary), 592 Fed. Appx. 102 (3rd Cir. 2015) | 1, 28 |
| US v. Cross, 308 F.3d 308 (3rd 2002) | 33 |
| *Other Authorities* | |

## IV.   JURISDICTIONAL STATEMENT

### A.   *The Bankruptcy Court's Original Jurisdiction*

The Bankruptcy Court exercised core subject matter jurisdiction over the underlying adversary proceeding pursuant to 28 U.S. C. §157(b) and/or 28 U.S.C. §1334; our Motions for Sanctions [Adv.Dkt. #67, #139, #233, #288 & #290] were collateral thereto.

### B.   *The District Court's Appellate Jurisdiction*

This Court has appellate jurisdiction over this appeal pursuant to 28 U.S.C. §158.

### C.   *The Relevant Filing Dates Establishing Timeliness of Appeal*

The Bankruptcy Court issued its final judgment through its Order (Adv.Dkt. #350) filed on December 29, 2016.   By filing that Order, the Bankruptcy Court made its previous interlocutory decisions appealable.

We filed our Notice of Appeal five (5) days later on January 3, 2017.

### D.   *The Appellants' Assertion of Finality*

On its face, Order (Adv.Dkt. #350) purports to dispose of any and all outstanding issues in the aforementioned adversary proceeding — including, but not limited to our Motions for Sanctions [Adv.Dkt. #67, #139, #233, #288 & #290].

E.   *The Appellants' Statement Regarding Prior Appeals*

Previously, we filed a Petition for a Writ of Mandamus against Judge Thomas.  *See* Case No. 3:15-cv-00779-RDM-MCC.

Although we filed a Petition, we never formally served that Petition upon Judge Thomas because he relented and agreed to hold a trial as soon as he received our Petition in the mail.

Soon after trial, our Petition was denied for lack of service.

We are not aware of any other appellate activity in this case.

A - 7

## V.   ISSUES PRESENTED FOR APPEAL

1.   Did the Bankruptcy Court err as a matter law, thereby abusing its discretion, when it held that motions for sanctions must be decided in a vacuum without regards to the particular facts of a particular case?   Is it, for example, reasonable to accuse President Barack Obama of racketeering because he enjoys a lifestyle far above his salary, travels in the company of armed men, and has been known to order his subordinates to kill people?   Likewise, was it reasonable for these Appellees to accuse us of serious torts and felonies based upon deficiencies in how I prepared *rough drafts* of documents actually corrected and finalized by the independent third-party administrator (accountant), auditor, and custodians who *actually* held and accounted for the Plaintiff's money?   In other words, is any theoretical doubt — no matter how impractical or remote — sufficient to justify *any* allegation against *anyone*, or must the court evaluate allegations in light of the *unique* facts of a particular case?   In short, were these Appellees obligated to investigate and assess their allegations *in light of the obvious and undisputed facts* prior to filing their Complaint (Adv.Dkt. #1)?   Should the Court have assessed their Complaints (Adv.Dkt. #1 & #81) on the "any conceivable" fact standard, or should the Court have assessed their Complaints based upon what they actually said and the obvious and undisputed facts?

2.   Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it ruled upon an imaginary motion challenging the legal

sufficiency of the Appellees' claims (if true), rather than our *actual* Motions for Sanctions (hereinafter "our Motions") challenging the Appellees' corruption and dishonesty in their investigation and prosecution of their *false* claims? Quite simply, our Motions alleged that these Appellees failed to investigate their allegations; prosecuted allegations they knew to be false; lied to attain an extension of the filing deadline; lied to prevent summary judgment; and lied to malign and defame us; our Motions did *not* allege that their 523 Claims (if true) were frivolous. In short, was the Bankruptcy Court entitled to substitute its own arguments for ours? [To be clear, we are *NOT* arguing that the Bankruptcy Court had to explain its decision; rather, we are arguing that the Bankruptcy Court cannot proffer a patently-erroneous explanation.]

3. Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it held that our Motions challenging the Appellees' subsequent pleadings had to be decided based solely upon the Appellees' knowledge at the time they filed their initial Complaint (Adv.Dkt. #1), or did the Third Circuit correctly hold that a non-movant's subsequent pleadings must be assessed based upon what the non-movant knew or *should have known* at the time of those subsequent pleadings? For example, even if we were to assume these Appellees can claim they weren't aware of attorney-client privilege, were they allowed to sue us on the off-chance that our attorneys might violate the law by revealing our privileged conversations, thereby substantiating their allegations that our attorneys

fabricated my wife's contractual theories, and/or were they allowed to continue litigating that theory after they "learned" that we would *NOT* waive privilege?  For another example, were they allowed to sue my wife on the off-chance that the New York State Bar's membership rolls are inaccurate and, thus, that my wife is an attorney despite those public records to the contrary?  Were they allowed to sue me as a "legal architect," thereby circumventing the prohibition on suing me as an attorney?  And what is a "legal architect"?  When is an attorney acting as a "legal architect" and when is he acting as an attorney?

4.     Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it ignored the Trustee's warnings to the Appellees regarding the merits of their allegations as extrinsic evidence of what the Appellees *should have known* about the merits of their allegations?   In lay terms, were the Appellees entitled to ignore the Trustee's warning that they were "tilting at windmills" merely because they never bothered to pursue discovery and, thus, allegedly remained blissfully ignorant of the evidentiary basis for his warning that their allegations were delusional?

5.     Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it allowed the Appellees to speculate at great length regarding their knowledge and motives?  Did he err when he allowed the Appellees' counsel to "testify" about settlement offers that he never made, that he specifically refused, and which he expressly refused to consider as "evidence" of the Appellees' good-

faith?   Likewise, if - as the Bankruptcy Court claims - there's some innocent explanation of the Appellees' threats to rape and sodomize my wife and/or of their decision to refer to me as a "faggot," then shouldn't we have heard that explanation from the witness stand, rather than through counsel's questions?  And shouldn't we have attained discovery regarding the Appellees' actual knowledge motives, or did the Bankruptcy Court correctly assume that such vile commentary is *NEVER* indicative of animus?  If so, how and why did the Bankruptcy Court reverse both its own prior decision and the state court's prior decision on the same issue without explanation or warning?

     6.    Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it took more than five (5) years to adjudicate this adversary proceeding — including, but not limited to its decision to grant the Appellees a seventy-eight (78) day extension to the sixty (60) day, Congressionally-mandated filing deadline and its decision to grant the Appellees a thirty-eight (38) month continuance of the previously-scheduled trial — merely because the Appellees chose not to start discovery until months *after* they had filed their Complaint (Adv.Dkt. #1) and months *after* the trial had been scheduled *at their request*?  Is doing absolutely nothing to investigate a claim "due diligence" sufficient to constitute "cause" for an extension?  Was the Court right to ignore the Appellees' leisurely pace as extrinsic evidence of their bad-faith?   Likewise, does the

Bankruptcy Court's leisurely pace negate the entire rationale for deference to its decision (namely, a desire to expedite litigation)?

7.      If, as the Bankruptcy Court held, discovery's potential to uncover new evidence was sufficient to justify the Appellees' initial allegations, then did the Appellees actually have to conduct reasonable discovery or could they rely upon discovery's potential without bothering to conduct any discovery?  Does the fact that our prior testimony (taken before our bankruptcy filing) fills eleven (11) volumes limit the Appellees' ability to rely upon discovery?  Does the fact that they didn't depose us in this case matter?  Does the fact that they lied about the questions they asked us the 341 meetings matter?  Does the fact that they never deposed anyone - including us - regarding their 727 Claims matter?  Can the Appellees wait to initiate discovery *AFTER* a trial has been scheduled at their request?  Can the Appellees subsequently fail to pick-up the documents that they have requested?  Can the Appellees fail to contact, much less depose, independent the third-party administrator (accountants), auditor, and custodians who actually held and accounted for the Plaintiff's money?  *In short, is turning a blind eye to obviously-vital evidence consistent with good-faith and, thus, non-sanctionable?*

8.      Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it granted the Plaintiff's request for a seventy-eight (78) day extension to the sixty (60) day, Congressionally-mandated filing deadline based upon the Plaintiff's false testimony and its counsel's unlawful failure to disclose

controlling contrary authority?  That is, can a party lie to attain an extension, so long as its complaint has "merit"; or are lying, deception, and fraud unlawful and sanctionable regardless of the merits of the underlying allegations?

9.    Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it allowed the Appellees to litigate this case for more than five (5) years — including, but not limited to its decision to accede to their demand for a ten (10) day trial at which they did not call a single witness who supported any of their allegations — without any evidence based upon the bizarre theory that we had to take the stand to "prove" our innocence, despite 11 volumes of prior testimony? That is, was the Bankruptcy Court correct when it held that the Appellees did *NOT* needlessly and vexatiously prolong this litigation by demanding a trial based solely upon the off chance that we might recant those 11 volumes of prior testimony in some sort of "Perry Mason" moment?

10.    As a matter of law, did the Bankruptcy Court abuse its discretion when it held that threatening to rape and sodomize a woman and/or referring to her husband as a "faggot" is *NOT* evidence of personal antipathy and/or bad-faith?  If, as the Bankruptcy Court has held, that threatening to rape and sodomize a woman and referring to her husband as a "faggot" is neither evidence of discriminatory animus nor evidence of personal animus, then what is it?  Did the Bankruptcy Court have the legal right to reverse both its own and the State court's decision that

those bigoted statements were proof of personal animus, rather than discriminatory animus? If so, how and why did it reach that conclusion?

11.    In assessing Appellees' knowledge regarding the truth or falsity of their allegations, should the Court have ignored the Appellees' prior testimony, admissions, and documents relating to their actual knowledge and beliefs regarding the truthfulness of their allegations? Can you sue someone on the off chance that everything you believe is wrong?

12.    Assuming arguendo the Appellees had non-frivolous 523 Claims, why were they entitled to append frivolous 727 Claims? Was the Bankruptcy Court running some sort of "Buy One, Get One" free promotion on allegations? Why would their Amended Complaint immunize their original Complaint?

13.    Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it held that motions for sanctions relate only to the merits of the respondents' allegations, not the means used to advance those allegations, and, thus, that the Appellees were legally entitled to fabricate evidence, mislead and deceive the Court, and/or lie with impunity because all's fair in love and litigation?

14.    Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it held that the Appellees were entitled to sue me based upon a factual allegations that they had denied under oath? In lay terms, was the Bankruptcy Court correct when it held that a party's prior testimony should be ignored in assessing the legality of that party's allegations? In short, can a party

make allegations they believe to be false merely because discovery might prove their own testimony is erroneous and/or perjurious?   Also, did the Bankruptcy Court correctly ignore the Appellees' subsequent admissions that they were only suing me as leverage against my wife?

15.   Assuming arguendo that the Appellees' 523 Claims were not facially frivolous, did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it held that the Appellees were entitled to sue us based upon allegations that they had denied under oath and that were belied by their own documents (including, but not limited to their own Trial Exhibits)?   In lay terms, was the Bankruptcy Court correct when it held that a party's prior testimony and documents should be ignored in assessing the merits of that party's allegations? Did the Bankruptcy Court correctly hold that parties may make allegations that they believe to be false merely because discovery might prove that their own testimony and their own documents are erroneous and/or perjurious?

16.   Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it ruled that *any* complaint that survives a motion to dismiss is therefore non-frivolous even if that complaint only survived because the Appellees fabricated evidence?   Did the Bankruptcy Court err as a matter of law, thereby abusing its discretion, when it allowed these Appellees to base their claims upon their preposterous assertion that they either knew or would discover what our attorneys had told us in our privileged conversations?   How could anyone rebut a

plaintiff's allegations relating to privileged materials without waiving privilege? Can a plaintiff force a defendant to choose between privilege and summary judgment?  In lay terms, can the Appellees defraud the tribunal in order to defeat our dispositive motions *with impunity* merely because their allegations (if true) are not "meritless"?

## VI.   STATEMENT REGARDING ORAL ARGUMENTS PURSUANT TO FED.R.BANKR.P. 8019(a)

In light of the significance of these issues and given the public's interest in promoting the integrity of the judicial process, we believe that oral arguments are necessary and proper in this case.

## VII.   STANDARD OF REVIEW: An Abuse of Discretion Contrary to Law and Reason

In this Circuit, appellate courts review lower courts' decisions on motions for sanctions for abuse of discretion. *See, e.g.,* <u>Simmerman v. Corino</u>, 27 F.3d 58, 61 (3d Cir. 1994). Thus, "'we evaluate the court's factual determinations, legal conclusions, and choice of an 'appropriate sanction' with substantial deference, considering not whether we would make the same precise determinations, but only whether those determinations are contrary to reason or without a reasonable basis in law and fact.'" <u>Ario v. Underwriting Members of Syndicate 53 at Lloyds for the 1998 Year of Account</u>, 618 F.3d 277, 287 (3d Cir. 2010) (quoting <u>Simmerman</u>, 27 F.3d at 62).

Applying that standard here, the Bankruptcy Court's decisions were, "contrary to reason" because the theoretical merits of the Appellee's 523 Claims *prior to discovery* cannot possibly justify their false and misleading statements to the Court *after* discovery; their fraudulent efforts to attain an extension, which led to an erroneous published decision and which made this entire ordeal possible; their failure to investigate their claims; their decision to pursue additional, frivolous 727 Claims, and their decision to pursue allegations that they knew to be false.   Likewise, cases cannot be decided in vacuums without regards to the obvious and undisputed facts thereof.

## VIII.  STATEMENT OF THE CASE: Is All Fair in Love and Litigation?

### A.  *STATEMENT OF FACTS & PROCEDURAL HISTORY: Why did this case take so long?*

Many years ago now, on December 6, *2011* to be precise,[1] the sixty (60) day, Congressionally mandated filing deadline for our creditors to file <u>both</u> discharge complaints (aka 727 claims) <u>and</u> dischargeability complaints (aka 523 claims) expired.

Several months later, on February 23, *2012*, the Appellees' filed an adversary complaint (Adv.Dkt. #1) against my wife and I that included <u>both</u> 523 <u>and</u> 727 claims.

When asked to account for their delay, the Appellees attributed at least a portion of their lengthy delay to the fact that they didn't think filing deadlines were very important.  *See* Tr. 3/1/12 (Dkt #86), p. 81, L: 7-10 (Goodchild: "And so the timing of the filing of the complaint in my view is not so urgent.").

Please note that Mr. Goodchild was appearing as both a witness and a lawyer at this hearing.[2]

---

[1]    *See, e.g.*, Opinion (Adv.Dkt. #40), p. 7 (The deadline was set for December 6, 2011,...").

[2]    *See, e.g.*, Tr. 3/1/12 (Dkt. #86), p. 88, L: 25 *et seq*  (GOODCHILD: "I suppose I should testify...").

A - 18

A few months *after* they filed their belated Complaint (Adv.Dkt. #1), on

June 13, *2012*, the Appellees claimed that they were ready for trial, and they agreed

to try their Complaint (Adv.Dkt. #1) on August 15, *2012*.[3]

A month later on July 11, 2012,[4] however, the Appellees suddenly "realized"

that they needed discovery, so they requested — and received — an indefinite

continuance of the previously-scheduled trial.    *See, e.g.,* LMF's Motion to

Continue (Adv.Dkt.#17); *and see* Order (Adv.Dkt. #45) ("The Plaintiff's request to

continue August 15, 2012 trial date is granted.")

Having attained the indefinite continuance they had requested, the Appellees

voluntarily abandoned their discovery efforts a few months later in October 2012.[5]

---

[3]      *See, e.g.,* Tr. 6/13/12 (Dkt. #130), p. 17, L: 10 - 13 ("THE COURT: I'll do
[the trial] any day you want me to -- I mean, if you can agree -- do you care? Do
you care, Mr. Goodchild? MR. GOODCHILD: Your Honor, I don't — no."); *and
see* Proceeding Memo (Adv.Dkt. #14) ("Order scheduling trial for August 15, 2012
at 10:00 a.m.").

[4]      *See, e.g.,* LMF Response (Adv.Dkt. #52), p. 2, Para. 3 ("LMF never
requested any discovery whatsoever from us [the Appellants] in this case until a
few days ago on July 11, 2012. *See* Exhibit A, p.5. Consequently, our response
won't even be due until the day before the trial, August 14, 2012. *See* Fed.R.Civ.P.
5(b)(2)(C) *and* Fed.R.Civ.P. 6(d) (setting deadline to respond to discovery requests
served by mail). **Response: Undisputed.**" [emphasis in original].

[5]      *See, e.g.,* LMF's Answer (Adv.Dkt. #183), p. 2, Para 2 ("**By way of further
response, LMF has not conducted discovery of the Debtors since October
2012...**") [emphasis in original]

In the meantime, they deposed absolutely no one, and they didn't bother to appear for the document production that they had requested![6]

Several years after they voluntarily abandoned their discovery "efforts," the Appellees still weren't ready to proceed, so they requested - and received - yet another continuance on August 14, *2015*.  *See* LMF's Memo (Adv.Dkt. #225); *and see* Order (Adv.Dkt. #231).

In the long years between the Appellees' two (2) successful attempts to delay the trial, one of their lead attorneys (Zachary Johns) managed to find time to graduate law school, pass the Bar, and practice law for a few years; meanwhile, the Appellees managed to find time to file an Amended Complaint (Adv.Dkt. #81) on April 22, *2013*, or slightly less than six (6) months *after* their discovery efforts had ended in October *2012*.

Despite demanding — and receiving — more than five (5) years to prepare for trial, the Appellees weren't quite sure whether they believed that we had stolen

---

[6]     *See, e.g.,* Christopher Paige's testimony [Tr. 12/1/15 (Adv.Dkt. #271), p. 6, L: 17 - 19 ("All these transactions that they're asking for are easily accounted for in the records they didn't bother to pick up. So I made a spreadsheet showing the answer."); *and see* Id. p. 18, L: 19 - 21 ("Yes. I produced everything I had. Yes. I'm sorry. I produced everything I had, but you didn't pick it all up."); p. 68, L: 4 - p. 99, L: 25].

more than $39 million of their money, or only some $6.6 million of their money.[7]

And, for some reason, they didn't bother investigating that multi-million dollar

discrepancy.   For example, they didn't even attempt to speak with any of

administrators (accountants), custodians, or auditors who actually held and

accounted for the money at issue.[8]

After a ten (10) day trial that began on November 4, *2015* and ended the

following year on January 20, *2016*, the Appellees rested without calling a single

witness who supported *any* of their allegations. *See generally* Opinion (Adv.Dkt.

#303).   Literally, they called only my wife, my sister-in-law, and myself to the

stand.   Id. at   2 ("In advancing its case, LMF has called both Debtors and the

female Debtor's sister as their only witnesses.").

For my wife and I, their "trial strategy" apparently assumed that we might

recant eleven (11) volumes of prior testimony in order to confess to all of their

---

[7]    *See, e.g.,* Christopher Paige's testimony [Tr. 1/20/16 (Adv.Dkt. #297), p. 63,
L: 23 - p. 64, L: 6 ("Q: Okay, how much money does LMF claim is missing from
the original 40 million? A: At Response 108, Page 10, Footnote 10, they claim that
we took $39.7 million. Q: And how much are they suing? A: It changes, but
approximately 6.7 million. Q: And have they explained to you why that $33
million, the other $33 million isA: No. I guess it's a tip for good service.")];

*And   see*   LMF's Response (Adv.Dkt. #108), p. 10, fnt. 10 ("After the
Chancery Court ruled that Lerner had a right to withdraw its money from the
Paiges' hedge fund, the remaining balance of $5.72 in the PCM account was
returned to Lerner, along with approximately $363,000 from the POP and POMF
accounts, which is all that remained of Lerner's investment after the Paiges used it
to pay Chancery Court costs and collect management and incentive fees.").

[8]    *See, e.g.,* Tr. 5/19/16 (Adv.Dkt. #328), p. 70, L: 17 - p. 74, L: 1.

allegations. *See generally* Appellees' Opening Arguments starting at Tr. 11/4/15 (Adv.Dkt. #249), p. 16, L: 23

With regards to my sister-in-law, they apparently hoped that she might recant her recent depositions, which she had filed to spare herself the burdens of testifying about issues on which she knew nothing. *See, e.g.*, Id., *but cf.* Jessica Paige's Affidavits at Exhibits A to our Motions (Adv.Dkt. #241 & #251).

When their "Perry Mason" moment failed to materialize because all three (3) of their witnesses inexplicably refused to spontaneously confess to multiple felonies and torts, they demanded judgment in their favor. Repeatedly. *See, e.g.,* LMF's Motions (Adv.Dkt. #275 & #293).

Instead, the Bankruptcy Court ruled in our favor *without ever hearing our defense*! *See generally* Opinion (Adv.Dkt. #303). Literally, we cross-examined only one (1) of the Appellees' three (3) witnesses, and we introduced only one (1) exhibit, which was admitted solely to allow the Court to understand my testimony. [I had referenced various documents, so the Court needed a list of those documents to interpret those references.]

In short, we prevailed using only the Appellees' evidence and the Appellees' evidence alone!

Even if we were to assume that these Appellees needed five (5) years to prepare for a trial based upon the chance that their adversaries might spontaneously

confess to serious felonies and torts, how did this case manage to make it to trial in the first place?

On August 9, 2012, we filed our Motion to Reconsider (Adv.Dkt. #50) the Bankruptcy Court's decision of August 1, 2012 (Adv.Dkt. #41), which granted the Appellee's Motion to Extend (Dkt. #35) and denied our Motion to Dismiss (Adv.Dkt. #4). Our Motion rested upon newly discovered evidence, which proved that Appellee Goodchild perjured himself when he falsely claimed to have "personally examined" us on documents that he had supposedly attained from the Trustee, but which - in fact - he subsequently admitted that he did not have.[9]

Likewise, we revealed to the Bankruptcy Court that the Appellees had failed to disclose controlling contrary authority [Orange Theatre Corp. v. Rayhertz Amusement Corp., 130 F.2d 185 (3rd Cir. 1942) and its progeny] that expressly forbade the Bankruptcy Court to enforce the Stipulation (Dkt. #40) that the

---

[9]     *See, e.g.*, Tr. 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I **personally examined** these debtors with respect to **the new** information that they had brought and the transfers that are -- were in the papers that were revealed to the trustee. That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added];

*But cf.* our Reply (Adv.Dkt. #64), Exhibits B - C (Appellee Goodchild's August 17, 2012 letter admitting that he did not, in fact, have the documents he claimed to used to "personally examine" us: "Please note that any documents previously produced to the Trustee in this matter were not also produced to Lerner, …").

Bankruptcy Court had enforced in violation of that undisclosed authority. *See generally* Opinion (Adv.Dkt.#40) and Order (Adv.Dkt. #41).

This issue arose solely because our former attorney inadvertently signed an erroneous Stipulation (Dkt. #40), which purported to authorize Mr. Goodchild to unilaterally reverse any decision from the Bankruptcy Court contrary to his client's wishes. *See* Dkt. #40, p. ("NOW, THEREFORE, the parties stipulate and agree that if the Court **denies** Lerner's Motion, Lerner shall have five (5) days from the date of the Court's order to file a complaint to determine dischargeability.") [emphasis added].

No one has ever explained how or why the Appellees believe that parties can *prospectively* agree to nullify a court decision, thereby rendering that court's opinion an unlawful advisory opinion and exercising a power that court doesn't have (namely, the power to grant extensions without cause).

Far from denying their non-disclosure, the Appellees sought to justify it: "Debtors' argument that a stipulation between counsel cannot form the basis for 'cause' to extend the filing deadline misunderstands that the cause analysis is separate and apart from the question of whether to enforce the joint stipulation." *See* LMF's Response (Adv.Dkt. #58), p. 3, n. 2 ( (internal citations omitted).

Of course, we did not address their contractual arguments because they had expressly waived their contractual argument: "Lerner's showing of cause permits this Court to deem Lerner's Complaint timely filed without the need to assess

whether to enforce the December 6, 2011 stipulation." LMF's Response (Adv.Dkt. #9), p. 4.

Regardless, their proposed distinction between "cause" and "contract" wasn't true either — Orange Theatre negates their contract theory as well because contracts cannot trump public policy. *See, e.g.*, In re Hurns, 1993 U.S. App. LEXIS 21875, *4 (9th Cir. 1993) ("Moreover, whether Hurns breached some private agreement not to raise timeliness of the complaint as a defense is irrelevant. C&B and Hurns could not stipulate to an extension of time without court approval."), *and see* Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 584 (1st Cir. 1994) (courts - not contracts - control dockets); *and see* 17A Am. Jur.2d Contracts § 237 (invalidating contracts against public policy.).

In lay terms, their "distinction" was patently absurd: if Orange Theatre does ***NOT*** preclude parties' attempts to contract around the "cause" requirement, then Orange Theatre never applies to any case ever since - by definition - that line of authority only applies to cases in which counsel have attempted to contract around the "cause" requirement.

Throughout this ordeal, we have tried as best we could to force an early resolution or trial of the issues discussed herein.[10]  In stark contrast, the Appellees were "content" to wait,[11] despite the fact that they supposedly believed that we were squandering *their* money on *our* defense.  *See, e.g.,*  Tr. 7/16/13 (Adv.Dkt. #118), p. 6, L: 21 *et seq.*

Despite <u>both</u> our frustration <u>and</u> their curious lack of interest in the welfare of their "own" assets, the Bankruptcy Court repeatedly deferred its adjudication of these issues until it ruled upon the merits of the Appellees' Complaints (Adv.Dkt. #1 & #81).  *See, e.g.*, Appellees' Letter (Adv.Dkt. #224); *and see* Orders (Adv.Dkt. #211 & #231).

Consequently, none of these issues were appealabl*e until now.*

---

[10]    *See* LMF's Response (Adv.Dkt. #142), p. 1 ("**Apparently frustrated** by the fact that the nine motions they previously filed against Lerner Master Fund, LLC ('LMF') in this adversary proceeding (including motions for summary judgment and for sanctions) remain pending, Debtors Michele Paige and Christopher Paige ('Debtors') have now filed what they acknowledge are three 'highly repetitive motions.' Adv. Dkt. No. 138 at p. 11. **Perhaps to attempt to force a ruling**, the following three recent filings by Debtors primarily repeat the same arguments that they have previously presented to this Court...") [emphasis added].

[11]    *See*  LMF's Response (Adv.Dkt. #142), p. 14 ("...(2) the fact that LMF is **content to wait** for a ruling from this Court on the numerous pending motions, rather than continually flood the Court with repetitive motion after repetitive motion.") [emphasis added].

## B. *ORDERS APPEALED*

We appeal from the Bankruptcy Court's final judgment [Order (Adv.Dkt. #350)], which denied our Motions for Sanctions [Adv.Dkt. #67, #139, #233, #288 & #290].

Although we believe that an appeal of a final order necessarily includes an appeal of the related interlocutory orders (which either implicitly or explicitly were included in the final judgment), we will - out of an abundance of caution - further specify that we appeal from any and all related interlocutory orders, as specified in our Notice of Appeal, to the extent that those previous decisions related to our requests for discovery in support of our Motions and/or to the admissibility of our evidence in support of those Motions.

In addition, we appeal from any and all interlocutory orders relating to the timeliness of the Appellees' Complaint (Adv.Dkt. #1).

More specifically, the interlocutory orders at issue in our appeal include — but are not limited to — Order (Adv.Dkt. #41), which relates to LMF's Motion to Extend (Dkt. #35) and our Motion to Dismiss (Adv.Dkt. #4); Orders (Adv.Dkt. #212 & #315), which relate to our discovery requests in support of our Motions for Sanctions, and Order (Adv.Dkt. #348), which relates to our evidence in support of our motions for sanctions.

IX. **SUMMARY OF THE ARGUMENT: In Litigation, Does Anything Go? Are Trials Perfectly-Acceptable Substitutes for Discovery? Does Ignoring Controlling Contrary Authority on Sanctions Constitute an "Abuse of Discretion"?**

Is litigation the legal and moral equivalent of a bar-room brawl? Are we just supposed to assume that parties and their attorneys should use any and all means, whether fair or foul, to advance their claims? When did lying, deception, and fraud become just more arrows in every litigant's quiver? *But cf.* Theokary v. Shay (In re Theokary), 592 Fed. Appx. 102, 108 (3rd Cir. 2015) ("The submission of fabricated evidence, **regardless of the merits or validity of the underlying claim,** always constitutes egregious misconduct.") [emphasis added].

Does it matter that these Appellees attained a seventy-eight (78) day extension to the sixty (60) day, Congressionally-mandated filing deadline[1] by *falsely* claiming to have initiated discovery from the Trustee in September 2011 (months *before* the filing deadline) when, in fact, they subsequently admitted they did not initiate that discovery until September 2012 (almost twelve (12) months *after* the filing deadline)?[2] Does it matter that their false claim regarding the timing of their initial discovery request to the Trustee was their "cause" for an extension?[3]

Does it matter that they hid controlling contrary authority [Orange Theatre Corp. v. Rayhertz Amusement Corp., 130 F.2d 185 (3rd Cir. 1942) and its progeny] from the Bankruptcy Court, thereby causing that Court to issue an erroneous

1

*published opinion*[4] that directly contravened that undisclosed authority?[5]   Or is hiding controlling contrary authority, thereby inducing an erroneous published opinion, just "clever" lawyering?

Does it matter that these Appellees testified under oath that they had "personally examined" us on documents that they subsequently admitted they didn't have?[6]   That they subsequently claimed to believe didn't exist?[7]   Does it matter that they claimed their questions at the 341 regarding those "non-existent" documents constituted further "cause" for an extension?[8]

***In short, are parties who believe they are entitled to an extension thereby permitted to lie in order to advance that claim?***

Does it matter that the Appellees 523 Claims against me were predicated upon a factual allegation[9] that they had expressly denied under oath — repeatedly?[10]

Does it matter that their 523 Claims against my wife and I were predicated upon a factual allegation[11] expressly contradicted by their own testimony,[12] their own production.[13] and their own Trial Exhibits?[14]

Does it matter that they told the Trustee their only evidence for their 727 Claims was that we were "smart" and "sophisticated"?[15]   Are those reasonable grounds to accuse us of perjury, fraud, embezzlement, and theft?   *But cf.* Brubaker Kitchens, Inc. v. Brown, 280 Fed. Appx. 174, 186 (3rd Cir. 2008) ("We agree with the District Court that before one levels accusations of tortious and malign

2

behavior against another person and imposes on that person the financial, temporal, and emotional strain of defending a federal lawsuit, one had better have more than a vague belief based on bad feelings and a stray comment that the accused was 'involved.'").

Do you know what the Trustee's Counsel - the attorney everyone agrees the Bankruptcy Court appointed to investigate fraudulent transfers and other potential objections to discharge[16] - testified when asked what evidence the Appellees had presented to the Trustee in support of their 727 Claims? "None."[17]

If they had evidence, why did they withhold that evidence from the Trustee? *But cf.* In re Farhid, 171 B.R. 94, 97 (N.D. Cal. 1994) [also cited at p. 7 Opinion (Adv.Dkt. #40)]: "In addition, **if there is something running around there where assets are being hidden or anything else**, the trustee still has full power to go after assets and I am concerned that if the moving party were acting in good faith, **the first thing the moving party should have done is contact the trustee and lay all this out for the trustee**." [internal citations omitted] [emphasis added].

If they did *not* have any evidence to share with the Trustee, why did they sue us?

Does it matter that they continued litigating against me for years *after* they had offered to settle their claims against me for absolutely nothing?[18]   In other

words, were they allowed to litigate against me *as leverage* in their negotiations against my wife?

In short, did the Bankruptcy Court correctly hold that the Appellees should have ignored ***their own evidence*** in assessing the merits of their claims?  Is it true that ***any*** evidence, no matter how slight, and/or ***any*** possibility, no matter how remote, that discovery might yield new evidence sufficient to justify litigation based upon factual allegations the plaintiff believes to be false?  ***In other words, are you entitled to sue someone on allegations that you believe to be false on the off-chance that future discovery might prove your OWN testimony, documents, and admissions are erroneous and/or perjurious?***

***Do warnings matter?***   Does it matter that they failed to heed explicit warnings from us, the Bankruptcy Court, and that Court's appointees that their claims were - at best - problematic, if not delusional?[19]  If litigating claims without conducting additional discovery ***after*** a credible, independent, court-appointed peer warns you that you're "tilting at windmills,"[20] isn't evidence of bad-faith, what is?

Throughout its Opinion (Adv.Dkt. #349), the Bankruptcy Court asserts parties can litigate ***anything*** as long as ***something*** might turn up.   *See, e.g.,* Opinion (Adv.Dkt. #349), p. 4 ("While this was never established at trial, the specific question critical here was whether this allegation was 'likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.'").

4

Laughably, even the Appellees disagree with the Bankruptcy Court regarding the importance of discovery. *See, e.g.,* LMF's Motion (Adv.Dkt. #194), p. 2 ("Rule 9011 of the Federal Rules of Bankruptcy Procedure does not permit litigants to manufacture incredibly serious accusations of illegal and immoral conduct with no factual support, and then engage in a fishing expedition to find out if any good faith basis for making such allegations happens to exist.").

Regardless, when did *actually following through* with discovery become optional?[21]   Does it matter that they failed to seek the testimony of obviously-material witnesses;[22] that they failed to conduct reasonable discovery[23] — including, but not limited to their failure to pick-up their own discovery requests?[24]

Does it matter that the Appellees lied *under oath* about the questions they had asked us at the 341 meetings?[25] Does it matter that they cited those imaginary questions as proof of their "due diligence"?[26]

Does it matter that they ignored obviously dispositive evidence?   *But cf.* Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3rd Cir. 1987) ("Notwithstanding the emphasis on the time of initial submission, however, parties will not be entitled to continuing immunity if they acquire *or should acquire* knowledge under the Rule's standard before a later filing. Subsequent papers must be judged by the information when they are filed.") [emphasis added].

Here, my "sloppy books" were reviewed *and corrected* by independent custodians, auditors, and administrators (aka. accountants),[27] so why weren't these

Appellees obligated to ask those eyewitnesses - the people who actually held and accounted for the money at issue - what they knew even if we assume my "sloppiness" in *the rough drafts* of documents actually created by those third parties?

Regardless, can parties continue relying upon discovery's "potential" years *after* they've voluntarily abandoned their discovery efforts?[28]

*In short, they presented no evidence to the Bankruptcy Court;[29] they presented no evidence to the Trustee;[30] they ignored their own testimony, documents, admissions; they conducted no further discovery AFTER they were warned their allegations were dubious at best; they didn't bother to speak with the people who actually held the money and kept the books; if that isn't frivolous, bad-faith litigation, what is?*

Did these Appellees have to justify all of their claims or only some of them? Please note that the Bankruptcy Court's Opinion (Adv.Dkt #349) never mentions the Appellees' 727 Claims. Was the Court running some sort of "Buy One, Get One Free" promotion?

Does it matter that their 727 Claims were based upon their false assertion that we had destroyed documents[31] when, in fact, those allegedly "missing" documents were sitting on their hard-drive all along?[32]

Does it matter that they never presented any evidence — or even any specific allegations[33] - to substantiate their 727 Claims?[34]

6

Does it matter that their 727 Claims didn't matter, even if true?[35]

*Thus, was the Bankruptcy Court correct when it held that filing an allegedly non-frivolous 523 Claim operates as some sort of magical talisman* that immunizes any and all actions that a party and/or its attorneys might take to advance that Claim AND that relieves those parties of any further discovery obligations AND that allows those parties to append any and all other claims they desire to their allegedly non-frivolous 523 Claim?

Finally, the Bankruptcy Court's Opinion (Adv.Dkt. #349) resorts to utterly sexist and homophobic "reasoning" that contradicts its own prior holdings on the same subject!  According to Judge Thomas, threatening to rape and sodomize a woman over a business dispute is *NOT* evidence of personal antipathy.  Likewise, referring to me, her husband, as a "faggot" is *NOT* evidence of personal antipathy. *See* Opinion (Adv.Dkt. #349), p. 5 ("I, too, cannot find evidence in this trial of a personal antipathy against the Paiges.").  That's disgusting.

Regardless, we should have been able to seek discovery on this issue.[36]  That is, this Court cannot simply assume there's some unspecified innocent explanation for such vile comments.

To put it another way, if these Appellees were *NOT* motivated by personal animus, then what motivated them?  A desire for a monetary recovery?  Nope, they denied that repeatedly.[37]

Besides, Judge Thomas previously opined that Delaware's Chancery Court held those vile emails were proof of personal animus, rather than discriminatory animus. *See* Opinion (Adv.Dkt. #72), p. 6 ("The case is regrettably colored by one additional factual dimension. During the course of the discovery phase of the Delaware litigation, a number of LMF's internal email conversations referring to the Paiges in sexually derogatory language was uncovered. While crass and insulting, the Court of Chancery found that the conversations were a mere byproduct of LMF's frustration with Michele Paige's perceived lack of business acumen and professionalism. **They were not indicative of any intent or attempt to harass or discriminate**.") [emphasis added].

How could the Bankruptcy Court revisit and reverse its own prior holding without explanation or warning?  And how could he reverse the Delaware court's decision that he had quoted and relied upon?  *But cf.*  Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 192 (3d Cir. 2006) (Rooker-Feldman doctrine precludes federal courts "from entertaining an action . . . if the relief requested effectively would reverse a state court decision or void its ruling.").

Regardless, how could this Court suggest that such vile sentiments prove *neither* discriminatory animus *nor* personal animus?  Are you *literally* suggesting that these comments are such an ordinary and reasonable part of professional communications that no further explanation is required?   Can "professionals"

8

discuss racial minorities in similarly derogatory terms, or are women and perceived homosexuals the only "acceptable" targets of such discourse?

**X.    ARGUMENT: Does the Truth Still Matter, or Have Federal Courts Adopted the Law of the Jungle?  And Assuming that a Claim is Non-Frivolous When Filed, Does that Relieve a Party and/or Its Attorneys of Any Further Obligation to Investigate their Claims?**

Neither my wife nor I are very important people.  We have nothing to offer you in exchange for your judgment.  We have only the truth.  And a simple, naive faith that the rule of law still matters in this country.  I pray our faith is justified.

*A.    On its face, the Bankruptcy Court's Opinion (Adv.Dkt. #349) inexplicably contradicts both itself and reason, simultaneously asserting that objective-reasonableness both is and is not an absolute legal defense to allegations of subjective bad-faith.*

I'm not a particularly intelligent person, but I have been blessed with a modicum of commonsense, so I ask you a very simply question: why did this case take so long?  Since the Appellees' discovery efforts ended in October **2012**,[38] why did the trial begin more than three (3) years later on November 4, **2015**?  If my wife and I wanted to delay the trial, what was our motive for delaying our victory?  And how did we persuade the Appellees to file two (2) continuances to advance *our* agenda?[39]  And why did we file a Petition for a Writ of Mandamus to force the trial we supposedly wanted to delay?

Did we file four (4) times as many pleadings as the Appellees because we wanted to delay our victory or because our deteriorating health[40] made us increasingly desperate to overcome the Appellees' vexatiousness?  By the way, we filed approximately the same number of pages as the Appellees filed,[41] so why does it matter that we filed more numerous, but shorter filings?  Why is frequency,

10

rather than length or content, the relevant criterion?   Laughably, the Bankruptcy

Court expressly held that our frequent filings were *NOT* motivated by bad-faith.[42]

Just to be clear, the Bankruptcy Court *literally* held that a defendant with

stage three cancer should *not* file additional pleadings that even the Appellees

concede were designed to force that Court to resolve her bankruptcy,[43] so that she

can attain the medical care she needs[44] because lengthy delays (including a thirty-

eight (38) month continuance of a previously-scheduled trial) are perfectly

normal![45]

Well, at least it's not like Judge Thomas said that Congress wanted him to

expedite this sort of litigation.  Oh, wait - it is![46]

Likewise, how did we prevail under Fed.R.Civ.P. 52 *without presenting a*

*defense*, but lose repeatedly under Fed.R.Civ.P. 56?[47]  How could we be entitled to

judgment on *their* evidence, but not be entitled to judgment on their evidence?  If

these Appellees did *NOT* lie about their evidence in order to defeat our previous

dispositive motions, then how did they manage to forestall summary judgment for

more than five (5) years?[48]  Did they somehow "lose" their evidence in the run-up

to trial?  Or did we somehow fail to preserve these issues in *any* of our numerous

dispositive motions?[49]

Apparently, Judge Thomas believes that the merits of the Appellees'

allegations hinged upon the credibility of our testimony.  Yet, he previously denied

that proposition.[50]

11

But perhaps I am misinterpreting <u>Bullock</u> as it applies to this case. It's not like Judge Thomas said the Appellees' allegations were, "not even close" to the <u>Bullock</u> standard. Oh, wait - it is! *See, e.g.,* Tr. 11/12/ 15 (Adv.Dkt. #255), p. 172, L: 6 - 9 ("The [Chancery Court] already ruled regarding Michele Paige regarding a breach of fiduciary responsibility, but that's **certainly not even close to defalcation** as it's considered in the bankruptcy court.") [emphasis added].

Even if we had to take the stand to prove our innocence — and nothing could be further from the truth[51] — why wouldn't the merits of our Motions for Sanctions [Adv.Dkt. #67, #139, #233, #288 & #290] *also* depend upon *their* credibility? That is, why doesn't it matter that these Appellees denied the factual predicates of *their* 523 Claims under oath?[52] And why doesn't it matter that they admitted to the Trustee that they had no evidence whatsoever for their 727 Claims?[53]

Literally, Judge Thomas argues that these Appellee's subjective beliefs and actual knowledge don't matter because evidence contradicting *their* beliefs might have turned up in discovery. If that were true, it's impossible to file a complaint in bad-faith because you can't get any more frivolous or fraudulent *than filing claims you believe to be false!*

If these Appellees sincerely and reasonably believed that I had conspired with my wife to manage their money, then why did they testify under oath that they

didn't even know whether or not I existed?[54]  Are we supposed to believe that they

might have entrusted $40 million to an imaginary person?

Regardless, why did they testify under oath that they did *NOT* believe I

secretly managed their money?  Remember the whole point of certifying that my

wife owned and operated her hedge funds was to prove that I was *NOT* exercising

secret control over an allegedly woman-owned business;[55] if they thought that I

was in fact exercising such secret control over my wife's hedge fund, then why did

they swear that I did not?  Are we supposed to think that I invented their affidavits,

but that they were too "restrained" to point out that I was lying about the contents

of documents in their custody, possession, and control?  How can they assert that

they were entitled to sue us because they might have been helping me to defraud

New York State?

In other words, Judge Thomas *literally* ruled that they must have been acting

in good-faith because their prior testimony on the same topic might have been

erroneous and/or perjurious!  And he didn't even bother to compel them to explain

the innate contradiction between their prior testimony and their allegations in his

Court![56]

Remember too that Judge Thomas ruled in our favor on the merits of these

Appellees' allegations on March 11, 2016.  *See* Order (Adv.Dkt. #303).  So why

didn't he issue his judgment until *nearly ten (10) months later* on December 29,

2016?  *See* Order (Adv.Dkt #350).  If, as he asserts, we were challenging the merits

13

of the Appellees' Amended Complaint (Adv.Dkt. #81), then what was he doing for the past year? Didn't he rule on those merits in March? He needed nearly ten (10) months to figure out what he had written?

And if the Delaware Court's prior opinion essentially precluded our Motions, then why did Judge Thomas hold a six (6) day evidentiary hearing spread across three (3) years with testimony from five (5) witnesses?[57] How could such a lengthy hearing fail to generate *any* evidence worth mentioning? *But cf.* Tr. 5/19/16 (Adv.Dkt. #328), p. 90, L: 19 - 23 (THE COURT: "— it's apparent that I'm not going to be able to rule off the bench. Okay. It's apparent that I'm not going to be able to rule after this conclusion of this hearing…").

My point, of course, is not merely that Judge Thomas's Opinion (Adv.Dkt. #349) is erroneous; rather, my point is that it's irrelevant *to the facts of this case*. We did *not* challenge the legal sufficiency of the Appellees' Complaint (Adv.Dkt. #81), and Judge Thomas did not hold a six (6) day evidentiary hearing spread over three (3) years to assess the merits of *their pleadings*; rather, we challenged the Appellee's honesty and integrity in investigating and prosecuting their claims. We didn't claim that their allegations were facially frivolous or that their attorneys were rude; we claimed they were liars, who prosecuted claims they *knew* to be false.

In that context, the "objective" merits of their allegations *prior to discovery* are patently-immaterial. That is, courts do *NOT* assess the merits of an allegation

based solely upon the legal sufficiency of those allegations, if true.   Rather, they look to what the plaintiff actually knew *or should have known* regarding the truth or falsity of their claims.   *See, e.g.,* <u>Galardo v. Ethyl Corp.</u>, 835 F.2d 479, 482 (3rd Cir. 1987).

Here, the Bankruptcy Court simply ignored all extrinsic evidence of the Appellees' actual knowledge and beliefs, thereby resolving this case in a vacuum that ignored the undisputed facts of this case.   For instance, nobody can explain how some "sloppy bookkeeping" in my *rough drafts*[58] of documents actually created by independent third parties somehow translated into reasonable doubt regarding our financial affairs *despite the undisputed fact that our books were overseen, kept, and corrected* by an independent administrator, multiple independent custodians, and an independent auditor![59]   Yet, these Appellees insisted upon interrogating me *at trial*, rather than seeking evidence from those independent third-parties![60]   By that logic, a party could pursue a paternity claim without seeking a DNA test against anyone who "might" be the father!

In other words, the Bankruptcy Court is *literally* arguing that parties are free to ignore potentially dispositive evidence from third parties, but that's utterly ludicrous.   *See, e.g.,* <u>In re Miller</u>, 529 B.R. 73, 94 (Bankr.E.D.Pa. 2015) ("As has been often mentioned, this case took a dramatic turn after Mr. Kutkowski's March 18, 2011 deposition. After the deposition, the conduct of Ettinger violated Rule

9011(b)(1) and (3) and 28 U.S.C. §1927 and constituted willful and intentional misconduct and bad faith. Ettinger should have dismissed the case; but he did not.").

Regardless, even if the mere possibility that discovery might yield additional evidence were sufficient to justify the initial filing, that possibility can't explain why these Appellants filed an Amended Complaint (Adv.Dkt. #81) and continued litigating for more than three (3) years *after* they voluntarily abandoned their discovery efforts!  By definition, nothing they did after October 2012 (when they admit they abandoned their discovery efforts)[61] was contingent upon discovery.

Literally, the Bankruptcy Court held that these Appellees could skip discovery in favor of a trial because we might spontaneously recant eleven (11) volumes of prior testimony![62]  Laughably, the Bankruptcy Court *also* held that those eleven (11) volumes of prior testimony were corroborated![63]  If eleven (11) volumes of undisputed, corroborated testimony isn't sufficient to preclude additional litigation, then what is?

I know it's tempting to think that an objectively-reasonable claim can't be subjectively-fraudulent, but that ignores the fact that a plaintiff is often a fact witness who has actual knowledge of the truth or falsity of its allegations.  Here, this plaintiff and its counsel lied, and that's never legal.  A plaintiff cannot, for example, say, "Maybe Chris ran the hedge fund with his wife," when they've

already testified that they did *NOT* believe that I ran the hedge fund with my wife.[64]

Now I have to make a quick aside.  Granted, the Delaware Court said harsh things about me in dicta, but so what?

First, how could I have been found liable for what even these Appellees describe as allegations "yet to be litigated in any forum"?[65]  In other words, the fact that someone *who had not heard my defense* thought that I might have been guilty is *NOT* proof of anything other than the dangers of relying upon dicta.

Second, few principles are more firmly established than the proposition that a party cannot rely upon hearsay, like dicta, to attain a trial.  *See,  e.g.*, GFL Advantage Fund, LTD. v. Colkitt, 272 F.3d 189, 199 (3rd Cir. 2001) ("To defeat summary judgment, he 'cannot rest simply on the allegations in the pleadings,' but 'must rely on affidavits, depositions, answers to interrogatories, or admissions on file.'") [internal citations omitted].  Thus, even if dicta could justify filing a lawsuit, it could *NOT* justify litigating that lawsuit for more than five (5) years!

Third, the Delaware Court expressly held that I was *not* a fiduciary.[66]  So why were they suing me as a fiduciary?

To circumvent the Delaware Court's express rejection of the factual predicate of their 523 Claims against me (their assertion that I was a fiduciary), here's what they wrote regarding the elements of their aiding and abetting claim:

"The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary duty, (2) breach of that fiduciary duty, and (3) knowing participation in the breach. *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986)." LMF's Response (Adv.Dkt. #275), Exhibit A, Para. 220.

But here's what that citation *actually* says, "...(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in that breach by the **defendants who are not fiduciaries.**" Weinberger v. Rio Grande Indus., Inc., 519 A.2d 116, 131 (Del. Ch. 1986).

Notice what they omitted from their citation?  Literally, they were asserting that the state court held <u>both</u> that I was <u>and</u> was ***NOT*** a fiduciary, and they altered their citation to make that ludicrous argument seem plausible.

Significantly, they persisted in making this "mistake" even after I expressly cited a more recent authority from a higher court to point out their "mistake" to them.   *See* Our Reply (Adv.Dkt. #282), Para. 220; *but cf.* LMF's Response (Adv.Dkt. #293), Exhibit A, Para. 239 ("The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary duty, (2) breach of that fiduciary duty, and (3) knowing participation in the breach.").

Look, if they wanted to rely upon dicta to assert that I had been held liable as a NON-FIDUCIARY, why were they entitled to lie about the law in order to claim that I had been held liable as a FIDUCIARY too?

Similarly, a plaintiff can't claim they had lots of other evidence to support their 727 Claims after they've already admitted to the Trustee that their only evidence is the defendants' sophistication and intelligence.[67]   That they were *legally* obligated to share their evidence with the Trustee isn't my *legal* opinion; it's Judge Thomas's![68]

In short, the Bankruptcy Court held that extrinsic evidence of the Appellee's knowledge and intent was immaterial to our Motions for Sanctions.   If that isn't transparently, "contrary to law and reason," what is?

If taken literally, the Bankruptcy Court's Opinion (Adv.Dkt. #349) renders it impossible for anyone to commit sanctionable misconduct.   That is, if a party's own testimony, documents, and admissions are *not* sufficient to preclude the possibility that discovery will substantiate that party's allegations, then what could preclude the possibility that discovery will substantiate a party's allegations?   If you can sue people as long as there's some chance that your own testimony, documents, and admissions might prove erroneous, then what's to stop anybody from suing anyone for anything?

Quite simply, motions for sanctions frequently depend upon factual issues that can only be resolved *after* trial, as even the Appellees agree.[69]   Consequently, the Bankruptcy Court's decision to assess the merits of the Appellees' allegations based solely upon what they knew on the day they filed their Complaint (Adv.Dkt.

#1) is transparently erroneous. *See, e.g.,* Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3rd Cir. 1987).

B.     *The Bankruptcy Court's Opinion (Adv.Dkt. #349) contradicts its own prior rulings on the core issues in this adversary proceeding, thereby simultaneously asserting that an objectively-reasonable legal theory both is and is not an absolute legal defense to allegations of subjective bad-faith and that a fiduciary both can and cannot solicit a self-interested settlement.*

Indeed, if advancing an objectively-reasonable legal claim *NEVER* constitutes bad-faith, then what has this Court been doing for five (5)[70] years since everyone agrees that *our* legal positions in *their* breach of fiduciary duty claims were objectively-reasonable?[71]     If advancing an objectively-reasonable claim *NEVER* constitutes bad-faith, then why were we litigating LMF's allegation that our attempts to advance our objectively-reasonable claims constituted bad-faith? How can you uphold a decision that contradicts itself on its predicate legal theory? That simultaneously asserts that objective-reasonableness both is and is not an absolute legal defense to allegations of bad-faith?

Are you *literally* suggesting that "bad-faith" for purposes of 523 is broader than "bad-faith" for the purposes of sanctions and, thus, that sanctions require something *more than* quasi-criminal scienter?  *See* Bullock v. Bank Champaign, N.A. (In re Bullock), 133 U.S. 1754, 1759 (2013) ("We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code.").

20

According to the Bankruptcy Court's Opinion (Adv.Dkt. 349), only a prior judgment seems sufficient to prevent further litigation of an issue, but that's insane on these facts: here, the Chancery Court expressly held that I was *NOT* a fiduciary, but the Bankruptcy Court let these Appellees re-litigate that point.[72]   Indeed, this case only got to trial because the Appellees successfully persuaded the Bankruptcy Court to hold that my wife and I could *NOT* rely upon the Chancery Court's holdings! *See, e.g.,* Our Preclusion Motion (Adv.Dkt. #171).

After more than five (5) years of litigation,[73] it's not surprising that the Bankruptcy Court can't remember its own rulings, but the Bankruptcy Court's flip-flops render its Opinion (Adv.Dkt. #349) patently-absurd.   A court may not be required to explain its denial of sanctions, but it can't proffer a patently-erroneous explanation.

At the end, like at the beginning, the reader is left to wonder why this case took so long; how these Appellees managed to litigate for so many years based upon nothing more than speculation regarding the discovery they did not conduct anyway; and why the Court utterly ignored its own lengthy evidentiary hearing.

Remember these Appellees were *NOT* ready for trial as recently as September 2015 — nearly three (3) years after they had abandoned discovery. *See, e.g.,* Appellees' Memo (Adv.Dkt. #225).   How is that possible?   How does a plaintiff get a second continuance *after* they have already attained a thirty-eight (38) month continuance of a previously-scheduled trial?   That is, the Bankruptcy

Court's Opinion (Adv.Dkt. #349) *literally* asserts that these Appellees were "surprised" when my wife, my sister-in-law, and I did **not** spontaneously confess to perjury and various other felonies and, thus, that they couldn't possibly have predicted how their case would "manifest" at trial.

If that's a serious argument, if a party can litigate on the off-chance that its opponents might spontaneously confess to various felonies and torts, then both sanctions and Fed.R.Civ.P. 56 are dead letters because the possibility of a "Perry Mason moment" is a universal constant that applies to each and every case.

Indeed, the Bankruptcy Court's Opinion (Adv.Dkt. #349) is surreal. For five (5) years now, the Bankruptcy Court has indulged the Appellees' arguments that our attempts to solicit a self-interested settlement constituted a quasi-criminal breach of our fiduciary duties. Yet, what did we learn during the aforementioned evidentiary hearing on our Motions for Sanctions? That **they** had solicited a self-interested settlement offer from **us** while they were acting as fiduciaries to our other creditors! *See* the Appellee's Trial Exhibit #36; *and see* Hass v. Hass (In re Hass), 273 B.R. 45, 52 (Bankr.S.D.NY 2002) ("Rather, once a creditor-plaintiff brings a Section 727(a) action, she 'becomes like a trustee' in the sense that the Section 727(a) action benefits all creditors of the estate."),[74] cited at LMF's Response (Adv.Dkt. #108), p. 7.

So do these Appellees believe that fiduciaries can seek self-interested settlements or don't they? Even if they reasonably, sincerely, and in good-faith

believe that point is "unsettled," how can they reasonably, sincerely, and in good-faith believe that we committed a "quasi-criminal" act by taking *their* position on that "unsettled" point of law?

C.      *They lied repeatedly.  Don't take my word for that proposition, take theirs!*

For brevity's sake, let's discuss just three (3) of the lies these Appellees used to prevent summary judgment for more than five (5) years:

When we sought judgment based upon the Delaware court's finding that my wife's contractual theories were objectively-reasonable, the Appellees asserted that finding was immaterial because our lawyers had invented those contractual theories sometime *after* May 2010.[75]

Except they also asserted that I had invented those same theories in early 2009.[76]

And how could they have a sincere, reasonable, good-faith basis to believe that they knew what our attorneys had told us while they simultaneously asserting that we had *NOT* waived privilege.[77]

Likewise, when I sought summary judgment based upon the fact that they were suing me for my work as an attorney, the Appellees vehemently denied suing me as an attorney,[78] bizarrely claiming that the Bankruptcy Court had "misunderstood" their allegations.[79]

At least, that's what they alleged when they weren't suing me for my legal work!  *See, e.g.*, LMF's Response (Adv.Dkt. #345), p. 4 ("At trial, LMF presented

evidence regarding the significant involvement and control Christopher Paige had in Debtors' hedge fund and his role as *the architect of Debtors' litigation strategy against LMF.*") [emphasis added].   So when is an attorney acting as a "legal architect" and when is he acting as "an attorney"?

Finally,   the Bankruptcy Court expressly held that LMF could sue my wife for legal malpractice.[80]  When she pointed out that she was *NOT* an attorney, LMF spent years arguing that she was.[81]

Yet, they never bothered to investigate that claim in any way, despite the fact that her Bar status was a matter of *public record* — a public record that these Appellees actually cited in this case![82]

If plaintiffs can block summary judgment by disputing the accuracy of public records that they actually cited, then what in the world constitutes frivolous, vexatious litigation?  And if parties can dispute the accuracy of public records, then wouldn't they have to do something to investigate that dispute?  Like asking my wife whether or not she's an attorney?

D.    *We clearly, unambiguously, and repeatedly stated that our Motions challenged the Appellees' integrity and honesty in investigating and prosecuting their allegations, not the merits of their Complaint (Adv.Dkt. #81).*

Let me quote a small portion of our voluminous preservation of the nature of our Motions:

"They lied, and they scarcely bother to deny it." *See* Our Post-Hearing Brief (Adv.Dkt. #335), p. 1.

"It's not everyday that someone responds to allegations that they're lying by lying, but — then again — everything about this case is extraordinary!" *See* Our Reply Brief (Adv.Dkt. #336), pp. 1 - 2.

"After five (5) years of litigation, twenty-six (26) hearings, and more than nine thousand (9000) pages of pleadings [their complaints, briefs, motions, responses, and other court filings], these Respondents [LMF, Morgan Lewis, and John Goodchild] rested without calling a single witness who supported *any* of their allegations, which were further belied by the Respondents' own pleadings, *their* prior testimony, *their* trial exhibits, *their* production, and the testimony of *every* witness — including, but not limited to the testimony of their star witness Jessica Paige, neutral parties Trustee Oleyar and Attorney Christman, and court-officer Attorney Spott." *See* Our Correspondence (Adv.Dkt. #339), p. 2.

"They [the Appellees] lied about everything according to them and you." Tr. 5/17/16 (Adv.Dkt. #326), p. 5, L: 8.

"In other words, they lied repeatedly." Id. at p. 47, L: 2 - 3.

"Through careful review of this Court's record and the respondents' statements and actions, therefore, we will prove by clear and convincing evidence they lied willfully, repeatedly, maliciously, and at the conclusion of the evidence, we'll ask you to punish them accordingly." Id. at p. 57, L: 14 - 18.

E.   *Laughably, Judge Thomas previously admitted that our Motions attacked the Appellees' honesty and integrity in investigating and prosecuting their claims, rather than the merits of their Complaints (Adv.Dkt. #1 & #81).*

Laughably, Judge Thomas previously admitted that our Motions challenged the Appellees' honesty and integrity in investigating and prosecuting their claims, rather than the merits of their Complaints (Adv.Dkt. #1 & #81):

> "THE COURT:   I understand.   I'm trying to reduce it [our Motions] to a simple state.
>
> MR. PAIGE:  Right.
>
> THE COURT:   Because I think essentially you're saying they didn't prosecute their complaint, but then you're adding this, you're saying you have evidence that they knew what they said in the complaint was false.
>
> MR. PAIGE:  Right.
>
> COURT:  And if that's what you're saying, that's fine
>
> MR. PAIGE:  Right.  They knew it was false.
>
> THE COURT:  And you're going to establish that and you're saying -- and **you're saying that on numerous occasions during the course of the trial counsel lied to the Court.**
>
> MR. PAIGE:  Yeah.
>
> THE COURT:   **Those are the two essential issues in your sanction motions**.
>
> MR. PAIGE:  Right.
>
> THE COURT:  Is that a fair statement?
>
> MR. PAIGE:  Right."

Tr. 5/17/12 (Adv.Dkt.#326),  p. 81, L: 14 - p. 82, L: 8

F.    *Incredibly, however, the Bankruptcy Court's Opinion (Adv.Dkt. #349) utterly ignores the issues raised in our Motions as defined by the Bankruptcy Court!*

Having defined our Motions as an attack upon the Appellee's honesty and integrity in investigating and prosecuting their claims, the Bankruptcy Court's Opinion (Adv.Dkt. #349) proceeds to ignore those issues entirely, magically transforming our Motions into an attack upon the legal sufficiency of the Appellees' Amended Complaint (Adv.Dkt. #81).

Let me quote Judge Thomas's "new and improved" version of our Motions: "The Paiges argue that the allegations made in the Amended Complaint have no basis in fact or law and that counsel violated Rule 9011 by filing and later pursuing that Complaint against them." Opinion (Adv.Dkt. #349), p. 7.

Furthermore: "I believe the essence of the Paiges' argument supporting this claim is that LMF advanced the Complaint with as weak a case as it manifested at trial." Opinion (Adv.Dkt.#349), p. 8.

And how could we have attacked LMF's Amended Complaint (Adv.Dkt. #81) through our Motion for Sanctions (Adv.Dkt. #67), which we filed more than a month earlier?  Were we psychics?

Not surprisingly, the Bankruptcy Court's decision to answer questions that nobody had asked led to a patently-erroneous result.

G.    *The Bankruptcy Court's error constitutes an abuse of discretion because it ignores the applicable authority, which clearly state that the merits of a party's complaint cannot justify or excuse that party's misconduct in its investigation and pursuit thereof.*

27

In his Opinion (Adv.Dkt. #349), Judge Thomas reversed well-settled authority on sanctions, thereby unlawfully transforming our trial into a bar-room brawl governed solely by the principle that "anything goes."

In contrast, we're asking you to uphold the Third Circuit's previous decision in <u>Theokary v. Shay (In re Theokary),</u> 592 Fed. Appx. 102, 108 (3rd Cir. 2015) ("The submission of fabricated evidence, **regardless of the merits or validity of the underlying claim,** always constitutes egregious misconduct.") [emphasis added].

We're asking you to rule that a party can't lie to attain an extension, even if its underlying complaint has merit.

We're asking you to hold that a party can't withhold controlling contrary authority governing its request for an extension, regardless of the "merits" of its claims.

We're asking you to hold that a party can't make allegations belied by its own production, its own testimony, and its own Trial Exhibits.

We're asking you to hold that a party can't make allegations belied by its own prior testimony, documents, and admissions.

We're asking you to hold that a party can't append frivolous allegations to non-frivolous allegations.

We're asking you to hold that a party can't sue people based upon general suspicion.

We're asking you to hold that a party can't accuse defendants of illegal and unethical conduct after they admit that they don't have any evidence for those allegations.

We're asking you to hold that a party can't fail to investigate its claims, thereby remaining in blissful, but deliberate ignorance of the facts until trial.

H.   *Unlike the unsuccessful movant in <u>Moeck v. Pleasant Valley School District</u>, our Motions rested upon a complete trial record, and the lies at issue related to dispositive issues.*

Unlike the unsuccessful movant in <u>Moeck v. Pleasant Valley School District</u>, our Motions rested upon a complete trial record.  *But cf.* <u>Id.</u> at 4 ("The District Court, having the benefit of fully briefed summary judgment motions and a voluminous record, further explained that the factual issues identified in Defendants' sanctions motions would be best resolved at summary judgment or trial.").

Likewise, the lies at issue here related to dispositive issues.  *But cf.* Id. at n. 8 ("In addition, many of the alleged falsehoods Defendants rely upon are immaterial.").

In stark contrast to <u>Moeck</u>'s immaterial lies, these Appellees' lies were dispositive.  Neither the Appellees nor the Bankruptcy Court can have it both ways: either there was no reason whatsoever to waste five (5) years litigating this

case, or the Appellees lied to thwart our dispositive motions, which - by definition - compels a finding of bad-faith. *See, e.g.,* In re Gioioso, 979 F.2d 956, 961 (3rd Cir. 1992) (holding that a party's reliance upon false statements to defeat dispositive motions "compels" a finding of bad-faith).

There's just no other way to explain how we managed to attain judgment *without presenting a defense* while simultaneously castigating us for filing "too many" dispositive motions. *See, e.g.,* LMF's Opposition (Adv.Dkt. #74), p. 26 ("Debtors also filed, simultaneously, seven dispositive motions that were unreasonable and burdensome because of their overlapping and duplicative nature.").

I. *The Bankruptcy Court's Order (Adv.Dkt. #350) suggesting that threatening to rape and sodomize a woman while referring to her husband as a "faggot" is NOT evidence of "personal antipathy" shocks the conscience.*

If threatening to rape and sodomize a woman over a business dispute is *NOT* evidence of personal antipathy, what is? If simultaneously referring to her husband as a "faggot" is *NOT* evidence of personal antipathy, then what could be? *See* Our Hearing Exhibits KK.

Indeed, the Bankruptcy Court's shocking indifference to our direct evidence literally contradicted its own prior holding! In this Opinion (Adv.Dkt. #349), he writes: "Just as in the Delaware case, the Paiges argued before me that LMF had a 'personal antipathy' to injure Michele Paige. The Delaware Chancellor found no

support for that argument despite a chain of tasteless emails among LMF associates." Opinion (Adv.Dkt. #349), p. 5.

That's funny, because he previously held the Delaware Court did *NOT* rule upon that issue!  Let me quote Judge Thomas again: "There is simply no law prohibiting an entity from acting wholly within his contractual rights but for the wrong reasons. The Delaware Court found that LMF had every right to demand return of its 40 million dollar investment. Therefore, its subjective motivation for the request is irrelevant." *See* Order (Adv.Dkt. #72), p. 6.  So which of Judge Thomas's mutually-exclusive interpretations is correct?   Were their motives litigated in the previous case or weren't they?

And let's remember what he's actually holding: he's *literally* saying that threatening to rape and sodomize a woman while referring to her husband as a "faggot" is *NOT* evidence of personal antipathy or bias!  If that doesn't shock the conscience, nothing could.

J.   *The Bankruptcy Court's apparent exclusion of our direct evidence of the Appellees' bad-faith is patently-erroneous because evidence of bad-faith is not inadmissible merely because it damages the Appellee's case.*

Weirdly, Judge Thomas apparently excludes Our Exhibit KK while simultaneously referencing those emails in his Opinion (Adv.Dkt. #349).   More significantly, he previously admitted those emails![83]  Thus, his apparent ruling at Adv.Dkt. #348 may be a clerical error.

Regardless, any reversal of his prior ruling would be patently-erroneous: the Appellees' statements about us relating to this dispute cannot be excluded on any grounds, particularly where - as here - their motives are at issue *as even they concede*.[84]   That is, a party does not get to object to its own admissions merely because those admissions expose their allegations as frauds upon the tribunal!

Here, these admissions prove that the parties were engaged in settlement talks long before March 10, 2010, thereby directly negating their entire theory of the case (which presupposed that we initiated this dispute on or about March 10, 2010, and, thus, that we could not sincerely believe that we were entitled to make a settlement offer to them).   Literally, these vile emails prove that LMF's executives were complaining about our prior settlement offers despite the fact that these Appellees claim to believe that those prior settlement offers do *NOT* exist! Laughably, LMF's executives are cursing us *in those vile emails* for failing to send them a "self-interested" settlement offer even as they supposedly believe that doing so would have constituted a breach of fiduciary duty!

Bizarrely, the Appellees deny that we've summarized their theory of the case correctly, but when the Bankruptcy Court actually litigated this precise issue, they said nothing while the Court ruled in our favor!  *See, e.g.,* Tr. 1/20/16 (Adv.Dkt. #297), p. 53, L: 2 - 22 (overruling LMF's objection under Fed.R.Evid. 408 because

this evidence rebuts the Respondents' false denials of the ongoing settlement talks referenced in these emails).

Likewise, evidence of bigotry and malice cannot be excluded merely because it makes the Appellees appear bigoted and malicious. *See, e.g.,* US v. Cross, 308 F.3d 308, 325 (3rd 2002) ("Rule 403 does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury. It does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone. We cannot agree with Appellants' argument that highly probative evidence of their intent and motive would have been kept out under Rule 403 merely because the evidence posed some risk of unfair prejudice.").

## XI.   CONCLUSION & RELIEF SOUGHT: Justice

If, as the Bankruptcy Court assumes, these Appellees had some reasonable, good-faith explanation for those vile emails, this litigation, and their half-hearted investigation, then why didn't they offer that explanation on the stand?  Or are we just supposed to assume that everyone threatens to rape and sodomize women over business disputes?  And are we just supposed to assume that "faggot" is now an acceptable part of ordinary business discourse?  If so, can the "N" word be far behind?  Or are women and perceived homosexuals the only people beneath this Court's protection?

Even if we were to consider only what they knew on the day they filed their Complaint (Adv.Dkt. #1), they couldn't possibly have believed that I secretly ran my wife's hedge funds *after* they had testified that I did not.

They couldn't possibly have believed that we initiated this dispute in March 2010 *after* they had testified those negotiations began much earlier and despite their internal correspondence documenting those written offers.

They couldn't possibly have believed that we had transferred money to corporate entities that also owed them money in order to hide that money from them.

They couldn't possibly have believed that we had committed bribery and/or extortion in relationship to this bankruptcy despite their failure to produce a scintilla of evidence — or even a specific allegation — in support of that claim.

34

They couldn't possibly have believed that we destroyed documents of which they already had a copy.

They couldn't possibly have believed that we lied at the 341 meeting despite their failure to produce a scintilla of evidence — or even a specific allegation — in support that claim.

They couldn't possibly have believed in any of their 727 allegations after they told the Trustee that they didn't have any evidence for those claims and despite the fact that they subsequently denied making 727 allegations.

They couldn't possibly have believed that we had stolen and/or hidden their money while simultaneously believing it was unnecessary to depose and/or otherwise speak with our accountants, auditors, and custodians (aka. the people who *actually* held and accounted for their money).[85]

Ultimately, therefore, the Bankruptcy Court's Opinion (Adv.Dkt. #349) flouts both law and reason because it rests upon three (3) clear and obvious legal errors:

1. That filing an allegedly objectively non-frivolous complaint somehow immunizes any and all other actions that a party and/or its attorneys might take in support of that claim — including, but not limited to lying to attain an extension, lying to fabricate evidence, and lying to create additional claims;

2. That filing an allegedly objectively non-frivolous complaint somehow relieves a party of any further obligation to investigate its allegations, so that as

long as that party remains *voluntarily* ignorant of the relevant facts, it may litigate its claims for years with impunity; and

3. That a party can file a claim that it *actually* knows to be false so long as discovery might prove that party's own testimony, documents, and admissions were erroneous.

That's simply not the law.  That cannot become the law.  My wife has stage three cancer and no funds to fight that disease or support our three small children; so - surely - you aren't going to hold that she had to litigate this case for more than five (5) years because they couldn't be bothered to investigate their claims and/or because they had to wait for "trial" to assess the merits of their allegations. "Chris's testimony raised doubts" doesn't translate into, "I don't need to pick-up the documents I've requested" and/or "I don't need to investigate my claims by talking to the independent parties who actually maintained, corrected, and reviewed the books" and/or "I don't need to read my client's prior testimony." The fact that evidence might be developed through discovery isn't an excuse to skip discovery, and it certainly isn't an excuse to keep litigating *after* discovery concludes.

At most, the Bankruptcy Court's Opinion (Adv.Dkt .#349) proves that these Appellees had the right to file their 523 Claims; it simply can't prove anything else because it doesn't address anything else.  The relevant question, however, is *NOT* whether or not these Appellees had a reasonable basis to file in the abstract; rather,

the question is whether or not they had a reasonable basis to litigate these claims in this way on these facts. If, as the Bankruptcy Court suggests, a party can litigate its claims for five (5) years based solely upon the possibility that the defendants might spontaneously confess at trial, then anybody can litigate anything against anybody.

By ignoring these Appellees' *actual* knowledge, their voluntary admissions to the Trustee regarding their complete and utter lack of evidence, their failure to conduct discovery, and their persistence in spite of the obviously exculpatory evidence available to them, the Bankruptcy Court flouted this Circuit's prior authorities on sanctions.

In lay terms, we gave them seventeen (17) months to investigate their allegations; they weren't entitled to re-file AND take five (5) years merely because they *preferred* to examine us at trial, rather than utilize Fed.R.Bankr.P. 2004, even assuming — for the sake of argument — that they needed to supplement our eleven (11) volumes of prior testimony. *See* our Motion for Sanctions (Adv.Dkt. #67), filed on March 1, **2013;** *and see* Tr. 1/5/12 (Dkt. #63) (COURT: "…you can use, you know, [a Rule] 2004 [examination] any time you want to to discover these facts.").

Similarly, the Bankruptcy Court's entire discussion of the "merits" of the Appellees' 523 Claims is utterly irrelevant to <u>both</u> the merits of their 727 Claims <u>and</u> the legality of the tactics they used to advance those Claims.

**WHEREFORE,** we respectfully request this Court reverse the Bankruptcy Court's Order (Adv.Dkt. #350); enter judgment in our favor; award us sanctions sufficient to deter LMF and its attorneys, given their financial resources; and end this case before my family and I suffer any more irreparable harms.

<u>Dated:</u> January 14, 2017          Respectfully submitted,


Christopher Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355


Michele Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

# ENDNOTES

[1]     *See, e.g.,* Opinion (Adv.Dkt. #40), p. 8 ("The Court finds that even if the stipulation extending the time to file a complaint is not upheld, independent grounds for such extension exists under Federal Rule of Bankruptcy Procedure 4007(c).").

[2]     Tr. 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I **personally examined** these debtors with respect to **the new information that they had brought** and the transfers that are -- **were in the papers that were revealed to the trustee**. That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added];

    *But cf.* Tr. 1/4/16 (Adv.Dkt. #287), p. 191, L: 2 - 11 ("[JOHNS]: And just to -- to be clear just in terms of dates, that was a September 11th, 2011 letter where we told you we had requested copies. [ME]: No. It was 2012 letter. September 2012 you told me that you had requested. It was definitely 2012, and I thought it was September 12th, maybe it September 11th, you could be right on that. And — [JOHNS]: **I think you're right. You corrected me on the year. So, about September 11th, 2012** — [ME]: Yes.") [emphasis added].

[3]     *See, e.g.,* LMF Response (Adv.Dkt. #9), p. 18, n. 6 ("An examination of the Paiges under Rule 2004 was not necessary here, since the information that Lerner sought from the Paiges - the canceled checks from the Paiges corporate entities - had already been requested by the Chapter 7 Trustee and was already slated for examination at the Section 341 meeting scheduled to resume on January 6, 2012.").

[4]     *See* Lerner Master Fund, LLC v. Paige (In re Paige), 476 B.R. 867 (Bankr. M.D.Pa. 2012).

[5]     According to the Respondents, the Bankruptcy Court's decision was the result of two (2) points: "More specifically, the Court's August 1, 2012 Order is premised upon two separate and independent conclusions: (1) the joint stipulation between counsel, extending the deadline, is enforceable, and (2) '[r]egardless of the enforceability of the joint stipulation' cause existed under the Federal Rules of Bankruptcy Procedure to extend the filing deadline because the Section 341 meeting of creditors was continued to a date beyond the filing deadline."  LMF Response (Adv.Dkt. #58), p. 2.

Of course, Orange Theatre forbade the enforcement of that alleged stipulation. *See, e.g.,* Orange Theatre v. Rayhertz Amusement Corp., 130 F.2d 185, 187 (3rd Cir. 1942) ("And our conclusion is that the Rules require court approval to make effective such stipulations as those here involved."); *and see* 1-6 Moore's Federal Practice - Civil 6.06(b) (citing Orange Theatre) ("A stipulation may serve as a basis for the court order that grants the requested relief, but it may not stand alone.  Because the court bears ultimate responsibility for its docket, the court must exercise full control over extensions of time.").

[6]     Tr. 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I **personally examined** these debtors with respect to **the new information that they had brought** and the transfers that are -- **were in the papers that were revealed to the trustee**. That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added];

*But cf.* Tr. 1/4/16 (Adv.Dkt. #287), p. 191, L: 2 - 11 ("[JOHNS]: And just to -- to be clear just in terms of dates, that was a September 11th, 2011 letter where we told you we had requested copies. [ME]: No. It was 2012 letter. September 2012 you told me that you had requested. It was definitely 2012, and I thought it was September 12th, maybe it September 11th, you could be right on that. And — [JOHNS]: **I think you're right. You corrected me on the year. So, about September 11th, 2012** — [ME]: Yes.") [emphasis added].

[7]     *See, e.g.,* LMF's Response (Adv.Dkt. #275), Exhibit A, Para. 180 ("**Despite this repeated statement to the contrary during discovery**, Debtors claim to have retained copies of the check stubs for their personal and corporate bank accounts, and provided them to the Trustee.") [emphasis added].

[8]      *See, e.g.,* Tr. 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I **personally examined** these debtors with respect to **the new information that they had brought** and the transfers that are -- **were in the papers that were revealed to the trustee**. That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added].

[9]      *See* LMF's Response (Adv.Dkt. #275), Ex. A, Para. 40 - 54; *and see* LMF's Response (Adv.Dkt. #293), Ex. A, Para. 308 ("Count II [sic] in LMF's Amended Complaint pleads that Mr. Paige is liable under section 523(a)(6) based on his role in *managing* LMF's investment,...") [emphasis added];

     *And see* LMF's Amended Complaint (Adv.Dkt. #81), Para. 46 ("As a result, **Christopher Paige** committed defalcation while acting in a *fiduciary capacity* with respect to Lerner's investment because he, along with his wife, was entrusted with managing Lerner's investment for Lerner's benefit,...") [emphasis added].

[10]     *See, e.g.,* Our Hearing Exhibit OOOO [Randy Lerner's deposition], p. 28, L: 19 - 20; 25 ("Can I ask a quick question of you? Is she [Michele] married?"; "I realize I never even knew that."). Do you really think they invested $40 million with a potentially imaginary person?

     *And see* Christopher Paige's testimony [Tr. 12/7/15 (Adv.Dkt. #274), p. 128, L: 12 17 - p. 129, L: 4 (documenting LMF's prior testimony in which their executives swore that I did not own or manage the entities at issue)]; *see also* Our Motion to Introduce Exhibit B (Adv.Dkt. #286), *citing* LMF's own production by Bates number (Paige 11804; Paige 17369; Paige 37645; Paige 38920; Paige 38277; Paige 37526) as corroboration of my testimony cited above.

[11]     *See, e.g.,* LMF's Response (Adv. Dkt. #275), Exhibit A, Para. 119 - 130; *and see* LMF's Response (Adv.Dkt. #293), Exhibit A, Para. 135 - 143 (repeatedly asserting that we breached our alleged fiduciary duties because there was no dispute between the parties prior to March 10, 2010).

[12]     *See, e.g.,* Our Hearing Exhibit OOOO [Randy Lerner deposition], p. 140, L: 20 - p. 141, L: 15 & Id. at p. 206, L: 9 - p. 211, L: 4 (Randy Lerner's discussion and acknowledgment of pre-March 14th settlement talks, including his receipt of his lawyer's written summary thereof).

[13]   *See, e.g.,* Our Hearing Exhibit KK (detailing LMF's threats to rape and sodomize my wife over a business dispute and discussing the ensuing settlement talks; please note that these emails began in late January **2009**, despite the Respondents' assertion that neither the dispute nor the settlement talks therein began until we initiated both more than a year later on March 14, **2010**.).

[14]   *See, e.g.,* Rob Bolandian email of **February 6, 2010**, at LMF's Trial Exhibit # 43 ("Let's discuss [Michele Paige's attached settlement offer] when you have time."); *and see* Rob Bolandian email dated **March 11, 2010**, at LMF's Trial Exhibit #44. ("We were surprised by the [settlement] documents you sent for our review and confused with the email below.").

[15]   *See* Attorney Christman's testimony [Tr. 5/18/16 (Adv.Dkt. #327), p.79, L: 11 - 21 (Q: Did he [Mr. Goodchild] tell you about any undisclosed bank accounts? A: I'm not sure that I can answer that question. I can explain that he told me that there could be accounts that we were dealing with people of great sophistication who, you know, had managed significant enterprises and significant amounts of money who are also, you know, very bright. And that there could very well -- and that you know, he believed that there may very well have been significant amounts of hidden assets.")]; *and see* Trustee Oleyar's testimony [Tr. 5/18/16 (Adv.Dkt. #327), p.96, L: 1 - 12 (discussing documents LMF provided and concluding that none of those documents justified an objection to discharge)].

[16]   *See, e.g.,* Order (Dkt. #57); *and see* Attorney Christman's testimony [Tr. 5/18/16 (Adv.Dkt. #327), p. 6, L: 4 - 13].

[17]   Tr. 5/18/16 (Adv.Dkt. #327), p. 79, L: 19 - 21 ("Q: And what evidence did he give you to substantiate that [727] allegation? A: None.");

   *And see* Id. at p. 52, L: 22 - p. 53, L: 9 (reaffirming that his investigation yielded no evidence supporting an objection to discharge).

[18]   *See* Our Hearing Exhibit NN (*also at* LMF's Hearing Exhibit 36).

   Note that I wasn't even a party to the alleged settlement offer referenced therein! *See* Id. at p. 1 ("...(d) **Lerner and Michele Paige** would enter into an agreement, to be negotiated in good faith, under which **Lerner** would accept payment of less than the full amount due...") [emphasis added].

[19]   *See, e.g.,* Attorney Christman's testimony [Tr. 5/18/16 (Adv.Dkt. #326), p. 43, L: 4 - 14 (recounting his warning to Mr. Goodchild that LMF's 727 claims were nothing more than "tilting at windmills")].

*And see* Attorney Christman's testimony [Tr. 5/18/16 (Adv.Dkt. #326), p. 22, L: 22; *and see* Id. at p. 52, L: 22 - p. 53, L: 9 (documenting the Trustee's investigatory conclusions)];

*And see* Trustee Oleyar's testimony regarding his assessment of the Respondents' evidence and his warning to them through counsel at Tr. 5/18/16 (Adv.Dkt. #327), p. 93, L: 9 - 10; p. 96, L: 3 - 12;

*See also* Tr. 3/1/12 (Dkt. #86), p. 90, L: 11 - 14 (CHRISTMAN: "But the Trustee, just to be clear, did not at the time of the objection deadline know whether or not there was anything that would support an objection to discharge **and still does not...**") [emphasis added].

[20]   *See, e.g.,* Tr. 5/18/16 p. 24, L: 6 *et seq.* (authenticating email to Mr. Goodchild in which the Trustee and Trustee's counsel warns that LMF's 727 Claims constituted "tilting at windmills.")

[21]   *See, e.g.,* <u>Galardo v. Ethyl Corp.</u>, 835 F.2d 479, 482 (3rd Cir. 1987) ("As a commentator has observed, the Rule does not permit use of the 'pure heart and empty head' defense.") [internal citations omitted];

*And see* Tr. 3/29/16 (Adv.Dkt. #319), p. 37, L: 11 - 20 (MR. GOODCHILD: "The text of Rule 11 is that every time I submit a paper, every time I submit a paper to Your Honor, I am making a certification to you. I'm making a representation. I am certifying that to the best of my knowledge, information, and belief, **formed after a reasonable inquiry under the circumstances,** that the paper is not being presented for any improper purpose...") [emphasis added].

[22]   *See, e.g.,* Opinion (Adv.Dkt. #303), p. 11 ("No testimony was offered by the outside auditor charged with reviewing records of the hedge funds. No testimony was offered by the document storage company to whom all corporate records were delivered during the Delaware litigation. No testimony was offered by LMF to whom access was granted during the Delaware litigation.").

23   *See, e.g.*, Christopher Paige's testimony [Tr. 5/19/16 (Adv.Dkt. #328), p. 83, L: 8 - 12 ("Q: But could they have found out and gone and talked to Rhino or paid Brown -- A: Jill Spott specifically asked Mr. Goodchild if she wanted us to verify the destruction of the documents and he didn't -- he ignored her."); *and see* Tr. 5/19/16 (Adv.Dkt. #328), p. 83, L: 8 - 18 (further documenting the Respondents' failure to accept Ms. Spott's offer to investigate the alleged destruction of documents by third parties)].

24   *See, e.g.*, Christopher Paige's testimony [Tr. 12/1/15 (Adv.Dkt. #271), p. 6, L: 17 - 19 ("All these transactions that they're asking for are easily accounted for in the records they didn't bother to pick up. So I made a spreadsheet showing the answer."); *Id.* at p. 18, L: 19 - 21 ("Yes. I produced everything I had. Yes. I'm sorry. I produced everything I had, but you didn't pick it all up."); *Id.* at p. 68, L: 4 - p. 99, L: 25].

25   *See generally* LMF's Trial Exhibits #67 & #69 (*also at* LMF's Response (Dkt. #69), Exhibits A & B), L: 7 - p. 180, L: 5 (proving that no questions were asked during the 341s related to LMF's 727 Claims).

   *See also* Attorney Spott's testimony [Tr. 5/17/19 (Adv.Dkt. #326), p. 174, L: 7 - p. 180, L: 5 (testifying that no questions were asked during the 341s related to LMF's 727 Claims)].

26   *See* LMF's Response (Adv.Dkt. #298), p. 21 ("Although Debtors disagree with the claims asserted in them, LMF's adversary complaint (Adv. Dkt. No. 1) and amended adversary complaint (Adv. Dkt. No. 81) are objectively reasonable on their face. Further, these pleadings are based on an extensive factual record from (1) discovery in the underlying Chancery Court litigation, (2) trial in the underlying Chancery Court litigation, and **(3) LMF's examination of Debtors at the Section 341 meetings held on November 4, 2011 and January 6, 2012.**") [emphasis added].

27   *See, e.g.*, Tr. 5/19/16 (Adv.Dkt. #328), p. 70, L: 17 - p. 74, L: 1 (detailing the role of the independent third parties who held and accounted for LMF's money).

28   *See, e.g.*, LMF's Answer (Adv.Dkt. #183), p. 2, Para 2 ("**By way of further response, LMF has not conducted discovery of the Debtors since October 2012...**") [emphasis in original].

29    *See, e.g.,* Opinion (Adv.Dkt. #303), p. 8 ("...but I simply came up empty"); Id. at p. 10 ("As it stands, the record is devoid of any evidence..."); Id. at p. 11 ("...but there is no evidence the Debtors took any affirmative action to cause records not to be available to LMF..."); Id. at p. 14 ("I further find that there is no evidence either Debtor had a conscious understanding that their activities under the various contracts that bound the parties was wrongful."); *and see* Id. at p. 15 (... LMF failed to present evidence to support that argument.").

30    *See, e.g.,* Trustee Oleyar's testimony regarding his assessment of the Respondents' evidence and his warning to them through counsel at Tr. 5/18/16 (Adv.Dkt. #327), p. 93, L: 9 - 10; p. 96, L: 3 - 12.

31    *See, e.g.,* Christopher Paige Testimony [Tr. 5/19/16 (Adv.Dkt. #328), p. 82, L: 23 - p. 83, L: 3 ("Q: Now let me just go back. So what documents are we talking about? Destruction of what documents?  A: Well, as far as I know the only thing that was destroyed was Rhino's copy. Had they read the 160,000 that LMF gave me that's all the documents I'm ever aware of they had in existence. They had it all on that hard drive."); *and see* Tr. 1/20/16 (Adv.Dkt. #297), p. 50, L: 21 - 25 ("Q: Okay, and does LMF have all the copies [of the "missing" documents] on that hard disc they provided to you?  A: I looked through everything.  They -- if there's something missing, I wasn't able to find it. I mean it looks complete. It appears to be complete.")].

32    *See, e.g.,* Opinion (Adv.Dkt. #303), p. 11 ("Christopher Paige emphatically denied destroying any records. Tr. #274 at 89. This testimony was not challenged.").

33    *See, e.g.,* Opinion (Adv.Dkt. #72), p. 12 ("Simply stated, it [Count VII of Adv.Dkt. #1] is in the nature of extortion or bribery.  The four corners of the Complaint do not support the allegation and the Count will be dismissed."); *see also* Opinion (Adv.Dkt. #303) ("It should be noted also that no specific asset or fund has been identified as being hidden from their creditors.").

34    *See, e.g.,* LMF's Response (Adv.Dkt. #89), p. 5, fnt. 1 ("The Court's April 1, 2013 Opinion and Order also dismissed Count VII.  Lerner has not reasserted that claim under 11 U.S.C. Sec. 727(a)(4)(C) in its Amended Complaint.").

Please note that LMF's Amended Complaint (Adv.Dkt. #81) was filed on April 22, 2013, several months *after* the safe harbor had expired in February 2013.

35   *See, e.g.,* Opinion (Adv.Dkt. #303), p. 8 ("Transfers from the Debtors' personal accounts to any one of these entities would hardly be motivated by a fraudulent intent since they were all liable to LMF. Such transfers would certainly not be motivated by an intent to spirit funds away from access by LMF.").

36   *See, e.g.,* Our Motion to Compel (Adv.Dkt. #82); *and see* Our Motion (Adv.Dkt. #291).

37   Critically, Mr. Goodchild proudly admitted that his client wasn't suing us for the money! *See, e.g.,* Tr. 3/1/12 (Dkt. #86), p. 25, L: 8-9 (When this Court pointed out that LMF's actions did not make any economic sense, Mr. Goodchild retorted, "In fact, my client would like to receive some recovery on the claim, **no matter what it is.**") [emphasis added].

   This was no mere slip of the tongue; Mr. Goodchild repeated the same sentiment when he explained why his client wanted to litigate against me in Delaware even if it didn't make any economic sense: "Your Honor, our position was that we were prepared to adjudicate the claim so that there was a claim established against Mr. Paige no matter what." Tr. 5/23/12 (Dkt.#129), p. 21, L: 25 *et seq.*

   *See also* Tr. 3/1/12 (Dkt. #86), p. 11, L: 21-22 ("We view that [establishing my liability] to be important irrespective of what happens with respect to the discharge proceeding.").

38   *See, e.g.,* LMF's Answer (Adv.Dkt. #183), p. 2, Para 2 ("**By way of further response, LMF has not conducted discovery of the Debtors since October 2012...**") [emphasis in original].

39   *See* LMF's Motion to Continue (Adv.Dkt. #17) [filed July 13, **2012**], and see LMF's Memo (Adv.Dkt. #245) [filed August 14, **2015**]. *And see* Orders (Adv.Dkt. #45 & #231) granting their requests.

40   *See, e.g.,* Tr. 11/20/15 (Adv.Dkt. #261), p. 188, L: 23 - p. 189, L: 1 ("MR. JOHNS: If I may be heard, the email in particular [LMF's Trial Exhibit #99] that I'm referring to is publicly filed in this court's docket at Docket Number 85. It's attached to debtors' motion to dismiss. It's Exhibit G to that motion.").

   In that Exhibit, we discuss the dire consequences of this litigation upon our health - a point we continued throughout this ordeal. *See, e.g.,* Correspondence (Adv.Dkt. #347).

46

[41]   *See, e.g.,* Tr. 5/19/16 (Adv.Dkt. #328), p. 8, L: 20 - 21 ("A: It's [the number of pages we filed] is about the same. We're about 5,000. It's altogether around 9,000 pages and it's evenly divided [between the Appellants and the Appellees").

[42]   *See* Opinion (Adv.Dkt. #303), p. 6 ("While the Debtors were manifestly indignant, I cannot find that they acted with an intent to be vexatious.").

[43]   *See* LMF's Response (Adv.Dkt. #142), p. 1 ("**Apparently frustrated** by the fact that the nine motions they previously filed against Lerner Master Fund, LLC ('LMF') in this adversary proceeding (including motions for summary judgment and for sanctions) remain pending, Debtors Michele Paige and Christopher Paige ('Debtors') have now filed what they acknowledge are three 'highly repetitive motions.' Adv. Dkt. No. 138 at p. 11. **Perhaps to attempt to force a ruling**, the following three recent filings by Debtors primarily repeat the same arguments that they have previously presented to this Court...") [emphasis added].

[44]   *See, e.g.,* Correspondence (Adv.Dkt. #347).

[45]   *See, e.g.,* Order (Adv.Dkt. #45) ("**The Plaintiff's** request to continue August 15, 2012 trial date is granted.") [emphasis added].

[46]   Tr. 1/5/12 (Dkt. #63), p. 13, L: 4 -7 (THE COURT: "But to me, you've got an obligation to show cause because Congress apparently wants these things [dischargeability complaints] disposed of quickly in Chapter 7, you know?  **They don't want these things dragged out.**") [emphasis added].

[47]   *See, e.g.,* Orders [Adv. Dkt. #41, 73, 149, 151, 153].

[48]   *See, e.g.,* LMF's Motion (Adv.Dkt. #309), p. 5 (stating this bankruptcy and adversary began "five" years ago).

[49]   *See, e.g.,* Our Motions (Adv.Dkt. #22, #24, #26, #28, #30, #32, #96,  #103)

[50]   *See, e.g.,* Opinion (Adv.Dkt. #72), p. 10, fnt. 7 ("The parties are advised that pending before the United States Supreme Court is the pivotal issue of how "defalcation" should be defined for purposes of § 523(a)(4). *Bullock v. BankChampaign, N.A,* cert. granted. 133 S.Ct. 526 (Mem), U.S.,2012. *Bullock v. BankChampaign, N.A. (In re Bullock),* 670 F.3d 1160 (11th Cir. 2012).");

*And see* Tr. 6/13/12 (Dkt. #130), p. 24, L: 15 - 18 ("It does.  I mean, you know -- I know there's been a non-published Circuit opinion saying that breach of fiduciary duty in and of itself isn't going to be enough to establish an (a)(4) exception.").

51    Obviously, Rule 56 is superfluous if plaintiffs have the right to force defendants to testify "credibly" at trial. Since the Bankruptcy Court held that LMF failed to present a *prima facie* case for any of its claims, its prior decisions on summary judgment were erroneous. *See* Opinion (Adv.Dkt. #303).

52    *See, e.g.,* Our Hearing Exhibit OOOO [Randy Lerner's deposition], p. 28, L: 19 - 20; 25 ("Can I ask a quick question of you? Is she [Michele] married?"; "I realize I never even knew that."). Do you really think they invested $40 million with a potentially imaginary person?

And see Christopher Paige's testimony [Tr. 12/7/15 (Adv.Dkt. #274), p. 128, L: 12 17 - p. 129, L: 4 (documenting LMF's prior testimony in which their executives swore that I did not own or manage the entities at issue)]; *see also* Our Motion to Introduce Exhibit B (Adv.Dkt. #286), *citing* LMF's own production by Bates number (Paige 11804; Paige 17369; Paige 37645; Paige 38920; Paige 38277; Paige 37526) as corroboration of my testimony cited above.

53    See Attorney Christman's testimony [Tr. 5/18/16 (Adv.Dkt. #327), p.79, L: 11 - 21.

54    *See, e.g.,* Our Hearing Exhibit OOOO [Randy Lerner's deposition], p. 28, L: 19 - 20; 25 ("Can I ask a quick question of you? Is she [Michele] married?"; "I realize I never even knew that.").

55    *See* Christopher Paige's testimony [Tr. 12/7/15 (Adv.Dkt. #274), p. 128, L: 17 - p. 129, L: 4] ("And they agreed to give me that affidavit, and they, in fact, gave me that affidavit, which very specifically said that if they thought I secretly owned or managed the funds, they'd be committing perjury.").

See also Our Motion to Introduce Exhibit B (Adv.Dkt. #286), *citing* LMF's own production by Bates number (Paige 11804; Paige 17369; Paige 37645; Paige 38920; Paige 38277; Paige 37526) as corroboration of my testimony cited above.

56    *See, e.g.,* Order (Adv.Dkt. #212).

57    *See, e.g.,* Tr. 7/16/13 (Adv.Dkt. #118); Tr. 3/29/16 (Adv.Dkt. #319); Tr. 5/17/16 (Adv.Dkt. #326); Tr. 5/18/16 (Adv.Dkt. #327); Tr. 5/19/16 (Adv.Dkt. #328); and Tr. 7/13/16 (Adv.Dkt. #340).

58    *See, e.g.,* Tr. 12/1/15 (Adv.Dkt. #271), p. 46, L: 2 (CHRIS: "See, I drafted this [our books] and then he [our independent accountant] would fix it.").

59    *See, e.g.,* Tr. 5/19/16 (Adv.Dkt. #328), p. 70, L: 17 - p. 74, L: 1.

60      *See, e.g.,* Opinion (Adv.Dkt. #303) ("No testimony was offered by the outside auditor charged with reviewing records of the hedge funds.").

61      *See, e.g.,* LMF's Answer (Adv.Dkt. #183), p. 2, Para 2 ("**By way of further response, LMF has not conducted discovery of the Debtors since October 2012...**") [emphasis in original].

62      *See, e.g.,* Christopher Paige's Testimony [Tr. 5/19/16 (Adv.Dkt. #328), p. 9, L: 18 - p. 10, L: 9].

63      *See* Order (Adv.Dkt. #303), p. 8.

64      *See* Christopher Paige's testimony [Tr. 12/7/15 (Adv.Dkt. #274), p. 128, L: 17 - p. 129, L: 4].

*See also* Our Motion to Introduce Exhibit B (Adv.Dkt. #286), *citing* LMF's own production by Bates number (Paige 11804; Paige 17369; Paige 37645; Paige 38920; Paige 38277; Paige 37526) as corroboration of my testimony cited above.

65      *See, e.g.,* LMF Motion (Dkt. #68), p. 4 ("Lerner does not seek to 're-try,' 're-litigate,' or appeal any judgment of the Chancery Court. Instead, Lerner seeks to assert its outstanding claims, **which have yet to be litigated in any forum,...**") [emphasis added].

66      "With no helpful briefing on this subject from the Lerner Fund, I refuse to go further and hold that someone like Christopher Paige, who is not even an officer, director, or member of the governing fiduciary is a direct fiduciary of the limited partnership and its investors." *See* Delaware Opinion at LMF's Amended Complaint (Adv.Dkt. #81), Exhibit A, p. 68

*See also* Opinion (Adv.Dkt. #72), p. 10 ("In fact, the Court of Chancery specifically found that Christopher Paige was *not* a 'direct fiduciary.'").

67      *See* Attorney Christman's testimony [Tr. 5/18/16 (Adv.Dkt. #327), p.79, L: 11 - 21 (Q: Did he [Mr. Goodchild] tell you about any undisclosed bank accounts? A: I'm not sure that I can answer that question. I can explain that he told me that there could be accounts that we were dealing with people of great sophistication who, you know, had managed significant enterprises and significant amounts of money who are also, you know, very bright. And that there could very well -- and that you know, he believed that there may very well have been significant amounts of hidden assets.")]

68    In re Farhid, 171 B.R. 94, 97 (N.D. Cal. 1994) [cited at p. 7 Opinion (Adv.Dkt. #40)].

69    *See, e.g.*, LMF's Letter (Adv.Dkt. #224) (asking the Bankruptcy Court to defer our Motions until the end of the trial).

70    *See, e.g.*, LMF's Motion (Adv.Dkt. #309), p. 5 (stating this bankruptcy and adversary began "five" years ago).

71    *See, e.g.*, LMF's 56.1 Statement (Adv.Dkt. #102), p. 2 ("In adjudicating Lerner's breach of contract counterclaim, the Chancery Court found that Debtors' interpretation of the contracts governing Debtors' hedge fund accounts was a reasonable interpretation...").

72    *See* Part A above.

73    *See, e.g.*, LMF's Motion (Adv.Dkt. #309), p. 5 (stating this bankruptcy and adversary began "five" years ago).

74    Hass v. Hass (In re Hass), 273 B.R. 45, 57 (Bankr.S.D.NY 2002) ("Before permitting any settlement connected with the dismissal or withdrawal of Section 727(a) claims, a bankruptcy court must be satisfied that the action is not a sham effort by the creditor-plaintiff to receive payment solely for himself on account of a Section 727(a) claim that is **representative in nature**.") [emphasis added].

75    *See, e.g.*, LMF's Response (Adv.Dkt. #93), p. 3 ("Debtors' contractual argument presented to the Chancery Court – that they had a contractual right to gate Lerner's capital – was **a post-hoc litigation position crafted by Debtors' counsel** that had no bearing on the Chancery Court's findings related to Debtors' state of mind at the time that they gated Lerner's capital, and thus no bearing on the defalcation element of § 523(a)(4).") [emphasis added];

     *And see* LMF's Response (Adv.Dkt. #143), p. 3, Para. 2; *see also* LMF's Response (Adv.Dkt. #102, p. 3, Para. 2 ("**LMF has further stated, in subsequent filings, that Debtors' contractual interpretation about their right to gate LMF's capital is a post-hoc litigation position that has no bearing on Debtors' state of mind at the time they gated LMF's capital. See LMF's Response to Debtors' Collateral Estoppel Motion (Adv. Dkt. No. 93) at p. 3.** ") [emphasis in originals].

[76] *See, e.g.,* LMF's Response (Adv.Dkt. #275), Exhibit A, Para. 113 ("**After the February 17, 2009 meeting**, Christopher Paige proposed to Michele Paige that the Paiges gate LMF's capital to prevent it from completely withdrawing. **Mr. Paige also initiated discussions with outside lawyers for the Paiges' Hedge Fund about the possibility of gating LMF's capital**, and raised the idea of suing LMF with Michele Paige.") [emphasis added] [internal citations omitted].

[77] *See, e.g.,* LMF's Response (Adv.Dkt. #293), Exhibit A, Para. 271 ("In addition, Debtors have advanced an advice of counsel defense by arguing that because Debtors relied on advice from PCM's counsel in deciding whether to gate LMF's capital, Debtors' acted in good faith and thus LMF cannot establish the requisite state-of-mind for any of its 523 claims. The elements for an advice of counsel defense include "(a) did counsel give the advice; (2) was the advice 'legal' advice; (3) did the debtor rely on the advice of counsel; and (4) while acting in good faith. **Debtors have not met their burden because they have offered no evidence showing what advice was given to them by counsel**, that either Debtor relied on that advice, or that Debtors were otherwise acting in good faith.") [emphasis added] [internal citations omitted];

*And see* LMF's Response (Adv.Dkt. #293), Exhibit A, p. 74, fnt. 20 ("On the contrary, Debtors carefully avoided waiving the privilege regarding discussions with their attorneys about [sic] gating of LMF's capital.").

[78] *See, e.g.,* LMF's Response (Adv.Dkt. #275), Exhibit A, Para. 40 - 55 [detailing my alleged activities in my alleged roles *other than as an attorney* at my wife's Funds]; *and see* LMF's Response (Adv.Dkt. #293), Ex. A, Para. 308 ("Count II [sic] in LMF's Amended Complaint pleads that Mr. Paige is liable under section 523(a)(6) based on his role in *managing* LMF's investment,...") [emphasis added].

[79] *See, e.g.,* LMF's Response (Adv.Dkt. #293), Exhibit A, Para. 286 "According to Debtors, during trial LMF did not pursue its original theory that Mr. Paige owed fiduciary duties to LMF because he acted towards LMF in his professional capacity as an attorney. Debtors are incorrect; **this was never LMF's theory**." [internal citations omitted] [emphasis added].

[80] Opinion (Adv.Dkt. #72), p. 11 ("The Delaware Opinion made clear that there was a breach of not only a fiduciary obligation on behalf of Michele Paige, but of a 'professional' responsibility. It is for that reason that I look to *In re Conte*, 33 F.3d 303 (3rd Cir. 1994) for guidance since that case focused on the question of whether malpractice by a lawyer could amount to a willful and malicious injury under § 523(a)(6).").

[81]   *See, e.g.,* Tr. 7/27/15 (Adv.Dkt. #223), p. 11, L: 7 - 8  (MR. GOODCHILD: "No, we are not conceding anything regarding Ms. Paige.").

[82]   *But cf.* LMF's Motion (Adv.Dkt. #194), p. 5, n. 3 (utilizing public records accessed through the Internet to determine my Bar status: "Although Mr. Paige previously testified that he converted to 'retired' status with the New York bar after litigation in the Delaware Chancery Court began, the New York state bar lists Mr. Paige as "currently registered." New York Attorney State Unified Court System, Attorney Detail, http://iapps.courts.state.ny.us/attorney/AttorneyDetails?attorneyId=5533778.").

[83]   *See* Tr. 5/19/16 (Adv.Dkt. #328), p. 27, L: 11 - 16 ("THE COURT: **You know what I think we already got into this record, the e-mails and the language utilizing those e-mails.** I don't think we have to rehash them. I think Mr. Paige is characterizing the impact that this language may have had, I understand that. But I don't think we have to rehash the e-mails again.") [emphasis added].

[84]   Tr. 7/16/13 (Dkt. #146/Adv.Dkt. #118), p. 94, L: 4 - 9 ("THE COURT: Is malice a factor [in our Motions for Sanctions]? I'm asking that of Mr. Goodchild. MR. PAIGE: I know you are. MR.GOODCHILD: If you have made some predicate findings, Your Honor, **malice can be taken into account**, that is true." Tr. 7/16/13 (Dkt. #146/Adv.Dkt. #118), p. 94, L: 4 - 9 [emphasis added].

[85]   *See, e.g.,* Tr. 5/19/16 (Adv.Dkt. #328), p. 70, L: 17 - p. 74, L: 1.

## XII.   CERTIFICATE OF COMPLIANCE & SERVICE

According to my word processing program, this Brief (and its Endnotes) contains 13,958 words, excluding those introductory portions which are not included in the word count by Rule.

Regardless, we're really entitled to 28,000 words.  Since my wife and I are separate persons, we would be entitled to file separate briefs totaling 28,000; by filing less than 14,000 words altogether, therefore, we're far below the letter and spirit of the Rule.

Under penalty of perjury, I hereby attest that I served a true and correct copy of the foregoing Notice of Appeal - including any exhibits thereto - upon the person(s) identified below on the date provided below via first-class U.S. mail, postage prepaid:

John Goodchild, Esq.
Morgan Lewis
1701 Market St
Philadelphia, PA 19103-2921

Dated: January 14, 2017        Respectfully submitted,



Christopher Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

Michele Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

1 of 9 DOCUMENTS

**LORI MOECK, In her capacity as parent and natural guarding of C.M. and A.M.; C.M. a minor; A.M., a minor v. PLEASANT VALLEY SCHOOL DISTRICT; DOUGLAS C. ARNOLD, Superintendent of Schools, Pleasant Valley School District; ANTHONY A. FADULE, Assistant Superintendent of Schools, Pleasant Valley School District; JOHN J. GRESS, Principal, Pleasant Valley School District: MARK GETZ, Wrestling Coach, Pleasant Valley School District, Pleasant Valley School District, Appellant**

No. 16-2473

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

2016 U.S. App. LEXIS 23186

December 20, 2016, Submitted under Third Circuit L.A.R. 34.1(a)
December 23, 2016, Filed

**PRIOR HISTORY:** [*1] APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA. (D.C. No. 3:13-cv-01305). District Judge: Hon. James L. Munley.

**CASE SUMMARY:**

**OVERVIEW:** HOLDINGS: [1]-The order denying the school district's motion for sanctions pursuant to Fed. R. Civ. P. 11 against appellees and their counsel was affirmed because the district court appropriately exercised its discretion in concluding the motions lacked merit, and were counterproductive as they relied upon factual discrepancies that did not show the claims were patently frivolous.

**OUTCOME:** Order affirmed.

**CORE TERMS:** summary judgment, discovery, meritless, unopposed, lifted, team, judicial resources, reasonable basis, appropriately, declining, e-mail, oppose, toes, wrestling, local rule, existing law, false statements, appropriate sanction', fails to comply, evidentiary support, citation omitted, discriminatory, collectively, discrepancies, aggressive, frivolous, patently, conserve, grabbed, invoked

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN1] An appellate court reviews a district court's order on a Fed. R. Civ. P. 11 motion for abuse of discretion. Thus, an appellate court evaluates the court's factual determinations, legal conclusions, and choice of an appropriate sanction with substantial deference, considering not whether it would make the same precise determinations, but only whether those determinations are contrary to reason or without a reasonable basis in law and fact.

*Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations*
[HN2] M.D. Pa. Civ. R. 7.6 provides that any party opposing any motion other than a motion for summary judgment shall file a response within 14 days of service of the movant's brief and any party who fails to comply with this rule shall be deemed not to oppose such motion. M.D. Pa. Civ. R. 7.6. There may be some cases where the failure of a party to oppose a motion will indicate that the motion is in fact not opposed, particularly if the party is represented by an attorney and in that situation the local rule may be appropriately invoked.

*Civil Procedure > Pleading & Practice > Motion Practice*
*Civil Procedure > Sanctions*
[HN3] A district court has the authority to "defer its ruling" on a Fed. R. Civ. P. 11 motion until final resolution of the case. Fed. R. Civ. P. 11.

*Civil Procedure > Sanctions*
[HN4] Fed. R. Civ. P. 11(c)(6) requires only that a district court explain the basis of its order when the court imposes a sanction, not when it denies sanctions. Fed. R. Civ. P. 11(c)(6).

*Civil Procedure > Sanctions*
[HN5] The standard under Fed. R. Civ. P. 11 is stringent because sanctions 1) are in derogation of the general American policy of encouraging resort to the courts for peaceful resolution of disputes, 2) tend to spawn satellite litigation counter-productive to efficient disposition of cases, and 3) increase tensions among the litigating bar and between the bench and the bar.

**COUNSEL:** Michael I. Levin, Esq., Paul J. Cianci, Esq., Levin Legal Group, P.C., Huntingdon Valley, PA, Counsel for Appellant.

Michael C. Schwartz, Esq., Jonathan J. James, Esq., James, Schwartz & Associates, P.C., Philadelphia, PA, Counsel for Appellees.

**JUDGES:** Before: SMITH, Chief Judge, McKEE and SHWARTZ, Circuit Judges.

**OPINION BY:** SHWARTZ

**OPINION**


**OPINION OF THE COURT**

SHWARTZ, Circuit Judge.

Pleasant Valley School District (the "School District") appeals the District Court's order denying its motions for sanctions pursuant to Fed. R. Civ. P. 11 against Plaintiffs and their counsel. Because the District Court appropriately exercised its wide discretion in concluding the motions lacked merit, and were counterproductive as they relied upon factual discrepancies that did not show the claims were patently frivolous, we will affirm.

**I**

This case arises out of incidents between two members of the Pleasant Valley High School (the "High School") wrestling team, C.M. and his sister A.M., and the team's coach, Mark Getz. Getz allegedly assaulted C.M. and discriminated against A.M. based on her gender. Plaintiffs [*2] alleged that during a team practice, C.M. was forced to wrestle a larger student, who threw him through the gymnasium doors into the hallway and punched him, and after Getz prodded C.M. to keep wrestling, a verbal and physical altercation ensued between Getz and C.M. in which Getz lifted C.M. up and "smash[ed] his head and back into the wall." App. 31, 54. Plaintiffs also asserted, among other things, that A.M. suffered gender discrimination through a culture of misogyny and intimidation, which allegedly included numerous sexually charged comments by Getz and the assistant coaches.

C.M., A.M., and their mother Lori Moeck (collectively, "Plaintiffs") brought various federal and state law claims against the School District, its Superintendent, its Assistant Superintendent, the High School's Principal (the "School Defendants"), and Getz (collectively, "Defendants"), seeking compensatory and punitive damages, injunctive relief, and attorneys' fees and costs. Following discovery, the School Defendants and Getz filed separate motions for summary judgment. Each motion was supported by a brief and statement of undisputed material facts ("Rule 56.1 statement").

Defendants thereafter filed two motions for sanctions. [*3] In one motion, the School Defendants asserted that discovery showed that Plaintiffs made numerous false statements in the complaint and amended complaint, and their claims lacked merit. In the second

motion, Defendants asserted that Plaintiffs' Rule 56.1 statement contained false statements. Many of the examples Defendants cited in both motions focused on small details that have little bearing on the essence of Plaintiffs' claims--that Getz allegedly acted in an aggressive and discriminatory manner. For instance, Plaintiffs alleged that Getz "grabb[ed] [C.M.] by the neck and chok[ed]" him, App. 39, 62, while C.M.'s testimony disclosed that Getz grabbed him by the shirt, under his neck. Similarly, Defendants complained that Plaintiffs alleged that Getz "lifted [C.M.] onto his toes, and ran with him . . . causing him to smash his head and back into the wall," App. 31, 54, while testimony showed that Getz "speed walk[ed]," App. 113, and "put [C.M.] up on the wall," App. 182, and that C.M.'s head "wasn't extremely pounded," App. 200; see also App. 1103 (comparing the representation in the brief that C.M.'s "toes were off the ground" when Getz lifted him up with C.M.'s testimony that he "was on [his] tippy-toes up against [*4] the wall," App. 198).[1] Plaintiffs filed motions to stay Defendants' Rule 11 motions until the District Court ruled on the pending summary judgment motions.

1 Defendants also asserted Plaintiffs' counsel falsified a document by changing the format of an e-mail from a parent of a former member of the wrestling team into a document that looked like a letter, and then sent it along with a cover letter to its author, soliciting information about Getz and misconduct at the School District. The record does not show that Plaintiffs submitted the letter or e-mail to the District Court.

Before ruling on the summary judgment motions, the District Court denied Defendants' Rule 11 motions. The court found "the motions meritless," noting that these Rule 11 motions tax judicial resources and emphasizing that the truth of the allegations in a case of this sort is revealed through discovery and addressed at summary judgment or trial, not via motions for sanctions. App. 3. The School District appeals.[2]

2 Plaintiffs do not appeal the orders granting Defendants' motions for summary judgment and declining to exercise supplemental jurisdiction over the state law assault and battery claim.

II[3]

3 The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

[HN1] We review a district court's order on a Rule 11 motion for abuse of discretion. Simmerman v. Corino, 27 F.3d 58, 61 (3d Cir. 1994). Thus, "'we evaluate the court's factual determinations, legal conclusions, and choice of an 'appropriate sanction' with substantial deference, considering not whether we would make the same precise determinations, but only whether those determinations are contrary to reason or without a reasonable basis in law and fact.'" Ario v. Underwriting Members of Syndicate 53 at Lloyds for the 1998 Year of Account, 618 F.3d 277, 287 (3d Cir. 2010) (quoting Simmerman, 27 F.3d at 62).

A

We first review the School District's assertion that Plaintiffs failed to oppose the first motion for sanctions and that the District Court erred in declining to grant the supposedly [*5] unopposed motion. The School District contends that, pursuant to Middle District Local Rule 7.6, the District Court should have treated the School Defendants' first Rule 11 motion as unopposed and thus granted the Rule 11 motion. [HN2] Local Rule 7.6 provides that any party opposing any motion other than a motion for summary judgment shall file a response within 14 days of service of the movant's brief and "[a]ny party who fails to comply with this rule shall be deemed not to oppose such motion." M.D. Pa. Local R. 7.6. Our Court has noted that "[t]here may be some cases where the failure of a party to oppose a motion will indicate that the motion is in fact not opposed, particularly if the party is represented by an attorney and in that situation the [local] rule may be appropriately invoked." Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (3d Cir. 1992); see also DiPaolo

v. Moran, 407 F.3d 140, 144-45 (3d Cir. 2005) (affirming grant of unopposed Rule 11 motion where no responsive pleading was filed and "the sanctions motion here did not involve obvious facial deficiencies").[4]

4 The rule may also be invoked "if a party fails to comply with the rule after a specific direction to comply from the court." Stackhouse, 951 F.2d at 30. The record does not indicate that the District Court instructed Plaintiffs to file a response to the School Defendants' motion.

Here, the District Court correctly treated the School Defendants' motion as opposed. Although Plaintiffs did not specifically file a brief in opposition to that Rule 11 motion, Plaintiffs did respond by filing a motion to stay. In that motion, Plaintiffs argued that "[b]ecause much of the issues raised in . . . Defendants [*6] [sic] Rule 11 motions go to the evidence ultimately before this Court, Plaintiff [sic] is seeking to place the Rule 11 motion and any proposed filing of a Rule 11 motion in suspense until after the summary judgment motions are decided." App. 662.[5] Plaintiffs in essence asserted that the fact-sensitive issues raised in the School Defendants' sanctions motion would best be evaluated at the summary judgment stage and accordingly opposed consideration of the Rule 11 motion on that basis. Cf. Anchorage Assocs. v. V.I. Bd. of Tax Review, 922 F.2d 168, 174 (3d Cir. 1990) (explaining that the local rule at issue "authorizes the court to grant applications solely on the basis of the information that the moving party puts before the court unless there is some response indicating that a genuine controversy exists concerning the right to the relief sought"). Therefore, the District Court did not abuse its discretion in declining to treat the motion as unopposed.

5 [HN3] A district court has the authority to "defer its ruling" on a Rule 11 motion until "final resolution of the case." Fed. R. Civ. P. 11, Advisory Committee's Note to 1993 Amendment. Thus, it is hard to say a party asking a court to defer such a ruling is not responding to the sanctions motion.

**B**

The District Court also did not abuse its discretion in denying both Rule 11 motions.[6] Despite the School District's argument that the District Court abused its discretion by denying the Rule 11 motions without analyzing their merits, the District Court specifically stated that it found "the motions meritless." App. 3. The District Court, having the benefit [*7] of fully briefed summary judgment motions and a voluminous record, further explained that the factual issues identified in Defendants' sanctions motions would be best resolved at summary judgment or trial.

6 Fed. R. Civ. P. 11(b) provides:

By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
. . .
(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b)(2)-(3). If a court determines that Rule 11(b) has been violated after notice and an opportunity to respond, it "may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Id. 11(c)(1).

In doing so, the District Court did more than what Rule 11 requires. [HN4] Rule 11(c)(6) requires only that a district court explain the basis of its order when the court imposes a sanction, not when it denies sanctions. Fed. R. Civ. P. 11(c)(6) ("An order imposing a sanction must describe the sanctioned conduct and explain the basis for [*8] the sanction."). While we welcome explanations for all rulings, the District Court did more than it needed to do when concluding that Defendants' motions were "meritless."

Our review of the record leads us to the same conclusion. Some discrepancies exist between the complaints and Plaintiffs' submissions in opposition to Getz's summary judgment motion, on the one hand, and facts elicited through discovery, on the other, but Plaintiffs' pleadings have a factual basis and are not "patently unmeritorious or frivolous." See Ario, 618 F.3d at 297 (citation omitted).[7] Although some of the factual allegations may have been exaggerated, the record includes evidence that provided a reasonable basis for the representations in the complaints and summary judgment submissions concerning Getz's allegedly aggressive and discriminatory behavior. See, e.g., App. 1027-35.[8] The District Court's conclusion that Defendants' accusations were meritless was therefore not "contrary to reason or without a reasonable basis in law and fact." See Ario, 618 F.3d at 287 (citation omitted).[9] Thus, the District Court did not abuse its discretion by denying Defendants' Rule 11 motions.

7 We have explained that [HN5] the standard under Rule 11 is "stringent" because sanctions "1) are in derogation of the general American policy of encouraging resort to the courts for peaceful resolution of disputes, 2) tend to spawn satellite litigation counter-productive to efficient disposition of cases, and 3) increase tensions among the litigating bar and between [the] bench and [the] bar." Doering v. Union Cty. Bd. of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir. 1988) (alterations in original) (citations and internal quotation marks omitted).

8 In addition, many of the alleged falsehoods Defendants rely upon are immaterial. For example, whether C.M.'s toes were touching the ground or not, there was evidence to support the allegation that C.M. was lifted up. See Fed. R. Civ. P. 11, Advisory Committee's Note to 1993 Amendment (stating that "Rule 11 motions should not be made or threatened for minor, inconsequential violations of the standards prescribed by subdivision (b)").

Other alleged misrepresentations occurred during depositions, in response to interrogatories, and to and about health care providers, or involved counsel's act of changing the e-mail into a document that resembles a letter. These incidents are not sanctionable under Rule 11 because they arose in the context of discovery and thus are not within the scope of Rule 11. Fed. R. Civ. P. 11(d) (stating that Rule 11 "does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37"); see also Landon v. Hunt, 938 F.2d 450, 453 (3d Cir. 1991) ("We have consistently held that Rule 11 sanctions are proper only in situations involving a signed pleading." (citation and emphasis omitted)).

9 The District Court also did not err in noting that Defendants' Rule 11 motions were, essentially, a waste of judicial resources, and that counsel in this case had "ha[d] clogged the docket with numerous motions for sanctions, motions for discovery and even a motion to disqualify counsel." App. 4. While the focus of Rule 11 is on whether a claim is wholly without merit, and is not dictated by whether resources will be expended in deciding the motion, Rule 11 motions should conserve rather than misuse judicial resources. See Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 99 (3d Cir. 1988) ("Rather than misusing scarce resources, [the] timely filing and disposition of Rule 11 motions should conserve judicial energies."). Thus, the District Court appropriately noted the history of counsels' conduct in this case and the importance of deciding the merits of the dispute, rather than ancillary issues.

**III**

For the foregoing reasons, we will affirm.