## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                                          )
                                                )
CHRISTOPHER PAIGE and                           )
MICHELE PAIGE,                                  )
                                                )    Case No. 3:17-cv-00023-MEM
      Debtors                            )
                                                )
_____)_____
                                                )                    **FILED**
CHRISTOPHER PAIGE,                              )                  **SCRANTON**
MICHELE PAIGE,                                  )
                                                )              FEB – 1 2017
                                                )
    Defendants/APPELLANTS)
                                                )          PER _____
      vs.                               )              DEPUTY CLERK
                                                )
LMF,                                            )    Case No. 5:11-bk-05957-JJT
MORGAN LEWIS, and                               )
JOHN GOODCHILD, ESQ.                            )    Adv. No. 12-ap-00067-JJT
                                                )
                                                )
    Plaintiff/APPELLEES              )
_____)_____

## APPELANTS' MOTION TO RECUSE
## JUDGE MANNION PURSUANT TO 28 U.S.C. 455(a) & (b)
## WITH INCORPORATED MEMORANDUM OF LAW

Would the general public *question* your ability to judge your son's *apparent[1]*

friends and his *apparent[2]* employer, who are *parties* to this appeal, impartially?

*See, e.g.*, LMF's Letter (App.Dkt. #7)[3] (Opposing Counsel's description of your

son's interests in this case); *and see* 28 U.S. 455(a) (requiring judges to recuse themselves whenever their impartiality, "…might reasonably be questioned.")

In other words, would the general public suspect that your son's interests and/or your extrajudicial "knowledge" of the parties might color or otherwise affect your judgment in this case? *See also* 28 U.S. 455(b).

**I.   FACTUAL BACKGROUND: Why did these Appellees fail to investigate their defamatory allegations in any way[4] despite multiple warnings from the Trustee (through counsel) that their malicious allegations were delusional[5] and why did they pursue allegations that they *KNEW* to be false[6] through five (5) years of litigation culminating in a ten (10) day trial[7] at which they called only witnesses who had denied (and continued to deny) their allegations under oath?[8]**

Even if everything these Appellees and the Trial Court have asserted were Gospel, so what?   What does anything they have argued regarding the legal sufficiency of LMF's Amended Complaint (Adv.Dkt. #81) have to do with our allegations that these Appellees failed to adequately investigate their allegations, that they lied to attain an extension, and that they pursued allegations that the *KNEW* or *SHOULD HAVE KNOWN* were false?  Why did the Trial Court define our allegations the same way as we just did here only to address completely different and utterly imaginary allegations in its decision?   *See, e.g.,* Tr. 5/17/12 (Adv.Dkt.#326),  p. 81, L: 14 - p. 82, L: 8; *but cf.* Opinion (Adv.Dkt. #349).  And why did the Trial Court hold a six (6) day hearing with five (5) witnesses only to ignore that hearing entirely?[9]

Assuming for the sake of argument that the Appellees' prior judgment in Delaware against my wife alone under completely different legal theories,[10] including a legal theory subsequently rejected by Delaware's Supreme Court,[11] was sufficient to sustain LMF's 523 Claims against my wife ***and I*** under the Bullock standard despite the Trial Court's prior statements to the contrary,[12] why were these Appellees entitled to pursue 727 Claims, which they themselves admitted had, "… nothing whatsoever to do…" with the allegations in Delaware?[13]  Was the Court running a "Buy One, Get One" free sale on ***false[14]*** allegations?

Regardless, even if these Appellees were relying upon a previous judgment, then why did they need more than four (4) years to prepare for trial?[15]  And why did they need a seventy-eight (78) day extension to the Congressionally-mandated sixty (60) day filing deadline to prepare a Complaint (Adv.Dkt. #1) based upon a previous judgment?[16]

And why were these Appellees allowed to sue me as a fiduciary despite the fact that they conceded the Delaware Court had rejected that claim against me?[17] Why were they allowed to re-try that theory?

Similarly, why were they able to lie about the caselaw, deliberately mis-quoting an authority to make it appear as if they could sue me as an fiduciary for allegedly aiding and abetting breach of fiduciary duty when Delaware law ***expressly*** forbids such claims against fiduciaries?[18]  Did the Trial Court correctly hold that creative pleading includes the right to lie about the applicable facts and

law?   *But cf.* <u>Thornton v. Wahl</u>, 787 F. 2d 1151, 1154 (7th Cir. 1986) ("Mrs. Thornton's presentation also cannot be described as a reasoned request for a change in the law. Her brief misrepresents existing law; she does not accurately describe the law and then call for change.") [emphasis added].

In short, did the Trial Court correctly hold that "anything goes" in love, war, and litigation?   *But cf.* <u>Theokary v. Shay (In re Theokary)</u>, 592 Fed. Appx. 102, 108 (3rd Cir. 2015) ("The submission of fabricated evidence, regardless of the merits or validity of the underlying claim, always constitutes egregious misconduct.") [emphasis added].

Even if discovery allowed these Appellees to file this lawsuit on February 23, *2012*, why were they allowed to pursue those claims for more than five (5) years[19] without conducting any discovery whatsoever since October *2012*?[20]  They didn't even bother to pick-up their own discovery requests![21]   How could discovery, which they voluntarily abandoned many years ago in October *2012*, justify anything that happened afterwards — including, but not limited to their decision to re-file their *false* allegations six (6) months *after* they abandoned their discovery efforts?

If we supposedly delayed the resolution of this case, then why did **THEY** file the continuances that actually prevented the trial?[22]  If we supposedly delayed the resolution of this case in order to extract a settlement from them, then why did

**THEY** repeatedly refuse our written offers to end this case for nothing — no payment or admissions of liability by anyone?[23]   If we supposedly delayed the resolution of this case through some alleged deficiency in our efforts to settle this case for nothing, then why did they spurn our attorney's offers to settle this case for nothing too?[24]

In short, why was the multi-billionaire[25] and his wealthy law firm suing impoverished, cancer-ridden, and innocent mother of three (3) toddlers and I (her husband) for so many years?  They claimed it wasn't about the money.[26]  In fact, they offered to settle with me in exchange for absolutely nothing — I didn't even have to abandon this litigation against them![27]  All I had to do was betray my wife![28]  When did parties acquire the right to sue people as leverage against other people?

If the Appellees' threats to rape and sodomize my wife and their references to me as a "faggot" were neither evidence of discriminatory animus[29] nor evidence of personal animus,[30] then what does such conduct prove?  That this Court is just really, really tolerant of such conduct?  Do you feel the same way about the n-word, or are women and perceived homosexuals the only people whose rights you don't respect?

And why did the state court suggest these comments were evidence of personal animus?[31]  How did the federal court substitute its judgment for the state court's?[32]  How did the federal court consider the state court's alleged decision on

5

this issue since the state court's decision was <u>both</u> hearsay <u>and</u> dicta?  That is, how did the Trial Court rely upon a decision that it expressly held the Chancery Court **NEVER** made because that issue (LMF's motives) was **NOT** part of the prior litigation?[33]

Regardless, why did they get to lie in order to attain an extension? Remember this case would have ended on or about March 1, 2012, but for Mr. Goodchild's false testimony that he "personally examined" us on documents that his colleague subsequently admitted he did not request until much, much later![34] Incredibly, Mr. Goodchild testified that he "personally examined" us on documents he claimed to believe did not exist![35]   How did he "personally examine" us on imaginary documents?

Indeed, how did Mr. Goodchild reasonably, sincerely, and in good-faith allege that his client invested $40 million with me personally[36] when his client had testified that he didn't even know I existed prior to the litigation in Delaware?[37] Was it reasonable to allege that his client may have invested money with an imaginary person?

Regardless, was it reasonable to allege that his client invested money with me despite the fact that his client had denied that allegation under oath **repeatedly**?[38]

The legal issues presented in our appeal, therefore, are quite simple.  First, is a trial court's discretion over sanctions plenary or do the Third Circuit's prior

authorities on sanctions limit that authority?  Second, did the Trial Court correctly

hold that the merits of a complaint must be assessed in a vacuum without regards

to the facts of any particular case?  Third, did the Trial Court correctly hold that

filing a non-frivolous complaint magically immunizes anything else a party might

do — including, but not limited to lying in order to attain an extension and/or to

bolster the case?

Or, in lay terms, is it really true that an impoverished cancer-ridden mother

of three (3) toddlers and her allegedly homosexual husband have no rights that a

multi-billionaire[39] and his wealthy lawyers are bound to respect?

## II.   ARGUMENT: Your son has financial and personal interests in the outcome of this case; consequently, you cannot be the judge of his interests.

With all due respect, we — the Appellants in the above-captioned appeal —

respectfully submit that you *MUST* recuse yourself from this case because no

reasonable person could trust your impartiality in a case in which your son's

employer and/or his friends are *parties* to the proceeding.

Remember Morgan Lewis isn't just the attorney in this case; they're also one

of the Appellees — a party has a completely different economic interest in and

relationship to an appeal than a mere attorney; consequently, you cannot preside in

this case, which has a direct and foreseeable effect upon your son.

Although recusal may not be automatic when a judge's child is an attorney at

a firm *representing* a party to a lawsuit, recusal must be automatic when your son

7

is employed by a ***party*** to the proceeding.  To cite only the most obvious example of how your son's interests are inextricably intertwined with Morgan Lewis's, a firm's reputation is an element of sanctions — can you impartially opine on the reputation of your son's employer?  What would be the consequences for your son if you were to hold that Morgan Lewis has a bad reputation?  Would your decision reflect the facts or your desire to help your son?

To illustrate our point by example, how many people can proffer an honest opinion regarding the quality of their own child's university?  Who ever says, "Any idiot can get into my son's college"?  Who wouldn't dismiss another person's assessment of their son's college as "biased"?

Indeed, we note that your son's professional listings on the Internet ***STILL*** assert that he is an employee of Morgan Lewis, which is one of the parties to this appeal.  Whatever the actual relationship between your son and Morgan Lewis, the fact that the public would reasonably infer that Morgan Lewis is <u>both</u> a party to this case <u>and</u> your son's employer necessarily creates the appearance of impropriety.  Appearance, after all, is a matter of perception, not fact.

Likewise, we have no idea how, why, or when your son left Morgan Lewis.  Does he have an axe to grind?  Does he have friends to reward?  Does he have a bonus to collect?  The relationships here are simply too close to be trusted.

In addition, the fact that Opposing Counsel concedes that your son has a personal relationship to the other parties to the appeal necessarily creates the

appearance of impropriety.   If nothing else, it suggests that you may have some personal relationship with the Appellees and/or that you may have some personal knowledge of the facts.  (For example, you may feel you "know" your son's firm, for better or for worse; consequently, you may judge this case based upon your "knowledge," rather than the facts.)   Consequently, this case is easily distinguishable from those cases in which the child's relationship was limited to working at the same law firm.

In this case, Opposing Counsel concedes that your son has <u>both</u> personal <u>and</u> economic ties to the Appellees, thereby rendering it impossible for anyone to disentangle your son's interests — and, thus, your interests — in this appeal.  *See, e.g.,* <u>U.S. v. Harrigan</u>, 80 Fed.App. 738, 742 (3rd Cir. Nov. 5, 2003) (judge's relationship to defendant's family would have precluded said judge from ruling in the defendant's favor; better practice, therefore, was recusal).

We regret the inconvenience; we intend no disrespect, but these facts are completely and utterly appalling; consequently, recusal is the only conceivable remedy because the question is not whether or not you can serve impartially, the question is whether or not a reasonable person would doubt your ability to serve impartially.  *See, e.g.,* 28 U.S. 455(a) (requiring a judge to recuse himself were his or her impartiality, "might reasonably be questioned.").

In lay terms, the appearance of impropriety *IS* an impropriety.  In short, you can't judge your son's friends and employer because reasonable people would question your ability to separate your son's interests from their interests.

Given the current status of the case, there's no reason you should not transfer the case immediately before you devote substantial time or effort to this appeal. Typically, motions to recuse are denied when the movant's motives can be questioned (aka "sour grapes") and/or when the Court has devoted substantial time or energy to a case; here, you have issued no substantive decisions of any kind; consequently, there's no cost to recusal to weigh against the benefits to public confidence.

That is, I simply haven't found any case in which a judge refused to recuse himself under similar circumstances *at the preliminary stages of a case* — a fact that reflects the indisputable reality that the standard of recusal must be lower at the start of the case as the importance of judicial economy grows over time.

This is *NOT* a case in which I'm a disgruntled loser complaining about the judge after his or her unfavorable opinion; likewise, this is *NOT* a case in which the conflict becomes apparent after you have devoted a great deal of time and attention to this case.  At this stage of the litigation, therefore, the standard for recusal is — and must be — quite low because there's no countervailing interest to consider.

**III.    CONCLUSION: Even if the Appellees were correct, their conduct is - at best - morally repugnant as they pursued an impoverished, cancer-ridden, innocent mother of three (3) toddlers and her husband for more than five (5) years without any evidence; consequently, you are being asked to declare that women and perceived homosexuals have no rights a multi-billionaire is bound to respect.**

In the final analysis, the conduct of your son's apparent employer and of his friends in this case is either grossly negligent or worse.    After all, either they *accidentally* pursued an impoverished, cancer-ridden innocent mother of three (3) toddlers and her husband for more than five (5) years without any evidence or they *deliberately* pursued an impoverished, cancer-ridden innocent mother of three (3) toddlers for more than five (5) years without any evidence.  Since their conduct is - at the very least - morally repugnant, your son benefits if you find someway to excuse it; consequently, you cannot serve as the judge in this case.

Since the Appellees' ignorance was the result of their conscious decisions to ignore their own evidence, to ignore their own witnesses' prior testimony, and to pursue no discovery whatsoever on their Amended Complaint (Adv.Dkt. #81), their ignorance (even assuming they were ignorant) constituted gross negligence at the very least and, thus, their claims that they were "surprised" by the evidence at trial is legally immaterial.

Likewise, nothing about their 523 Claims gave them a carte blanche to add other false claims and/or to lie to attain an extension.  Thus, all of the Appellees' counter-arguments are immaterial *to the facts of this case.*

As I said before, the fact that Barack Obama lives beyond his apparent means, travels in the company of armed men, and has confessed to ordering hits does not give rise to a non-frivolous racketeering claim against him because you can't ignore the fact that Mr. Obama was the President of the United States at the time of the alleged racketeering.  By the same logic, you can't ignore the facts of this case to assess the merits of LMF's allegations in a vacuum.

Regardless, nothing about the merits of their 523 Claims can immunize the Appellees' other frauds.

**WHEREFORE,** we respectfully request that you recuse yourself and that this case be reassigned.

<u>Dated:</u> January 30, 2017          Respectfully submitted,


Christopher Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355


Michele Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

ENDNOTES

[1]  Although Mr. Goodchild's Letter (App.Dkt. #7) does not specify your son's precise relationship with the Appellees, one must assume the worst because the standard is the *appearance* of impropriety. *See* 28 U.S. 455(a).

[2]  Although Mr. Goodchild asserts in his Letter (App.Dkt. #7) that your son no longer works at Morgan Lewis, his professional listings on the Internet beg to differ.  Whatever the truth of the matter, your son's professional listings on the Internet would shape public perception of his relationship to Morgan Lewis.

[3]  Since there are several dockets in this matter, I will refer to this Court's Docket in this appeal as "App.Dkt." to avoid any confusion.

[4]  According to the Appellees, their discovery efforts ended in October 2012, nearly six (6) months *before* they filed their Amended Complaint (Adv.Dkt. #81). *See, e.g.,* LMF's Answer (Adv.Dkt.#183), p. 2, Para 2 ("**By way of further response, LMF has not conducted discovery of the Debtors since October 2012...**") [emphasis in original].

[5]  *See, e.g.,* Trustee's Counsel's [Attorney Christman's] testimony [Tr. 5/18/16 (Adv.Dkt. #326), p. 43, L: 4 - 14 (recounting his warning to Mr. Goodchild that LMF's 727 Claims were nothing more than "tilting at windmills")].

6     For example, LMF's own testimony, Trial Exhibits, and production belied their allegations that my wife and I initiated this dispute over the Gates on or about March 14, 2010. *See, e.g.,* LMF's Response (Adv. Dkt. #275), Exhibit A, Para. 119 - 130; *and see* LMF's Response (Adv.Dkt. #293), Exhibit A, Para. 135 - 143 (falsely claiming that we initiated both this dispute over the Gates and settlement talks therein on or about March 14, 2010);

*But cf.* Our Hearing Exhibit OOOO [Randy Lerner deposition], p. 140, L: 20 - p. 141, L: 15, *and see* Id. at p. 206, L: 9 - p. 211, L: 4 (Randy Lerner's discussion and acknowledgment of pre-March 14th settlement talks, including his receipt of his lawyer's written summary thereof); Rob Bolandian email of **February 6, 2010**, at LMF's Trial Exhibit # 43 ("Let's discuss [Michele Paige's attached settlement offer] when you have time."); Rob Bolandian email dated **March 11, 2010**, at LMF's Trial Exhibit #44. ("We were surprised by the [settlement] documents you sent for our review and confused with the email below."); *and see* Our Hearing Exhibit KK (detailing LMF's threats to rape and sodomize my wife over a business dispute and discussing the ensuing settlement talks; please note that these emails began in late January **2009**, despite the Respondents' assertion that neither the dispute nor the settlement talks therein began until we initiated both more than a year later on March 14, **2010**.).

7     *See, e.g.,* Opinion (Adv.Dkt. #303), p. 2 ("After ten days of trial, LMF rested.").

8     *See, e.g.,* Opinion (Adv.Dkt. #303) p. 2 ("In advancing its case, LMF has called both Debtors and the female Debtor's sister as their only witnesses.").

9     *See generally* Tr. 7/16/13 (Adv.Dkt. #118); Tr. 3/29/16 (Adv.Dkt. #319); Tr. 5/17/16 (Adv.Dkt. #326); Tr. 5/18/16 (Adv.Dkt. #327); Tr. 5/19/16 (Adv.Dkt. #328); *and see* Tr. 7/13/16 (Adv.Dkt. #340).

10     To quote Judge Thomas, "The [Chancery Court] already ruled regarding Michele Paige regarding a breach of fiduciary responsibility, **but that's certainly not even close to defalcation as it's considered in the bankruptcy court.**". Tr. 11/12/ 15 (Adv.Dkt. #255), p. 172, L: 6 - 9 [emphasis added].

11    After the Chancery Court's decision in our case, Delaware's Supreme Court expressly held that the Chancery Court had mis-stated the law, expressly holding that the existence of our alleged fiduciary duties to LMF was an *UNSETTLED* question of law on which reasonable minds could differ. *See* <u>Gatz Properties, LLC v. Auriga Capital Corp.</u>, 59 A.3d 1206, 1219 (DE 2012) ("Fourth, the merits of the issue whether the LLC statute does - or does not - impose default fiduciary duties is one about which reasonable minds could differ.").

12    To quote Judge Thomas, "The [Chancery Court] already ruled regarding Michele Paige regarding a breach of fiduciary responsibility, **but that's certainly not even close to defalcation as it's considered in the bankruptcy court.**". Tr. 11/12/ 15  (Adv.Dkt. #255), p. 172, L: 6 - 9 [emphasis added].

13    Tr. 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I personally examined these debtors with respect to the new information that they had brought and the transfers that are -- were in the papers that were revealed to the trustee. **That testimony had nothing to do with anything that happened in the Chancery Court.**") [emphasis added];

14    Since the Appellees did *NOT* appeal Judge Thomas's judgment in our favor, they've necessarily — albeit implicitly — conceded our innocence and, thus, the falsity of their allegations. *See, e.g.,* Opinion (Adv.Dkt. #303).

15    *See, e.g.,* LMF's Motion for Continuance (Adv.Dkt. #17); Order (Adv.Dkt. #45); *and see* LMF's Memo (Adv.Dkt .#225).

16    *See, e.g.,* Opinion (Adv.Dkt. #40) & Order (Adv.Dkt. #41) granting LMF's request for a seventy-eight (78) day extension to a sixty (60) day filing deadline — including, but not limited to a six (6) day extension for no particular reason! *See* Mr. Goodchild's admission that LMF **chose** to file late at Tr. 3/1/12 (Dkt #86), p. 81, L: 7-10 ("I didn't think those six days were relevant because I knew we would be before Your Honor on March 1st. And so the timing of the filing of the complaint in my view is not so urgent.").

[17]   "With no helpful briefing on this subject from the Lerner Fund, I refuse to go further and hold that someone like Christopher Paige, who is not even an officer, director, or member of the governing fiduciary is a direct fiduciary of the limited partnership and its investors." *See* Delaware Opinion at LMF's Amended Complaint (Adv.Dkt. #81), Exhibit A, p. 68

*See also* Opinion (Adv.Dkt. #72), p. 10 ("In fact, the Court of Chancery specifically found that Christopher Paige was *not* a 'direct fiduciary.'").

[18]   Here's what they wrote regarding the elements of their aiding and abetting claim: "The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary duty, (2) breach of that fiduciary duty, and (3) knowing participation in the breach. *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986)." LMF's Response (Adv.Dkt. #275), Exhibit A, Para. 220.

But here's what that citation *actually* says, "...(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in that breach by the **defendants who are not fiduciaries.**" Weinberger v. Rio Grande Indus., Inc., 519 A.2d 116, 131 (Del. Ch. 1986).

Notice what they omitted from their citation?  Literally, they were asserting that the state court held <u>both</u> that I was <u>and</u> was *NOT* a fiduciary, and they altered their citation to make that ludicrous argument seem plausible.

Significantly, they persisted in making this "mistake" even after I expressly cited a more recent authority from a higher court to point out their "mistake" to them.  *See* Our Reply (Adv.Dkt. #282), Para. 220; *but cf.* LMF's Response (Adv.Dkt. #293), Exhibit A, Para. 239 ("The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary duty, (2) breach of that fiduciary duty, and (3) knowing participation in the breach.").

[19]   *See, e.g.,* LMF's Motion (Adv.Dkt. #309), p. 5 (stating that this litigation began "five" years ago).

[20]   According to the Appellees, their discovery efforts ended in October 2012, nearly six (6) months *before* they filed their Amended Complaint (Adv.Dkt. #81). *See, e.g.,* LMF's Answer (Adv.Dkt.#183), p. 2, Para 2 (**"By way of further response, LMF has not conducted discovery of the Debtors since October 2012..."**) [emphasis in original].

21     *See, e.g.,* Christopher Paige's testimony [Tr. 12/1/15 (Adv.Dkt. #271), p. 6, L: 17 - 19 ("All these transactions that they're asking for are easily accounted for in the records they didn't bother to pick up. So I made a spreadsheet showing the answer."); Id. at p. 18, L: 19 - 21 ("Yes. I produced everything I had. Yes. I'm sorry. I produced everything I had, but you didn't pick it all up."); Id. at p. 68, L: 4 - p. 99, L: 25].

22     *See, e.g.,* LMF's Motion for Continuance (Adv.Dkt. #17); Order (Adv.Dkt. #45); *and see* LMF's Memo (Adv.Dkt .#225).

23     *See, e.g.,* Christopher Paige's testimony [Tr. 7/13/16 (Adv.Dkt. #340), p. 5, L: 22 - p. 14, L: 15].

24     Id.

25     *See, e.g.,* Our Hearing Exhibit OOOO (Lerner deposition), p. 128, L: 5 - 7 (in which LMF's owner claims to have "several" billion dollars).

26     Critically, Mr. Goodchild proudly admitted that his client wasn't suing us for the money! *See, e.g.,* Tr. 3/1/12 (Dkt. #86), p. 25, L: 8-9 (When this Court pointed out that LMF's actions did not make any economic sense, Mr. Goodchild retorted, "In fact, my client would like to receive some recovery on the claim, **no matter what it is.**") [emphasis added].

This was no mere slip of the tongue; Mr. Goodchild repeated the same sentiment when he explained why his client wanted to litigate against me in Delaware even if it didn't make any economic sense: "Your Honor, our position was that we were prepared to adjudicate the claim so that there was a claim established against Mr. Paige no matter what." Tr. 5/23/12 (Dkt.#129), p. 21, L: 25 *et seq.*

*See also* Tr. 3/1/12 (Dkt. #86), p. 11, L: 21-22 ("We view that [establishing my liability] to be important irrespective of what happens with respect to the discharge proceeding.").

27     *See* Our Hearing Exhibit NN (*also at* LMF's Hearing Exhibit 36).

Note that I wasn't even a party to the alleged settlement offer referenced therein! *See* Id. at p. 1 ("...(d) **Lerner and Michele Paige** would enter into an agreement, to be negotiated in good faith, under which **Lerner** would accept payment of less than the full amount due...") [emphasis added].

28      Since LMF never dropped me from the case, one must infer that pressuring my wife to submit to the Appellees' demands was the implicit price of their offer.

29      On the one hand, the Trial Court held that these vicious emails were not proof of discriminatory animus. *See* Opinion (Adv.Dkt. #72), p. 6 ("The case is regrettably colored by one additional factual dimension. During the course of the discovery phase of the Delaware litigation, a number of LMF's internal email conversations referring to the Paiges in sexually derogatory language was uncovered. While crass and insulting, the Court of Chancery found that the conversations were a mere byproduct of LMF's frustration with Michele Paige's perceived lack of business acumen and professionalism. **They were not indicative of any intent or attempt to harass or discriminate**.") [emphasis added].

30      On the other hand, the Trial Court held these same emails were not proof of personal animus either. *See* Opinion (Adv.Dkt. #349), p. 5 ("Just as in the Delaware case, the Paiges argued before me that LMF had a 'personal antipathy' to injure Michele Paige. The Delaware Chancellor found no support for that argument despite a chain of tasteless emails among LMF associates.").

31      *See* Opinion (Adv.Dkt. #72), p. 6 ("The case is regrettably colored by one additional factual dimension. During the course of the discovery phase of the Delaware litigation, a number of LMF's internal email conversations referring to the Paiges in sexually derogatory language was uncovered. While crass and insulting, the Court of Chancery found that the conversations were a mere byproduct of LMF's frustration with Michele Paige's perceived lack of business acumen and professionalism. **They were not indicative of any intent or attempt to harass or discriminate**.") [emphasis added].

32      *But cf.* Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 192 (3d Cir. 2006) (Rooker-Feldman doctrine precludes federal courts "from entertaining an action . . . if the relief requested effectively would reverse a state court decision or void its ruling.").

33      Let me quote Judge Thomas again: "There is simply no law prohibiting an entity from acting wholly within his contractual rights but for the wrong reasons. The Delaware Court found that LMF had every right to demand return of its 40 million dollar investment. Therefore, its subjective motivation for the request is irrelevant." See Order (Adv.Dkt. #72), p. 6. So which of Judge Thomas's mutually-exclusive interpretations is correct? Were their motives litigated in the previous case or weren't they?

[34]    *See, e.g.,* Tr. 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I **personally examined** these debtors with respect to **the new information that they had brought** and the transfers that are -- **were in the papers that were revealed to the trustee**. That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added];

*But cf.* Tr. 1/4/16 (Adv.Dkt. #287), p. 191, L: 2 - 11 ("[JOHNS]: And just to -- to be clear just in terms of dates, that was a September 11th, 2011 letter where we told you we had requested copies. [ME]: No. It was 2012 letter. September 2012 you told me that you had requested. It was definitely 2012, and I thought it was September 12th, maybe it September 11th, you could be right on that. And — [JOHNS]: **I think you're right. You corrected me on the year. So, about September 11th, 2012** — [ME]: Yes.") [emphasis added].

[35]    *See, e.g.,* LMF's Response (Adv.Dkt. #275), Exhibit A, Para. 180 ("**Despite this repeated statement to the contrary during discovery**, Debtors claim to have retained copies of the check stubs for their personal and corporate bank accounts, and provided them to the Trustee.") [emphasis added].

[36]    *See, e.g.,* LMF's Amended Complaint (Adv.Dkt. #81), Para. 10 ("In October 2007, Lerner entrusted **the Paiges** with $40 million to be invested in the Onshore Fund and Offshore Fund (collectively, 'the Funds')" [emphasis added];

[37]    *But cf.* Our Hearing Exhibit OOOO, p. 28, L: 19 - 20; 25 ("Can I ask a quick question of you? Is she [Michele] married?"; "I realize I never even knew that.").

[38]    *See, e.g.,* Christopher Paige's testimony [Tr. 12/7/15 (Adv.Dkt. #274), p. 128, L: 13 - p. 130, L: 3 (documenting Respondents' prior testimony denying that I owned the entities at issue and denying that I managed their money)].

[39]    *See, e.g.,* Our Hearing Exhibit OOOO (Lerner deposition), p. 128, L: 5 - 7 (in which LMF's owner claims to have "several" billion dollars).

## CERTIFICATE OF SERVICE

Under penalty of perjury, I hereby attest that I served a true and correct copy of the foregoing Motion to Recuse - including any exhibits thereto - upon the person(s) identified below on the date provided below via first-class U.S. mail, postage prepaid:

John Goodchild, Esq.
Morgan Lewis
1701 Market St
Philadelphia, PA 19103-2921

<u>Dated:</u> January 30, 2017          Respectfully submitted,

Christopher Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

# PRIORITY
★ M A I L ★

**FLAT RATE ENVELOPE**
ONE RATE ★ ANY WEIGHT™

P S 0 0 0 0 1 0 0 0 0 1 4

EP14F July 2013
OD: 12.5 x 9.5

\* Domestic only.   \* For international shipments, the maximum weight is 4 lbs.

US POSTAGE AND FEES PAID
PRIORITY MAIL
Jan 30, 2017
Mailed from ZIP 11224
PM Flat Rate Env

Commercial/Flat Rate

0718000512BG



PRIORITY MAIL 2 — DAY

0006

RECEIVED
SCRANTON

FEB 01 2017

DEPUTY CLERK

PAIGE
CHRISTOPHER PAIGE
PO BOX 261
Shiyep PA 18357

SHIP TO:
COURT CLERK
US DISTRICT COURT
235 N WASHINGTON AVE
NEALON FEDERAL BLDG & COURTHOUSE
235 NORTH WASHINGTON AVE
SCRANTON PA 18501-5001

USPS TRACKING #

9405 5102 0082 8293 2370 97



UNITED STATES
POSTAL SERVICE®

TRACKED
★ ★ ★
INSURED\*
★ ★ ★