## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHRISTOPHER PAIGE and | ) | |
| MICHELE PAIGE, | ) | |
| | ) | Case No. 3:17-cv-00023-MEM |
| Debtors | ) | |
| | ) | |
| _____ | ) | _____ |
| | ) | |
| CHRISTOPHER PAIGE, | ) | **FILED** |
| MICHELE PAIGE, | ) | **SCRANTON** |
| | ) | |
| | ) | FEB 2 7 2017 |
| Defendants/APPELLANTS | ) | |
| | ) | PER _____ DEPUTY CLERK |
| vs. | ) | |
| | ) | |
| LMF, | ) | Case No. 5:11-bk-05957-JJT |
| MORGAN LEWIS, and | ) | |
| JOHN GOODCHILD, ESQ. | ) | Adv. No. 12-ap-00067-JJT |
| | ) | |
| | ) | |
| Plaintiff/APPELLEES | ) | |
| _____ | ) | _____ |

## APPELLANTS' NOTICE OF MOOTNESS; AND
## APPELLANTS' MOTION TO STRIKE AND/OR MOTION TO
## FORCE AN AMENDMENT TO THE APPELLEES' BRIEF
## PURSUANT TO FED.R.BANKR.P. 9011(a)
## WITH INCORPORATED MEMORANDUM OF LAW

Why did the Appellees Morgan Lewis and John Godchild refuse to file a

Brief in their own defense?   Why won't they *formally and publicly* join their

client's arguments and assertions?  In your experience, does an attorney's refusal to sign his or her own Brief signal confidence in their arguments?

I.   **FACTUAL & PROCEDURAL BACKGROUND: Why Did These Appellees Need More than Five (5) Years to Prepare for a Trial in Which They Called *NO FAVORABLE WITNESSES* Whatsoever; Did They Sincerely, Reasonably, and in Good-Faith Believe that Witnesses Are Optional?**

I won't bore you with a detailed "background" discussion because one (1) undisputed fact renders all others moot: why did these Appellees insist upon litigating this case for more than five (5) years despite the fact that the *only* witnesses they attempted to call at trial *DENIED* their allegations?  *See, e.g.,* LMF's Response (Adv.Dkt. #275), Ex. A, Para. 211 - 212 (asking Judge Thomas to ignore all of their own witnesses' trial testimony).  In your experience, do most lawyers think that *favorable* witnesses are optional?  How often have you presided over a trial in which the *ONLY* witnesses whom the plaintiff called to testify *DENIED* the plaintiff's allegations?  How often has a plaintiff asked you to ignore all of its own witnesses?  Id.

Isn't that absurd waste of court time precisely what dispositive motions were designed to prevent?  If Rule 56 doesn't apply to plaintiffs who have absolutely no witnesses who support their allegations, then when does it apply?  Do you really believe that your colleague ordered a ten (10) day trial because he thought that these Appellees intended to present absolutely no testimony whatsoever in support of any of their allegations?  Or do you think they lied to him about their evidence?

2

II.   **ARGUMENT: The Appellees Morgan Lewis & John Goodchild Made a General Appearance, Thereby Waiving Their Unspecified Objection to This Court's Appellate Jurisdiction; Likewise, They Didn't Sign Their Brief, Thereby Violating Fed.R.Bankr.P. 9011(a).**

For some bizarre, but unspecified reason, the Appellees Morgan Lewis and John Goodchild pretend that they're not parties to this appeal. *See, e.g.*, LMF's Response (App.Dkt. #12), p. 1, n. 1 ("Appellants styled this appeal in a way that suggests multiple Appellees.   This response is submitted on behalf of all Appellees."); *and see* LMF's Brief (App.Dkt. #67), p. 9, n. 1 ("This brief is also submitted on behalf of Appellee John C. Goodchild, III and the law firm of Morgan, Lewis & Bockius LLP, to the extent any is a proper appellee.").

To be frank, I'm not sure what they're attempting to argue since their Brief (App.Dkt. #67) never mentions "jurisdiction," but the Appellees' apparent objection to this Court's appellate jurisdiction - whatever it may be - is now moot given their general appearance in their Brief. *See generally* LMF's Brief (App.Dkt. #67).

To the extent that the Appellees are attempting to assert an objection to this Court's subject matter jurisdiction (rather than an objection to this Court's personal jurisdiction over the non-signing Appellees), I can only speculate what they're attempting to argue, but I note that the Federal Rules anticipate and require Appellees to state their jurisdictional objections in their initial Brief. *See, e.g.,* Fed.R.Bankr.P. 8014(b) ("Appellee's Brief. The appellee's brief must conform to

the requirements of subdivision (a)(1)–(8) and (10), except that none of the following need appear **unless the appellee is dissatisfied with the appellant's statement**: (1) the jurisdictional statement;…") [emphasis added].

It is ironic, to say the least, that these Appellees are attempting to argue that they're not acting vexatiously while simultaneously both challenging this Court's jurisdiction and waiving that objection!  What was the point of raising this issue only to ignore it entirely?  Isn't that the epitome of a vexatious argument?

Nevertheless, I believe that I'm obligated to point out these Appellees' weird challenge to this Court's appellate jurisdiction - whatever that challenge was - is now moot by virtue of their general appearance.

In addition, I am compelled to note that no one actually signed LMF's Brief on behalf of either Morgan Lewis or Mr. Goodchild (hereinafter "non-signing Appellees"); rather, Mr. Goodchild *expressly* signed LMF's Brief on behalf of LMF alone.  *See* LMF's Brief (App.Dkt. #67), p. 47.  Consequently, this Court cannot accept the Appellees' Brief and/or this Court must compel the non-signing Appellees [Morgan Lewis & John Goodchild] to comply with Fed.R.Bankr.P. 9011(a).  *See* Id. ("An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.").

III.   **LEGAL SIGNIFICANCE: The Appellees Morgan Lewis and John Goodchild Didn't Sign Their Brief Because They'd Have to Admit to a Serious Ethics Violation.**

4

Normally, I wouldn't care because I believe that the non-signing Appellees are bound by their aforementioned general appearance, but these non-signing Appellees' bizarre attempt to conceal their general appearance raises an important ethical issue: LMF's so-called "settlement letter" of April 2013 [LMF's Hearing Exhibit #36] could *not* have been a settlement letter because neither Morgan Lewis nor Mr. Goodchild should have been negotiating with us on behalf of their client while simultaneously negotiating with us on behalf of themselves. *See* Pa. R. Prof'l Conduct 1.7 ("—[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer."). Thus, their so-called settlement letter could *NOT* have resolved this dispute regarding sanctions — a dispute it does not even mention (presumably because the non-signing Appellees were attempting to comply with the aforementioned ethics rules).

Although the non-signing Appellees obviously do not want to make an admission that could be used against them at a subsequent disciplinary hearing and/or malpractice action, the Rules do *NOT* permit the non-signing Appellees to evade their responsibility for the accuracy of the factual assertions within *their* Brief. Here, the fact that their Brief asserts that they were attempting to negotiate

for their client *and themselves* at the same time is utterly damning, but they're stuck with the factual assertions in ***their*** Brief nonetheless!

That is, they need to ratify their client's assertions in their joint-Brief, or they need to disavow their client's assertion, but they can't ignore Rule 9011's mandate in order to avoid admitting — in open court, by and through the counsel of their choice — that they violated the ethics rules ***as interpreted by this Circuit***. Ferguson v. Valero Energy Corp., 454 Fed.Appx. 109, 113, n. 2 (3rd. Cir. 2011) ("We also note that had Schiable and the Firm [plaintiff's lawyers] negotiated their own release from sanctions during the settlement talks with respect to their clients' suit, they could have been subject to disciplinary action under the conflict-of-interest provisions of the Pennsylvania Rules of Professional Conduct.").

In short, the non-signing Appellees are caught between a rock and a hard place: either they admit that they were attempting to negotiate a global settlement (thereby admitting they violated the ethics rules) or they deny that they were attempting to negotiate a global settlement (thereby admitting they lied to Judge Thomas when they claimed that they had offered, "to bring all of this to an end."). *See, e.g.,* Tr. 5/19/16 (Adv.Dkt. #328), p. 138, L: 5 - 8 (GOODCHILD: "And so on that basis in 2013 when I offered to have a conversation with you to bring all of this to an end you decided that that wasn't good enough and that you would ask for a million and a half dollars."). If you're wondering why the non-signing Appellees

refused to sign their own Brief, wonder no more — at best, they violated the ethics rules!

The only real questions are as follows: 1. Why did they offer us such a great "deal" — a deal that, on its face, would have allowed me to escape scot free AND to pursue this sanctions case against them? [LMF's Hearing Exhibit #36], and 2. Why would you trust anything they have to say now that you know the *real* reason they won't sign *their own Brief*?

Don't get me wrong, I'm sure they'll sign a "corrected" Brief, but ask yourself why a *pro se* idiot like me had to direct their attention to this issue, and you'll know all you need to know about this case took so long.  They always have an excuse, but is that excuse plausible?  And are you willing to accept that excuse without subjecting them to the oath and cross-examination?

Or, in lay terms, why did they need five (5) years to "prepare" for a trial of claims supposedly based upon a previous judgment and for which *their* only witnesses were the Defendants and the Defendants' sister?  *See, e.g.,* Opinion (Adv.Dkt. #303), p. 2 ("In advancing its case, LMF has called both Debtors and the female Debtor's sister as their only witnesses.").  Were they morons who thought Perry Mason was a documentary, or were they just trying to torture us?  Why would anyone — much less such skilled lawyers — spend so much time and effort preparing for a trial that they'd lose *UNLESS* we spontaneously confessed?  Even litigants on the People's Court don't appear without witnesses; even idiots like me

7

don't count on spontaneous confessions from their opponents; so how could Morgan Lewis and John Goodchild forget that they needed witnesses who actually supported their allegations?

And how could they forget to sign their own Brief?  How did we win on a dispositive motion *without presenting a defense?*  *See, e.g.,* LMF's Opposition (Adv.Dkt. #275), p. 4 ("…Debtors have not begun to put on their case.") [emphasis added].

These "mistakes" are only mistakes in the same sense that firing a loaded gun into your sworn enemy's head suggests that you "thought" the gun wasn't loaded.  At best, you now know *from their own lips* that they were trying to circumvent the ethics rules *as interpreted by this Circuit*; why would that give you *any* confidence whatsoever in anything they have to say?  Fool me once, shame on you; fool me twice…

## IV.  CONCLUSION: I May Be the Rambling Idiot They Claim I Am, But I Didn't Show Up to Trial Without Any Witnesses — And How Could Litigating Without Witnesses Constitute "Good Faith"?

Look, I may be the rambling idiot they claim I am, but I am the rambling idiot who beat them on a dispositive motion (aka without presenting a defense). *See, e.g.,* LMF's Opposition (Adv.Dkt. #275), p. 4 ("…Debtors have not begun to put on their case.") [emphasis added].  So why did we win?  Obviously, they don't claim that we "outlawyered" them, so why did we win?

8

In lay terms, they're literally arguing that our innocence is so obvious and undeniable that even idiots like us couldn't lose this case. *See, e.g.,* LMF's Brief (Adv.Dkt. #67), p. 29 (alleging we won despite our incompetence). Fine, so why didn't they recognize our innocence prior to March 11, 2016, when Judge Thomas rejected their garbage?

You can say whatever you want, but everyone knows the truth: Chapter 7 cases are *NOT* supposed to take five (5) years because the creditor hopes that the defendants will spontaneously confess at trial. Somebody screwed up here. If you want to blame your colleague — if you want to publicly denounce him as a liar or an idiot who either can't or won't enforce summary judgment — I can't stop you, but I think you should admit the obvious: they lied. There's just no other explanation for how this case transpired.

Americans have lost faith in their courts; if you want to tell them they're right, then go ahead and issue an opinion that applauds these Appellees' conduct in this case; that says there's nothing anyone can do to prevent tragedies like this because neither lawyers nor clients can be expected to investigate their allegations *before* trial; that says calling people "faggots" and threatening to rape and sodomize them *over a business dispute* is no big deal.

If they're right, if legal ethics really are the joke that everyone believes they are, then lawyers truly deserve the public's scorn and ridicule.

**WHEREFORE,** we respectfully request that you ignore the Appellees' jurisdictional objections (whatever they were) and that you strike their Brief unless they sign it.

<u>Dated:</u> February 22, 2017          Respectfully submitted,

Christopher Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355


Michele Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHRISTOPHER PAIGE and | ) | |
| MICHELE PAIGE, | ) | |
| | ) | Case No. 3:17-cv-00023-MEM |
| Debtors | ) | |
| | ) | |
| _____ | ) | _____ |
| | ) | |
| CHRISTOPHER PAIGE, | ) | |
| MICHELE PAIGE, | ) | |
| | ) | |
| | ) | |
| Defendants/APPELLANTS | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| LMF, | ) | Case No. 5:11-bk-05957-JJT |
| MORGAN LEWIS, and | ) | |
| JOHN GOODCHILD, ESQ. | ) | Adv. No. 12-ap-00067-JJT |
| | ) | |
| | ) | |
| Plaintiff/APPELLEES | ) | |
| _____ | ) | _____ |

## PROPOSED ORDER

After careful review of the Record, I hereby find that Appellees Morgan

Lewis and John Goodchild have waived their objection, if any, to this Court's

appellate jurisdiction, and their Brief shall be stricken unless they sign it within

seven (7) days of this order.

**DATED:**

## CERTIFICATE OF SERVICE

Under penalty of perjury, I hereby attest that I served a true and correct copy of the foregoing Motion - including any exhibits thereto - upon the person(s) identified below on the date provided below via first-class U.S. mail, postage prepaid:

John Goodchild, Esq.
Morgan Lewis
1701 Market St
Philadelphia, PA 19103-2921

Dated: February 22, 2017      Respectfully submitted,

Christopher Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Case No. 3:17-cv-00023

## CHRISTOPHER AND MICHELE PAIGE
*Appellants*

*and*

## LERNER MASTER FUND,
## MORGAN LEWIS,
## JOHN GOODCHILD, ESQ.,
*Appellees*

# APPELLANTS' REPLY BRIEF
# IN THEIR APPEAL FROM THE FINAL JUDGMENT
# DENYING THEIR MOTIONS FOR SANCTIONS

From the United States Bankruptcy Court
Middle District of Pennsylvania
The Hon. John J. Thomas, United States Bankruptcy Judge
Case No. 5:11-bk-05957 - JJT (In re Paiges)
Adv.No. 12-ap-00067-JJT (LMF vs. Paige)

Christopher and Michele Paige
75-78 177th St.
Fresh Meadows, NY 11366
718.591.6355
Appellants, *pro se*

**DATED:** February 22, 2017

## I.   TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | TABLE OF CONTENTS | A - 1 |
| II. | TABLE OF AUTHORITIES | A - 3 |
| III. | **INTRODUCTION:** These Appellees ask you to brand your colleague, Judge Thomas, as either a crook or an idiot who either would not or could not enforce decades of summary judgment jurisprudence; in stark contrast, we ask you to infer the obvious: they lied about their evidence to prolong this case, thereby inflicting severe and irreparable harm upon innocent and vulnerable defendants. | 1 |
| IV. | **SUMMARY OF THE ARGUMENT:** Why did these Appellees fail to investigate their defamatory allegations *in any way* despite multiple warnings from the Trustee (through counsel) that their malicious allegations were delusional and why did they pursue allegations that they *KNEW* to be false through five (5) years of litigation culminating in a ten (10) day trial at which they called only witnesses who had denied (and continued to deny) their allegations under oath? | 7 |
| V. | **ARGUMENT:** The Appellees' arguments are irrelevant to the facts of this case because they attempted to re-try the issues they lost in Delaware, thereby violating even their own understanding of permissible conduct.   Likewise, the Appellees' arguments ignore the undisputed chronology of events, which proves they could have not done what they claim to have done for the reasons they assert; at best, therefore, the timeline proves that they were guilty of gross negligence, thereby rendering their protestations of innocence legally immaterial. | 12 |

| A. | The Appellees' arguments are irrelevant to these facts because they attempted to re-try the issues they lost in Delaware, thereby violating their own understanding of permissible conduct. | 13 |
| --- | --- | --- |
| B. | The Appellees' arguments ignore the problem of time, thereby falsely asserting that plaintiffs can litigate in blissful ignorance for as long as they like so long as they don't use discovery to "cure" their ignorance. | 14 |
| C. | The Appellees lied to attain an extension of the filing deadline, thereby prolonging this case for years. | 20 |
| D. | If they believed my wife and I had $39 million of their money, then why didn't they attempt to find and recover their "missing" millions?  Neither the Trial Court nor the Appellees ever attempted to justify the Appellees' 727 Claims, which even they concede had "nothing" to do with the previous litigation in Delaware. | 23 |
| VI. | CONCLUSION: Justice requires sanctions. | 24 |
| VII. | ENDNOTES | 29 |
| VIII. | Appellants' Statement Regarding Appendices | C - 1 |
| IX. | Certificates of Length & Service | C - 2 |

A - 2

## II.   TABLE OF AUTHORITIES

|  |  |
|---|---|
| *Caselaw* | |
| Bullock v. Bank Champaign, N.A. (In re Bullock), 133 U.S. 1754, 1759 (2013) | 8, 17, 38 |
| Gaiardo v. Ethyl Corp., 835 F.2d 479 (3rd Cir. 1987) | 14, 22, 27 |
| *See* Gatz Properties, LLC v. Auriga Capital Corp., 59 A.3d 1206, 1219 (DE 2012) | 33 |
| In re Miller, 529 B.R. 73 (Bankr.E.D.Pa. 2015) | 16 |
| Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181 (3d Cir. 2006) | 37 |
| Theokary v. Shay (In re Theokary), 592 Fed. Appx. 102 (3rd Cir. 2015) | 9 |
| Thornton v. Wahl, 787 F. 2d 1151 (7th Cir. 1986) | 9 |
| *Other Authorities* | |
| ABA MODEL RULES OF PROFESSIONAL CONDUCT, Rule 3.3(a)(1) | 21 |
| Fed.R.Civ.P. 56 | 4 |

A - 3

How much should *innocent*[1] people and *their families* suffer when extremely-wealthy plaintiffs[2] and their equally powerful attorneys[3] can't be bothered to investigate their allegations? *See, e.g.,* Tr. 11/20/15 (Adv.Dkt. #261), p. 199, L: 24 - p. 203, L: 5. (LMF's attorneys demanding that I account for a *$159,000* check cashed by *LMF*). In lay terms, is it really too much to expect an attorney to know the fate of a *$159,000* check cashed by his client and photocopied in the Trial Exhibit that he's using to examine the defendant? Or did these Appellees have a sincere, reasonable, and good-faith belief that we had stolen[4] the *$159,000* that *LMF* had deposited into *its* own checking account? Legally, did Judge Thomas correctly hold that LMF needed discovery from *my wife and I* to learn the contents of *its own bank account*?

### III. INTRODUCTION: These Appellees ask you to brand your colleague, Judge Thomas, as either a crook or an idiot who either would not or could not enforce decades of summary judgment jurisprudence; in stark contrast, we ask you to infer the obvious: they lied about their evidence to prolong this case, thereby inflicting severe and irreparable harm upon innocent and vulnerable defendants.

If, as these Appellees assert, we prevailed because LMF could not satisfy its allegedly "high burden" of proof, then whose testimony supported *their* allegations? Remember LMF's argument below was that every one of its *own* witnesses — everyone who had testified at the trial — had lied. *See, e.g.,* LMF's Response (Adv.Dkt. #275), Ex. A, Para. 211 - 212. Since these Appellees literally

asked Judge Thomas to disregard *all* of the trial testimony, what was the imaginary contrary evidence that he supposedly weighed, but found wanting?

Indeed, here's what he actually wrote about LMF's "evidence" for each of its allegations:

- Regarding LMF's "badges of fraud" arguments, he wrote, "… I simply came up **empty**…". Opinion (Adv.Dkt. #303), p. 8;

- Did you notice how and when we supposedly "co-mingled" assets? "Christopher Paige further testified that both business and personal expenses were paid from a corporate account and then reconciled at the end of the year with the help of their tax professionals. Transfers from one account to another were preceded by memorandums delivered to the prime broker and copied to the administrator." Id. at 7 [internal citations omitted];

- Thus, for LMF's Count V (embezzlement), he concluded, "As it stands, the record **devoid of any evidence**…". Id. at 10;

- Regarding LMF's Count VI (record destruction), he held "…but there is **no evidence** the Debtors took any affirmative action to cause records not to be available to LMF…". Id. at 11;

- Regarding LMF's Count VII (failure to account/false statements), he expressly held they didn't even attempt to *acquire* evidence, "Despite the fact that the Debtors were on the stand for a combined ten days, **I do not believe the question was ever specifically asked** of them." Id. at 12; and

2

- Regarding LMF's 523 Claims (Counts I - IV) (quasi-criminal intent), he found, "I further find that there is **no evidence** either Debtor had a conscious understanding that their activities under the various contracts that bound the parties was wrongful." Id. at 14.

If presenting *any* evidence - or *one* favorable witness - is a "high burden," then I guess they're right, but do you think that Judge Thomas is such a Grade A moron that he thought a plaintiff is entitled to a trial in order to dispute *all* of its *own* witnesses' trial testimony?  How does a plaintiff get a trial without *any* favorable witnesses?  Or do you think that these Appellees lied about their evidence to defeat summary judgment?  That is, who is really insulting Judge Thomas — the Appellees who ask you to attribute bizarre and idiotic sentiments to him; or my wife and I, who ask you to assume that he was deceived by their voluminous filings?

I don't know why they're supposedly "confused" by our indirect proof, but it's a simple logical tool that does *NOT* insult Judge Thomas in any way.  [After all, if Judge Thomas shares their misunderstanding of our indirect proof, then he certainly knew how to respond.]

Ultimately, whether you believe the relevant time frame is ten (10) years or four (4) years or something in between, should a multi-year, multi-million dollar litigation finally end when the Plaintiff fails to persuade the Defendants to confess

3

*at trial*? Does hoping that the Defendants will confess *at trial* seem like a *normal* trial strategy to you? How can that strategy be reconciled to summary judgment?

In lay terms, if we filed too many dispositive motions, then how did we win on yet another dispositive motion? What changed between the close of discovery in October 2012,[5] and their decision to rest on January 20, 2016, that allowed us to win *on their evidence* if - as they allege - we were not entitled to win on the same evidence, which we had presented in our previous dispositive motions?

Remember *they* claimed below that our *winning* dispositive motion merely rehashed our previous dispositive motions! *See, e.g.,* LMF's Opposition (Adv.Dkt. #293), p. 3 ("Like Debtors' motion for judgment under Rule 52, the Motions for Judgment and/or Dismissal do not cite or refer to the factual record from trial,…"). So, quite literally, they're arguing that plaintiffs have the right to force defendants to deny their allegations *at trial* — a rule that eviscerates Rule 56! Does that strike you as a sincere, reasonable, and good-faith interpretation of summary judgment jurisprudence?

In assessing the proposition that these Appellees needed discovery to assess the merits of their allegations, remember where LMF found its "missing" money: in its own bank account! *See, e.g.,* Tr. 11/20/15 (Adv.Dkt. #261), p. 199, L: 24 - p. 203, L: 5. Doesn't everybody need more than five (5) years of litigation[6] and a ten (10) day trial[7] to discover the fate of a *$159,000* check that's sitting in their own bank account? Don't you routinely forget *$159,000* deposits into your own bank

4

account?   Doesn't everybody routinely misplace *$159,000*, thereby prompting them to spend millions[8] litigating *false* allegations of theft[9] for years and years and years?  Happens every day, right?

Remember these Appellees couldn't decide whether we had "stolen" more than $39 million of *their* money or only $6.6 million of *their* money, and they *never* attempted to resolve that $32 million discrepancy![10]   Because who cares about a measly $32 million, right?   Obviously, nobody can expect clients or attorneys to investigate their alleged damages *before* they spend millions litigating their false allegations for more than five (5) years!  That would be crazy!

Don't you routinely ask yourself, "Does my 401k have $40 million or just $7 million?"  Doesn't everybody "forget" the value of their investments plus or minus $32 million?

In short, why did these Appellees — a multi-billionaire[11] and his self-proclaimed "super lawyers"[12] — spend millions pursuing a $6.6 million judgment[13] against an impoverished,[14] cancer-ridden,[15] *innocent[16]* mother of three (3) toddlers[17] and I (her husband) through litigation that lasted more than five (5) years[18] without bothering to seek their "missing" $39 million?[19]

And why did they show-up for trial without *any* witnesses?  Literally, Judge Thomas had to adjourn the trial for a day, so that the Appellees could subpoena their witnesses[20] — my wife, her sister, and myself![21]  Because doesn't everyone need years to prepare for a trial in which their "strategy" depends upon their

5

opponents spontaneously confessing,[22] thereby recanting their voluminous prior testimony![23]  Because Perry Mason is a documentary, right?

In assessing the need for a trial in this matter, remember that we prevailed on a dispositive Motion![24]   Literally, we never presented our defense!   *See, e.g.,* LMF's Opposition (Adv.Dkt. #275), p. 4 ("…**Debtors have not begun to put on their case.**") [emphasis added].  How did we prevail upon a dispositive Motion if — as the Appellees previously claimed — we were *NOT* entitled to prevail upon our previous dispositive Motions, which raised the same *legal* issues?[25]  Looking at this Record, are you really going to suggest that we did *NOT* do enough to raise these issues?

Don't take my word for the proposition that our winning Motion did not rely upon the trial record in any way; take the Appellees': "Like Debtors' motion for judgment under Rule 52, the Motions for Judgment and/or Dismissal **do not cite or refer to the factual record from trial,…**")  LMF's Opposition (Adv.Dkt. #293), p. 3 [emphasis added]. *See also* LMF's Opposition (Adv.Dkt. #275), p. 4 ("Neither of their Motions contains a single citation to testimony, trial exhibits admitted at trial, or any other evidence.").  Since the Appellees concede that we won *without* referring to the trial record in any way, why weren't we entitled to win *before* the trial?

In lay terms, is Judge Thomas a crook or an idiot who either would not or could not enforce the law, or did these Appellees lie to prevent summary judgment?

6

You already know our assessment of Judge Thomas's competence and integrity, but the world's about to read *your* assessment of *your* colleague's competence and integrity. Are you *really* going to write an opinion that brands your colleague as either a liar or a fool? Or will you concede the obvious: that these Appellees lied to prolong this case and, thus, that these Appellees are guilty of bad-faith litigation *as a matter of law*?

IV.   **SUMMARY OF THE ARGUMENT: Why did these Appellees fail to investigate their defamatory allegations *in any way*[26] despite multiple warnings from the Trustee (through counsel) that their malicious allegations were delusional[27] and why did they pursue allegations that they *KNEW* to be false[28] through five (5) years of litigation culminating in a ten (10) day trial[29] at which they called only witnesses who had denied (and continued to deny) their allegations under oath?[30]**

Even if everything these Appellees and the Trial Court have asserted were Gospel, so what? What does anything they have argued regarding the alleged *legal* sufficiency of LMF's Amended Complaint (Adv.Dkt. #81) have to do with our Motions for Sanctions [Adv.Dkt. #67, #139, #233, #288 & #290], which allege that these Appellees failed to adequately investigate their allegations, that they lied to attain an extension, and that they pursued allegations they either *KNEW* or *SHOULD HAVE KNOWN* to be false?

Why did the Trial Court define our allegations the same way as we just did only to address completely different and utterly imaginary allegations in its decision? *See, e.g.,* Tr. 5/17/12 (Adv.Dkt.#326), p. 81, L: 14 - p. 82, L: 8; *but cf.* Opinion (Adv.Dkt. #349). And why did the Trial Court hold a six (6) day long

hearing on our aforementioned Motions in which the Court heard testimony from five (5) witnesses only to ignore absolutely everything from its own sanctions hearing in its decision (Adv.Dkt. #349)?[31]

Assuming for the sake of argument that the Appellees' prior judgment in Delaware against *my wife alone* under completely different legal theories,[32] including a legal theory subsequently rejected by Delaware's Supreme Court,[33] was sufficient to sustain LMF's 523 Claims against my wife *and I* under the <u>Bullock</u> standard (despite the Trial Court's previous statements to the contrary),[34] why were these Appellees entitled to pursue 727 Claims, which they themselves admitted had, "…nothing whatsoever to do…" with the allegations in Delaware?[35]  Was the Court running a "Buy One, Get One" free sale on *false[36]* allegations?

Regardless, even if these Appellees were relying upon a previous judgment, then why did they need more than four (4) years to prepare for trial?[37]  And why did they need a seventy-eight (78) day extension to the Congressionally-mandated sixty (60) day filing deadline to prepare a Complaint (Adv.Dkt. #1) based upon a previous judgment?[38]

And why were these Appellees allowed to sue me as a fiduciary despite the fact that they had conceded the Delaware Court had rejected that claim against me?[39]  Why were they allowed to re-try that theory?

Similarly, why were they able to lie about the caselaw, deliberately mis-quoting an authority to make it appear as if they could sue me *as a fiduciary* for

8

allegedly aiding and abetting a breach of fiduciary duty when Delaware law *expressly* forbids such claims against fiduciaries?[40]   Did the Trial Court correctly hold that creative pleading includes the right to lie about the applicable facts and authorities? *But cf.* Thornton v. Wahl, 787 F. 2d 1151, 1154 (7th Cir. 1986) ("Mrs. Thornton's presentation also cannot be described as a reasoned request for a change in the law. Her brief misrepresents existing law; she does not accurately describe the law and then call for change.").

In short, did the Trial Court correctly hold that "anything goes" in love, war, and litigation? *But cf.* Theokary v. Shay (In re Theokary), 592 Fed. Appx. 102, 108 (3rd Cir. 2015) ("The submission of fabricated evidence, regardless of the merits or validity of the underlying claim, always constitutes egregious misconduct.").

Even if discovery's potential allowed these Appellees to file this lawsuit on February 23, *2012*, why were they allowed to pursue those claims for more than five (5) years[41] without conducting any discovery whatsoever since October 2012?[42]   They didn't even bother to pick-up their own discovery requests![43]   How could discovery, which they voluntarily abandoned many years ago in October *2012*, justify anything that happened afterwards — including, but not limited to their decision to re-file their *false* allegations six (6) months *after* they had abandoned their discovery efforts?

9

Similarly, if we supposedly delayed the resolution of this case, then why did **THEY** file the **multiple** continuances that actually prevented the trial?[44]   If we supposedly delayed the resolution of this case in order to extract a settlement from them, then why did we wait seventeen (17) months to implement our plan?[45]   How did we know that **THEY** would give us 17 months to act?[46]   And why did **THEY** repeatedly refuse our written offers to end this case for nothing — no payment or admissions of liability by anyone?[47]   If supposedly delayed the resolution of this case through some alleged deficiency in our efforts to settle this case for nothing, then why did they spurn our attorney's offers to settle this case for nothing too?[48]   Were **they** part of our conspiracy against **them**?

In short, why was this multi-billionaire[49] and his self-proclaimed "super lawyers"[50] suing an impoverished,[51] cancer-ridden,[52] and **innocent[53]** mother of three (3) toddlers[54] and I (her husband) for so many years?  They claimed it wasn't about the money.[55]   In fact, they even offered to settle with me in exchange for absolutely nothing — I didn't even have to abandon this sanctions litigation against them![56]   All I had to do was betray my wife![57]   When did parties acquire the right to sue people as leverage against other people?

Furthermore, if the Appellees' threats to rape and sodomize my wife and their references to me as a "faggot" were neither evidence of discriminatory animus[58] nor evidence of personal animus,[59] then what does such conduct prove?  That this Court is just really, really tolerant of such conduct?  Do you feel the same

10

way about the n-word, or are women and perceived homosexuals the only people whose rights you don't respect?

And why did the state court suggest these comments were evidence of personal animus?[60]  How did the federal court substitute its own judgment for the state court's?[61]   How did the federal court consider the state court's alleged decision on this issue since the state court's decision was <u>both</u> hearsay <u>and</u> dicta? That is, how did the Trial Court rely upon a decision that it expressly held the Chancery Court *NEVER* made because that issue (LMF's motives) was *NOT* part of the prior litigation?[62]

Regardless, why were they entitled to lie in order to acquire an extension? Remember this case would have ended years ago on or about March 1, 2012, but for Mr. Goodchild's false testimony that he "personally examined" us on documents that his colleague subsequently admitted he did not request until much, much later![63]  Incredibly, Mr. Goodchild testified that he "personally examined" us on documents he claimed to believe did not exist![64]   How did he "personally examine" us on imaginary documents?  *When did lying under oath to attain an erroneous published opinion become an acceptable legal tactic?*

Indeed, how did Mr. Goodchild reasonably, sincerely, and in good-faith allege that his client had invested $40 million with me personally[65] when his client had testified that he didn't even know I existed prior to the litigation in

Delaware?[66]   Was it reasonable to allege that his client may have invested $40 million with an imaginary person?

Regardless, was it reasonable to allege that his client invested money with me despite the fact that his client had denied that allegation under oath *repeatedly*?[67]

The legal issues presented in our appeal, therefore, are quite simple.  First, is a trial court's discretion over sanctions plenary or do the Third Circuit's prior authorities on sanctions limit that authority?  Second, did the Trial Court correctly hold that the merits of a complaint must be assessed in a vacuum without regards to the facts of any particular case?  Third, did the Trial Court correctly hold that filing a non-frivolous complaint magically immunizes anything else a party might do — including, but not limited to lying in order to attain an extension and/or to bolster the case?

Or, in lay terms, is it really true that an impoverished cancer-ridden mother of three (3) toddlers and her allegedly homosexual husband have no rights that a multi-billionaire and his wealthy lawyers are bound to respect?

**V.   ARGUMENT: The Appellees' arguments are irrelevant to the facts of this case because they attempted to re-try the issues they lost in Delaware, thereby violating even their own understanding of permissible conduct.   Likewise, the Appellees' arguments ignore the undisputed chronology of events, which proves they could have not done what they claim to have done for the reasons they assert; at best, therefore, the timeline proves that they were guilty of gross negligence, thereby rendering their protestations of innocence legally immaterial.**

**A.** *The Appellees' arguments are irrelevant to the facts of this case because they attempted to re-try the issues they lost in Delaware, thereby violating their own understanding of permissible conduct.*

If, as my opponents suggest, the only way for plaintiffs to violate Rule 9011 is to re-litigate a theory in the bankruptcy court that they have already lost in state court, then how could *that* rule help *these* Appellees?  Remember the state court in this case held that our *ONLY* motive for imposing the Gates was self-interest, to acquire the compensation that we reasonably believed was part of our contractual rights[68] (even if we were to assume that we're both bound by the state court's alleged judgment against my wife, despite Delaware law to the contrary).[69]  Here, the Appellees successfully thwarted our efforts to prevent them from re-litigating our motives,[70] thereby wasting more than five (5) years trying to prove that we were motivated by some unspecified hatred of LMF.

Laughably, they even attempted to re-litigate the cause of LMF's damages, falsely claiming that my wife mismanaged LMF's money.   (As she testified without dispute, LMF's damages were our attorneys' fees, not investment losses.)[71]

**In short, the Trial Court didn't apply its own rule!**

Laughably, the Trial Court suggested that I would have been found liable for aiding and abetting in Delaware "but for" alleged deficiencies in LMF's pleadings,[72] which is odd because the Trial Court expressly cleared me of those same charges! *See* Opinion (Adv.Dkt. #303), p. 15 ("It should go without saying that unless Count I could be established against Michele Paige, then Count III

13

alleging that Christopher 'aided and abetted' her would also come up short."). So, did the Trial Court re-try LMF's aiding and abetting allegations against me, or did the Trial court mis-state the previous judgment?

In lay terms, therefore, the Trial Court's "rule" is so transparently fallacious that even the Trial Court couldn't apply its own "rule" correctly!

B.   *The Appellees' arguments ignore the problem of time, thereby falsely asserting that plaintiffs can litigate in blissful ignorance for as long as they like so long as they don't use discovery to "cure" their ignorance.*

In the final analysis, my opponents simply ignore the problem of time. As long as you accept the proposition that time moves in only one direction, then you must infer that these Appellees were - at the very least - acting with a depraved indifference to the truth, thereby rendering their protestations of innocence legally immaterial. *See, e.g.*, Gaiardo v. Ethyl Corp., 835 F.2d 479, 482 (3rd Cir. 1987) ("As a commentator has observed, the Rule does not permit use of the 'pure heart and empty head' defense.") [internal citations omitted].

After all, the Appellees could *not* have remained ignorant of the relevant evidence throughout the entire litigation. Surely, for example, everyone must agree that they knew what the relevant evidence would be when they rested their case on January 20, 2016. Yet, they continued litigating for two (2) more months! Indeed, it's the Appellees — not I — who claim that my winning Motion was *independent* of the trial, rather than a consequence of the evidence adduced at trial.[73]  Clearly,

therefore, their alleged   "ignorance" of the relevant evidence played no part whatsoever in their decision to litigate because correlation is the *sin qua non* of causation.   That is, you can't claim that you were motivated by ignorance of the relevant facts when you were *not* ignorant of the relevant facts.

To illustrate our point by example, you can't claim self-defense when you continued firing your bolt-action rifle into a prostrate, unconscious victim.  By the same logic, these Appellees certainly weren't litigating in good-faith when they continued litigating for two (2) additional months *AFTER* they had rested their case!  Pretending that these Appellees were relying upon discovery and/or that they were surprised by how their own evidence "manifested" at trial is patently ridiculous where, as here, the Appellees continued litigating for two (2) additional months *AFTER* they knew what their evidence would be with absolute certainty for the same reason and in the same way that it's ludicrous to pretend you started shooting in self-defense when you kept shooting long after any conceivable threat had been eliminated.

Delivering the coup de grace necessarily negates any claim of self-defense, and demanding two (2) additional months of litigation *after* you've rested is litigator's coup de grace.  I mean what "new" evidence were they waiting for when they continued litigating *after* they had rested?

Actually, what these Appellees did in this case is even *more* ludicrous than our hypothetical because our hypothetical shooter could at least claim shock or

some other form of diminished mental capacity, but these events transpired over years through the intervention of disinterested attorneys. Consequently, these Appellees' actions were the epitome of cold-blooded, pre-meditated acts.

In short, the only factual dispute in this case is *WHEN* these Appellees started litigating in bad-faith. Heretofore, every court has held that a party's ability to claim ignorance of the relevant facts ends with discovery. *See, e.g.,* In re Miller, 529 B.R. 73, 94 (Bankr.E.D.Pa. 2015) ("As has been often mentioned, this case took a dramatic turn after Mr. Kutkowski's March 18, 2011 deposition. After the deposition, the conduct of Ettinger violated Rule 9011(b)(1) and (3) and 28 U.S.C. §1927 and constituted willful and intentional misconduct and bad faith. **Ettinger should have dismissed the case; but he did not.**") [emphasis added]. In this case, that principle means everything these Appellees did *after* October 2012 (when they voluntarily abandoned their discovery efforts)[74] constitutes bad-faith litigation. Notably, that includes their Amended Complaint (Adv.Dkt. #81), which they filed six (6) months *after* they had abandoned discovery!

Similarly, the timeline here proves that these Appellees never intended to investigate or prove their allegations; instead, they wanted only to hurt us. Whatever you believe these Appellees either knew or should have known on February 23, *2012*, when they filed their Complaint (Adv.Dkt. #1), they *repeatedly* claimed — in open court, by and through the counsel of their choice — that they

were **not** ready to try their allegations until many years later on November 4, 2015.[75] What were they doing for all those years? How could anyone believe that what these Appellees knew — or should have known — did not change in any way over all those years of litigation?

That is, how could their alleged initial ignorance (even assuming they really were ignorant) constitute a defense when they concede their **continued** ignorance was completely voluntary? To use the Trial Court's logic, a person has **not** conspired to blow up a plane as long as they choose not to examine the contents of the suitcase they've been asked to smuggle past airline security. Literally, we imprison people despite similar claims of willful "ignorance," but we won't sanction these Appellees on the same evidence? *See, e.g.,* Bullock v. BankChampaign, N.A., — U.S. —, 133 S.Ct. 1754, 1759-60; 185 L.Ed.2d 922 (2013) ("We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. ALI, Model Penal Code §2.02(2)(c), p. 226 (1985). See *id.*, §2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of 'knowledge' was designed to include "'willful blindness'").

Likewise, remember LMF's trial strategy. Literally, they claimed to believe that my wife and I planned to confess everything.[76] How is that remotely plausible? If they thought we planned to confess, then why didn't they seek

summary judgment?  That's how reasonable people attempt to resolve cases based upon undisputed facts, right?

Not surprisingly, therefore, the Record proves that these Appellees *did* seek summary judgment in August 2013.[77]  But why did they wait so long?  Didn't they believe that they *already* had a judgment against us?

Even if we assume they filed that Motion in good-faith, they've known since August 28, 2013 *at the very latest* that we denied their allegations![78]  Yet, they kept going and going and going!  Literally, they claim that they reasonably, sincerely, and in good-faith believed that we would *recant* our previous testimony for no particular reason!  In other words, their defense is that they thought Perry Mason is a documentary.

And why were they doing any of this?  In the letter that *they* introduced into evidence, they admitted they didn't want a dime *from me*![79]  I didn't even have to abandon this sanctions litigation against them![80]  So why did they litigate this case against me for years *after* that extraordinary proposal in April *2013* [a proposal they made months **BEFORE** their aforementioned summary judgment motion (Adv.Dkt. #107), so why were they offering to settle for nothing if they supposedly believed that we weren't denying their allegations?]?  Literally, they claim to have litigated against me in order to obtain absolutely nothing!  Look at the Record; do you think their litigation efforts against me cost them absolutely nothing?  So why did they spend so much in a failed effort to obtain absolutely nothing?

And why did they litigate against my wife?   Although they claim to have desired a "meaningful"[81] payment from her - a payment that would have cost us at least $2.9 million[82] - they admit that they didn't expect to collect any judgment they might have attained.[83]   So why bother?   Who spends more on litigation than they hope to obtain?

In other words, the problem with my opponents' arguments is that they pretend all of these events transpired at roughly the same time, but history — as recorded in the Record — proves that's not the case.

Again, to illustrate my point by example, it's impossible to act in "self-defense" by chopping someone into little pieces with a hacksaw.   It's physically impossible to "accidentally" dismember another human being whom you "mistakenly" believe is a threat because, at some point, you've got to realize your victim is either dead or otherwise incapacitated.   In lay terms, nobody feels "threatened" by a decapitated corpse.

Likewise, you can't litigate for more than five (5) years by accident.   At some point during the last five (5) years, these Appellees must have realized that they weren't going to prevail because they must have realized that they didn't have any way to rebut our sworn denials; yet, they continued litigating any way.   That's the epitome of bad-faith.

Quite simply, if plaintiffs can sue people who can't possibly pay based on the off-chance that their victims might spontaneously confess, then anybody could

sue anyone for anything.  To take just one example, how do I know that you aren't running a child-pornography ring from your office computer?  I mean I don't have any evidence that you are running a child pornography ring from your office computer, but who knows what you'll confess at trial?

See my point?  Judge Thomas didn't modify sanctions law, he eviscerated it because he applied an imaginary "any conceivable fact" standard to determine frivolity.  Literally, he said plaintiffs are free to sue anyone as long as something might turn up in discovery or at trial — a proposition so absurd that even the Appellees have rejected it.[84]  If litigants this sophisticated and this wealthy with so much at stake and so much time to investigate their allegations don't need to attempt discovery to avail themselves of this "any conceivable fact" standard, then no one will ever need to investigate anything.

C.    *The Appellees lied to attain an extension of the filing deadline, thereby prolonging this case for years.*

Regardless of the merits of their allegations, why did these Appellees need — or deserve — an extension to examine us at the 341 meetings since the Record of those meetings, the Record *they* prepared, proves they lied about the questions they asked us at those meetings?[85]  How did they "personally examine" us in March on documents that they wouldn't request until September?[86]  Absent time travel, how could they ask us questions based upon documents *BEFORE* they had seen those documents?  That's a neat trick!

20

Let's be clear: there's nothing to debate here.  The Record proves what Mr. Goodchild said, and the Record — in the form of *his own colleague's admissions* — proves his statements weren't true.

Even if you were to assume that Mr. Goodchild just goofed (rather than lied), the Record also proves that he never corrected his "mistake."  Consequently, he lied, even if you believe that his lie was his failure to correct his "mistake," rather than the original mis-statement.  *See,   e.g.*, ABA MODEL RULES OF PROFESSIONAL CONDUCT, Rule 3.3(a)(1) ("A lawyer shall not knowingly...fail to correct false statement of material fact or law previously made to the tribunal by the lawyer").  Thus, the passage of time has rendered his original intention moot: he lied to the Court, even if you believe that his only lie was his failure to correct the Record.

If you abandon the principle that attorneys owe a duty of candor to the tribunal, rather than a duty to merely refrain from lies, then you have eviscerated our legal system.  Courts can't function when attorneys can profit from their "mistakes," nor can our legal system survive if attorneys need only avoid *criminal* perjury charges to discharge their ethical duties to the Court.

Let me illustrate my point by example.  On behalf of your client, you sue me for paternity.  I seek summary judgment based upon my sworn testimony that I've never slept with your client.  In response, you file an Affidavit from your expert

claiming that my DNA tests prove I am the father. The next day, your expert calls to inform you that he made a mistake. After rechecking his files, he now realizes that my DNA tests prove I am *NOT* the father. What do you do?

According to the Appellees, you do nothing because you haven't lied; rather, you've simply failed to correct a mistake. But do you think your silence is ethical, good-faith litigation? Do you think it's okay to brand me an adulterer, a perjurer, and a negligent parent because you can't be bothered to correct your own mistake? By the same logic, how and why could these litigants continue litigating this case based upon Mr. Goodchild's "mistake," even if we assume it really was just a mistake? Or do we admit the obvious: that once we had identified his "mistake" in our Motion to Reconsider (Adv.Dkt. #50), his continued silence and/or any and all of his subsequent filings were frauds upon the tribunal? *See, e.g.*, Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3rd Cir. 1987) ("Notwithstanding the emphasis on the time of initial submission, however, parties will not be entitled to continuing immunity if they acquire or should acquire knowledge under the Rule's standard before a later filing. Subsequent papers must be judged by the information when they are filed.").

To be clear, I'm *not* complaining about what Mr. Goodchild said in court; rather, I'm complaining about the documents he signed and filed, which relied upon and incorporated the same and similar false statements in their *successful*

efforts to block our dispositive motions.  *See, e.g.,* LMF Reply (Adv.Dkt. #9), p. 18, n. 6 (falsely claiming they were "relying" upon our production to the Trustee).

D.       *If they believed my wife and I had $39 million of their money, then why didn't they attempt to find and recover their "missing" millions?  Neither the Trial Court nor the Appellees ever attempted to justify the Appellees' 727 Claims, which even they concede had "nothing" to do with the previous litigation in Delaware.*

Besides, why did they file and litigate their 727 Claims?  How can they, on the one hand, accuse us of such terrible acts of dishonesty and moral turpitude while, on the other, claim to believe that we would confess to everything?[87]  If plaintiffs can sue people on the off-chance that they might confess, then sanctions are literally meaningless because that possibility exists in every case.

Similarly, why didn't they want to find their "missing" millions?  Even they don't claim that they actually found their "missing" money (other than the $159,000 they "found" in their bank account), so why did they stop looking?  I'm sure you remember this story, but it's worth repeating.  During summation, the defense attorney argues, "They can't prove murder; they can't even prove she's dead.  She might walk right through that door at any moment now."  Everyone turns to look at the courtroom door.  "The fact that you looked proves you have doubts."  The jury retires, returning only a few minutes later with a guilty verdict.  Afterwards, the defense attorney asks how they could have convicted.  The jury replies, "Your client didn't look."

Your Honor, would a sincere, reasonable, and good-faith plaintiff have abandoned its efforts to find its "missing" millions years *before* trial?[88]  What was the point of seeking a $6.6 million judgment against my wife and I while they supposedly believed that we held onto more than $39 million of *their* money?  Why didn't they care about recovering all of their "missing" millions?  Why did they say they would have been satisfied with an uncollectible judgment instead of their "missing" millions?[89]

There's really only one (1) reason why these Appellees wouldn't have looked for their "missing" millions or even cared about how many millions they were looking for: they already knew we were innocent.

## VI.   CONCLUSION: Justice requires sanctions.

My wife and I are not important people.   Unlike the Appellees, we have nothing to offer you in exchange for your judgment, but the principles on which we stand are the most important principles in the world.   If you will not defend the defenseless, then whom will you defend?   Will you, when asked to account for your life here on earth, explain that you worked tirelessly to ensure that wealthy clients and their powerful attorneys could sue anyone for anything without bothering to investigate their  allegations, or will you explain that you defended justice, even when — especially when — its beneficiaries could not repay you in any way?

Let us pray that you look past the parties' relative wealth and power to the facts of this case; let us pray that you judge this case without regards to your own interests; let us pray that you will enforce the law without fear or favor. In the final analysis, they necessarily - albeit implicitly - admit that they litigated *false* allegations against an impoverished, cancer-ridden, and innocent mother of three (3) toddlers and her husband — people they concede they threatened to rape and sodomize *over a business dispute*! At best, therefore, their conduct was morally repugnant.

At law, their blatant disregard for the truth constitutes sanctionable misconduct regardless of their subjective intent because the law does not condone or excuse gross negligence.

Your Honor, do you *really* believe that these Appellees litigated this particular case against us in this particular fashion because they are just that dumb? Or will you admit the obvious: they litigated this particular case against us in this particular fashion because their only objective was to hurt us?

In the final analysis, I'm not asking you to trust my understanding of the law or the facts in this case; rather, I'm asking you to trust Judge Thomas's understanding of the law and the facts. According to him, this case *required* more than five (5) years of litigation and a ten (10) day trial to resolve. Nevertheless, as even the Appellees concede, he also held that the Appellees failed to present a *prima facie* case for any of their claims. *See* LMF's Response to Debtors' Motions

for Judgment (Adv.Dkt. #275), p. 2 ("Debtors claim that LMF has failed to establish a *prima facie* case on any of its claims."); *and see* Opinion (Adv.Dkt. #303).

So who is the incompetent lawyer in this crowd? If I'm the only person who knew that litigation can be resolved without trial when the plaintiff doesn't have any evidence other that its own subjective disbelieve of the defendants' sworn denials, then who's the idiot lawyer in this bunch? I mean is that remotely plausible? Do you *really* believe there's any chance that neither these Appellees nor Judge Thomas understood how summary judgment works and, thus, that they truly believed that plaintiffs don't need witnesses to attain an trial?

Or do you think that these Appellees lied about their evidence to prevent summary judgment? Because once you admit that they lied about their evidence to prevent summary judgment, haven't you necessarily conceded that I have proven bad-faith regardless of what these Appellees supposedly knew *before* discovery? In other words, did Judge Thomas correctly hold that sanctions require *facial* frivolity without regards to either the facts of a particular case or any subsequent developments?

As my wife likes to say, either these extremely wealthy and sophisticated Appellees *accidentally* litigated false claims against an impoverished, cancer-ridden, mother of three (3) toddlers for more than five (5) years without any evidence or these extremely wealthy and sophisticated Appellees *deliberately*

litigated false claims against an impoverished, cancer-ridden, mother of three (3) toddlers for more than five (5) years without any evidence.

Either way, that's a distinction without a difference for the same reason and in the same way that throwing a bomb into a crowd is murder regardless of the bomber's *specific* intent. Some actions impose a duty of care, and litigating for so many years against such desperate people imposed a duty of care. That's not my opinion; that's the Third Circuit's: "As a commentator has observed, the Rule does not permit use of the 'pure heart and empty head' defense." Gaiardo v. Ethyl Corp., 835 F.2d 479, 482 (3rd Cir. 1987).

If you believe the Appellees' conduct in this case constitutes appropriate conduct for litigants and attorneys in this Circuit, then I cannot imagine a more damning insult to the other litigants and attorneys in this Circuit. I am realistic enough to know that most people hold the Bar in contempt, believing that courts adhere to the law of the jungle and that "legal ethics" is an oxymoron, but I am naive enough to hope you will *not* confirm the general public's suspicions by upholding this patently-erroneous decision.

If what these Appellees did in this case is lawful, then *YOU* should be ashamed of your membership in a "profession" that condones such despicable behavior.

**WHEREFORE,** we respectfully request this Court reverse the Bankruptcy Court's Order (Adv.Dkt. #350); enter judgment in our favor; award us sanctions

sufficient to deter LMF and its attorneys, given their financial resources; and end

this case before my family and I suffer any more irreparable harms.

Dated: February 22, 2017          Respectfully submitted,


Christopher Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355


Michele Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

## VII. ENDNOTES

[1]   *See, e.g.,* Opinion (Adv.Dkt. #303) documenting our innocence.

[2]   *See, e.g.,* Our Hearing Exhibit OOOO (Lerner deposition), p. 128, L: 5 - 7 (in which LMF's owner claims to have "several" billion dollars).

[3]   *See, e.g.,* Our Hearing Exhibits EEE & KKKK & ZZZZ (in which Mr. Goodchild describes himself as a "super lawyer."); Our Hearing Exhibit LLLL (in which Morgan Lewis praises its prowess); *see also* Our Hearing Exhibits MMMM - NNNN (in which his co-counsel make similar claims).

[4]   *See generally* LMF's 727 Claims [Counts IV - VIII of their Complaint (Adv.Dkt.#1)], which allege that we stole and/or secreted their money.

[5]   *See, e.g.,* LMF's Answer (Adv.Dkt. #183), p. 2, Para 2 (**"By way of further response, LMF has not conducted discovery of the Debtors since October 2012…"**) [emphasis in original].

[6]   *See, e.g.,* LMF's Motion (Adv.Dkt. #309), p. 5 (stating this bankruptcy and adversary began "five" years ago).

[7]   *See, e.g.,* Opinion (Adv.Dkt. #303), p. 2 ("After ten days of trial, LMF has rested.").

[8]   According to these Appellees, LMF spent millions litigating their claims against us. *See, e.g.,* Tr. 7/16/13 (Dkt. #146/Adv.Dkt. #118), p. 49, L: 18 - 23 ("Q: How much has LMF spent litigating its claims against you? A: $26 million. Q: And how do you know that? A: **Because they put in affidavits** in the court below saying they — that they were spending three times as much as we were, and **they also mentioned it** in the negotiations.") [emphasis added].

[9]   *See generally* LMF's 727 Claims [Counts IV - VIII of their Complaint (Adv.Dkt.#1)], which allege that we stole and/or secreted their money.

10    *See, e.g.,* LMF's Complaint (Adv.Dkt. #1), p. 2, Para. 7 ("In October, 2007, Lerner entrusted the Paiges with $40 million to be invested in the Onshore Fund and Offshore Fund (collectively, "the Funds").."); *and see* LMF's Response (Adv.Dkt. #108), p. 10, fnt. 10 ("After the Chancery Court ruled that Lerner had a right to withdraw its money from the Paiges' hedge fund, the remaining balance of $5.72 in the PCM account was returned to Lerner, along with approximately $363,000 from the POP and POMF accounts, which is all that remained of Lerner's investment after the Paiges used it to pay Chancery Court costs and collect management and incentive fees.");

But cf. Complaint (Adv.Dkt. #1), p. 13 ("WHEREFORE, Lerner prays that this Court determine that all debts of Michele and Christopher Paige are non-dischargeable, or in the alternative, that the judgment against Michele and Christopher Paige from the Delaware Court of Chancery, in the amount of **$6,568,400.00**, is a non- dischargeable debt, and award judgment in favor of Lerner and against Michele and Christopher Paige in the amount of **$6,568,400.00** plus post-judgment interest, and award Lerner any other relief as is just.") [emphasis added].

11    *See, e.g.,* Our Hearing Exhibit OOOO (Lerner deposition), p. 128, L: 5 - 7 (in which LMF's owner claims to have "several" billion dollars).

12    *See, e.g.,* Our Hearing Exhibits EEE & KKKK & ZZZZ (in which Mr. Goodchild describes himself as a "super lawyer."); Our Hearing Exhibit LLLL (in which Morgan Lewis praises its prowess); *see also* Our Hearing Exhibits MMMM - NNNN (in which his co-counsel make similar claims).

13    *See, e.g.,* Complaint (Adv.Dkt. #1), p. 13 ("WHEREFORE, Lerner prays that this Court determine that all debts of Michele and Christopher Paige are non-dischargeable, or in the alternative, that the judgment against Michele and Christopher Paige from the Delaware Court of Chancery, in the amount of **$6,568,400.00**, is a non- dischargeable debt, and award judgment in favor of Lerner and against Michele and Christopher Paige in the amount of **$6,568,400.00** plus post-judgment interest, and award Lerner any other relief as is just.") [emphasis added].

14    *See, e.g.,* Order (App.Dkt. #8) (permitting us to proceed *in forma pauperis*).

15    *See, e.g.,* Correspondence (Adv.Dkt. #347).

16    *See, e.g.,* Opinion (Adv.Dkt. #303) documenting our innocence.

[17]    *See, e.g.,* Tr. 12/7/15 (Adv.Dkt. #274), p. 51, L: 16 - 25.

[18]    *See, e.g.,* LMF's Motion (Adv.Dkt. #309), p. 5 (stating this bankruptcy and adversary began "five" years ago).

[19]    *See, e.g.,* LMF's Complaint (Adv.Dkt. #1), p. 2, Para. 7 ("In October, 2007, Lerner entrusted the Paiges with $40 million to be invested in the Onshore Fund and Offshore Fund (collectively, "the Funds")."); *and see* LMF's Response (Adv.Dkt. #108), p. 10, fnt. 10 ("After the Chancery Court ruled that Lerner had a right to withdraw its money from the Paiges' hedge fund, the remaining balance of $5.72 in the PCM account was returned to Lerner, along with approximately $363,000 from the POP and POMF accounts, which is all that remained of Lerner's investment after the Paiges used it to pay Chancery Court costs and collect management and incentive fees.").

Despite "losing" more than $39 million, LMF sought only $6.6 in return. *See, e.g.,* Complaint (Adv.Dkt. #1), p. 13.

[20]    *See, e.g.,* Tr. 11/4/15 (Adv.Dkt. #249), p. 42, L: 10 *et seq.*

[21]    *See, e.g.,* Opinion (Adv.Dkt. #303), p. 2 ("In advancing its case, LMF has called both Debtors and the female Debtor's sister as their only witnesses.").

[22]    *See, e.g.,* LMF's Opening Statement starting at Tr. 11/4/15 (Adv.Dkt. #249), p. 16, L: 23.

[23]    *See, e.g.,* Christopher Paige's Testimony [Tr. 5/19/16 (Adv.Dkt. #328), p. 9, L: 18 - p. 10, L: 9 (documenting the volume of our prior testimony, which filled eleven (11) binders)].

[24]    *See, e.g.,* Opinion (Adv.Dkt. #303), p. 2 ('After ten days of trial, LMF has rested. The Debtors have countered with a Motion under Rule 52 seeking judgment in their favor on partial findings.").

[25]    *See, e.g.,* Our Dispositive Motions (Adv.Dkt. #4, 22, 24, 26, 28, 30, 32, 50, 92, 96, 97, 103, 134, 136, 165, 167, 173, 233, 264, 270);

*But cf.* LMF's Oppositions (Adv.Dkt. #9, 58, 93, 101, 142, 143, 170, 183).

26    According to the Appellees, their discovery efforts ended in October 2012, nearly six (6) months *before* they filed their Amended Complaint (Adv.Dkt. #81). *See, e.g.,* LMF's Answer (Adv.Dkt.#183), p. 2, Para 2 (**"By way of further response, LMF has not conducted discovery of the Debtors since October 2012...")** [emphasis in original].

27    *See, e.g.,* Trustee's Counsel's [Attorney Christman's] testimony [Tr. 5/18/16 (Adv.Dkt. #326), p. 43, L: 4 - 14 (recounting his warning to Mr. Goodchild that LMF's 727 Claims were nothing more than "tilting at windmills")].

28    For example, LMF's own testimony, Trial Exhibits, and production belied their allegations that my wife and I initiated this dispute over the Gates on or about March 14, 2010. *See, e.g.,* LMF's Response (Adv. Dkt. #275), Exhibit A, Para. 119 - 130; *and see* LMF's Response (Adv.Dkt. #293), Exhibit A, Para. 135 - 143 (falsely claiming that we initiated both this dispute over the Gates and settlement talks therein on or about March 14, 2010);

But *cf.* Our Hearing Exhibit OOOO [Randy Lerner deposition], p. 140, L: 20 - p. 141, L: 15, *and see* Id. at p. 206, L: 9 - p. 211, L: 4 (Randy Lerner's discussion and acknowledgment of pre-March 14th settlement talks, including his receipt of his lawyer's written summary thereof); Rob Bolandian email of **February 6, 2010**, at LMF's Trial Exhibit # 43 ("Let's discuss [Michele Paige's attached settlement offer] when you have time."); Rob Bolandian email dated **March 11, 2010**, at LMF's Trial Exhibit #44. ("We were surprised by the [settlement] documents you sent for our review and confused with the email below."); *and see* Our Hearing Exhibit KK (detailing LMF's threats to rape and sodomize my wife over a business dispute and discussing the ensuing settlement talks; please note that these emails began in late January **2009**, despite the Respondents' assertion that neither the dispute nor the settlement talks therein began until we initiated both more than a year later on March 14, **2010.**).

29    *See, e.g.,* Opinion (Adv.Dkt. #303), p. 2 ("After ten days of trial, LMF rested.").

30    *See, e.g.,* Opinion (Adv.Dkt. #303) p. 2 ("In advancing its case, LMF has called both Debtors and the female Debtor's sister as their only witnesses.").

31    *See generally* Tr. 7/16/13 (Adv.Dkt. #118); Tr. 3/29/16 (Adv.Dkt. #319); Tr. 5/17/16 (Adv.Dkt. #326); Tr. 5/18/16 (Adv.Dkt. #327); Tr. 5/19/16 (Adv.Dkt. #328); *and see* Tr. 7/13/16 (Adv.Dkt. #340).

32      To quote Judge Thomas, "The [Chancery Court] already ruled regarding Michele Paige regarding a breach of fiduciary responsibility, **but that's certainly not even close to defalcation as it's considered in the bankruptcy court.**". Tr. 11/12/ 15 (Adv.Dkt. #255), p. 172, L: 6 - 9 [emphasis added].

33      After the Chancery Court's decision in our case, Delaware's Supreme Court expressly held that the Chancery Court had mis-stated the law, expressly holding that the existence of our alleged fiduciary duties to LMF was an *UNSETTLED* question of law on which reasonable minds could differ. *See* Gatz Properties, LLC v. Auriga Capital Corp., 59 A.3d 1206, 1219 (DE 2012) ("Fourth, the merits of the issue whether the LLC statute does - or does not - impose default fiduciary duties is one about which reasonable minds could differ.").

34      To quote Judge Thomas, "The [Chancery Court] already ruled regarding Michele Paige regarding a breach of fiduciary responsibility, **but that's certainly not even close to defalcation as it's considered in the bankruptcy court.**". Tr. 11/12/ 15 (Adv.Dkt. #255), p. 172, L: 6 - 9 [emphasis added].

35      Tr. 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I personally examined these debtors with respect to the new information that they had brought and the transfers that are -- were in the papers that were revealed to the trustee. **That testimony had nothing to do with anything that happened in the Chancery Court.**") [emphasis added];

36      Since the Appellees did *NOT* appeal Judge Thomas's judgment in our favor, they've necessarily — albeit implicitly — conceded our innocence and, thus, the falsity of their allegations. *See, e.g.,* Opinion (Adv.Dkt. #303).

37      *See, e.g.,* LMF's Motion for Continuance (Adv.Dkt. #17); Order (Adv.Dkt. #45); *and see* LMF's Memo (Adv.Dkt .#225).

38      *See, e.g.,* Opinion (Adv.Dkt. #40) & Order (Adv.Dkt. #41) granting LMF's request for a seventy-eight (78) day extension to a sixty (60) day filing deadline — including, but not limited to a six (6) day extension for no particular reason! *See* Mr. Goodchild's admission that LMF **chose** to file late at Tr. 3/1/12 (Dkt #86), p. 81, L: 7-10 ("I didn't think those six days were relevant because I knew we would be before Your Honor on March 1st. And so the timing of the filing of the complaint in my view is not so urgent.").

[39] "With no helpful briefing on this subject from the Lerner Fund, I refuse to go further and hold that someone like Christopher Paige, who is not even an officer, director, or member of the governing fiduciary is a direct fiduciary of the limited partnership and its investors." *See* Delaware Opinion at LMF's Amended Complaint (Adv.Dkt. #81), Exhibit A, p. 68.

*See also* Opinion (Adv.Dkt. #72), p. 10 ("In fact, the Court of Chancery specifically found that Christopher Paige was *not* a 'direct fiduciary.'").

[40] Here's what they wrote regarding the elements of their aiding and abetting claim: "The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary duty, (2) breach of that fiduciary duty, and (3) knowing participation in the breach. *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986)." LMF's Response (Adv.Dkt. #275), Exhibit A, Para. 220.

But here's what that citation *actually* says, "...(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in that breach by the **defendants who are not fiduciaries.**" Weinberger v. Rio Grande Indus., Inc., 519 A.2d 116, 131 (Del. Ch. 1986).

Notice what they omitted from their citation? Literally, they were asserting that the state court held both that I was and was *NOT* a fiduciary, and they altered their citation to make that ludicrous argument seem plausible.

Significantly, they persisted in making this "mistake" even after I expressly cited a more recent authority from a higher court to point out their "mistake" to them. *See* Our Reply (Adv.Dkt. #282), Para. 220; *but cf.* LMF's Response (Adv.Dkt. #293), Exhibit A, Para. 239 ("The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary duty, (2) breach of that fiduciary duty, and (3) knowing participation in the breach.").

[41] *See, e.g.,* LMF's Motion (Adv.Dkt. #309), p. 5 (stating that this litigation began "five" years ago).

[42] According to the Appellees, their discovery efforts ended in October 2012, nearly six (6) months *before* they filed their Amended Complaint (Adv.Dkt. #81). *See, e.g.,* LMF's Answer (Adv.Dkt.#183), p. 2, Para 2 ("**By way of further response, LMF has not conducted discovery of the Debtors since October 2012**...") [emphasis in original].

34

[43]   *See, e.g.,* Christopher Paige's testimony [Tr. 12/1/15 (Adv.Dkt. #271), p. 6, L: 17 - 19 ("All these transactions that they're asking for are easily accounted for in the records they didn't bother to pick up. So I made a spreadsheet showing the answer."); Id. at p. 18, L: 19 - 21 ("Yes. I produced everything I had. Yes. I'm sorry. I produced everything I had, but you didn't pick it all up."); Id. at p. 68, L: 4 - p. 99, L: 25].

[44]   *See, e.g.,* LMF's Motion for Continuance (Adv.Dkt. #17); Order (Adv.Dkt. #45); *and see* LMF's Memo (Adv.Dkt .#225).

[45]   Note our first Motion for Sanctions (Adv.Dkt. #67) was not filed until March 1, 2013.

[46]   Note, for example, they delayed the trial in this case, which was scheduled for August 15, 2012 — long before we filed our Motion (Adv.Dkt. #67). *See, e.g.,* Proceeding Memo (Adv.Dkt. #14), *and see* LMF's Motion to Continue (Adv.Dkt. #17).

[47]   *See, e.g.,* Christopher Paige's testimony [Tr. 7/13/16 (Adv.Dkt. #340), p. 5, L: 22 - p. 14, L: 15].

[48]   Id.

[49]   *See, e.g.,* Our Hearing Exhibit OOOO (Lerner deposition), p. 128, L: 5 - 7 (in which LMF's owner claims to have "several" billion dollars).

[50]   *See, e.g.,* Our Hearing Exhibits EEE & KKKK & ZZZZ (in which Mr. Goodchild describes himself as a "super lawyer."); Our Hearing Exhibit LLLL (in which Morgan Lewis praises its prowess); *see also* Our Hearing Exhibits MMMM - NNNN (in which his co-counsel make similar claims).

[51]   *See, e.g.,* Order (App.Dkt. #8) (permitting us to proceed *in forma pauperis*).

[52]   *See, e.g.,* Correspondence (Adv.Dkt. #347).

[53]   *See, e.g.,* Opinion (Adv.Dkt. #303) documenting our innocence.

[54]   *See, e.g.,* Tr. 12/7/15 (Adv.Dkt. #274), p. 51, L: 16 - 25.

55   Critically, Mr. Goodchild proudly admitted that his client wasn't suing us for the money! *See, e.g.,* Tr. 3/1/12 (Dkt. #86), p. 25, L: 8-9 (When this Court pointed out that LMF's actions did not make any economic sense, Mr. Goodchild retorted, "In fact, my client would like to receive some recovery on the claim, **no matter what it is.**") [emphasis added].

This was no mere slip of the tongue; Mr. Goodchild repeated the same sentiment when he explained why his client wanted to litigate against me in Delaware even if it didn't make any economic sense: "Your Honor, our position was that we were prepared to adjudicate the claim so that there was a claim established against Mr. Paige no matter what." Tr. 5/23/12 (Dkt.#129), p. 21, L: 25 *et seq.*

*See also* Tr. 3/1/12 (Dkt. #86), p. 11, L: 21-22 ("We view that [establishing my liability] to be important irrespective of what happens with respect to the discharge proceeding.").

56   *See* Our Hearing Exhibit NN (*also at* LMF's Hearing Exhibit 36).

Note that I wasn't even a party to the alleged settlement offer referenced therein! *See Id.* at p. 1 ("...(d) **Lerner and Michele Paige** would enter into an agreement, to be negotiated in good faith, under which **Lerner** would accept payment of less than the full amount due...") [emphasis added].

57   Since LMF never dropped me from the case, one must infer that pressuring my wife to submit to the Appellees' demands was the implicit price of their offer.

58   On the one hand, the Trial Court held that these vicious emails were not proof of discriminatory animus. *See* Opinion (Adv.Dkt. #72), p. 6 ("The case is regrettably colored by one additional factual dimension. During the course of the discovery phase of the Delaware litigation, a number of LMF's internal email conversations referring to the Paiges in sexually derogatory language was uncovered. While crass and insulting, the Court of Chancery found that the conversations were a mere byproduct of LMF's frustration with Michele Paige's perceived lack of business acumen and professionalism. **They were not indicative of any intent or attempt to harass or discriminate.**") [emphasis added].

36

[59]     On the other hand, the Trial Court held these same emails were not proof of personal animus either.   *See* Opinion (Adv.Dkt. #349), p. 5 ("Just as in the Delaware case, the Paiges argued before me that LMF had a 'personal antipathy' to injure Michele Paige.   The Delaware Chancellor found no support for that argument despite a chain of tasteless emails among LMF associates.").

[60]     *See* Opinion (Adv.Dkt. #72), p. 6 ("The case is regrettably colored by one additional factual dimension. During the course of the discovery phase of the Delaware litigation, a number of LMF's internal email conversations referring to the Paiges in sexually derogatory language was uncovered. While crass and insulting, the Court of Chancery found that the conversations were a mere byproduct of LMF's frustration with Michele Paige's perceived lack of business acumen and professionalism. **They were not indicative of any intent or attempt to harass or discriminate.**") [emphasis added].

[61]     *But cf.*  Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 192 (3d Cir. 2006) (Rooker-Feldman doctrine precludes federal courts "from entertaining an action . . . if the relief requested effectively would reverse a state court decision or void its ruling.").

[62]     Let me quote Judge Thomas again: "There is simply no law prohibiting an entity from acting wholly within his contractual rights but for the wrong reasons. The Delaware Court found that LMF had every right to demand return of its 40 million dollar investment. Therefore, its subjective motivation for the request is irrelevant."   *See* Order (Adv.Dkt. #72), p. 6.   So which of Judge Thomas's mutually-exclusive interpretations is correct?   Were their motives litigated in the previous case or weren't they?

[63]   *See, e.g.,* Tr. 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I **personally examined** these debtors with respect to **the new information that they had brought** and the transfers that are -- **were in the papers that were revealed to the trustee.** That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added];

But *cf.* Tr. 1/4/16 (Adv.Dkt. #287), p. 191, L: 2 - 11 ("[JOHNS]: And just to -- to be clear just in terms of dates, that was a September 11th, 2011 letter where we told you we had requested copies. [ME]: No. It was 2012 letter. September 2012 you told me that you had requested. It was definitely 2012, and I thought it was September 12th, maybe it September 11th, you could be right on that. And — [JOHNS]: **I think you're right. You corrected me on the year. So, about September 11th, 2012** — [ME]: Yes.") [emphasis added].

[64]   *See, e.g.,* LMF's Response (Adv.Dkt. #275), Exhibit A, Para. 180 ("**Despite this repeated statement to the contrary during discovery,** Debtors claim to have retained copies of the check stubs for their personal and corporate bank accounts, and provided them to the Trustee.") [emphasis added].

[65]   *See, e.g.,* LMF's Amended Complaint (Adv.Dkt. #81), Para. 10 ("In October 2007, Lerner entrusted **the Paiges** with $40 million to be invested in the Onshore Fund and Offshore Fund (collectively, 'the Funds')" [emphasis added];

[66]   *But cf.* Our Hearing Exhibit OOOO, p. 28, L: 19 - 20; 25 ("Can I ask a quick question of you? Is she [Michele] married?"; "I realize I never even knew that.").

[67]   *See, e.g.,* Christopher Paige's testimony [Tr. 12/7/15 (Adv.Dkt. #274), p. 128, L: 13 - p. 130, L: 3 (documenting Respondents' prior testimony denying that I owned the entities at issue and denying that I managed their money)].

[68]   *See, e.g.,* Opinion (Adv.Dkt. #303), p. 14 ("At best, the Delaware ruling could be interpreted such that Michele Paige conducted the hedge fund in a way to maximize her own self interest. *Bullock*, however, stands for the proposition that simple self dealing is not sufficient to support a loss of dischargeability under § 523(a)(4).").

[69]   *See, e.g.,* Del.Ch.Ct.R.54(b) (precluding final judgment against only some parties); *but cf.* LMF's Motion for Relief (Dkt. #50), pp. 4-5, Para 12. (claiming the litigation in Delaware was "final" against my wife, but not "final" against me).

70    *See, e.g.,* LMF's Opposition (Adv.Dkt. #93).

71    *See, e.g.,* Michele Paige's testimony at Tr. 11/12/15 (Adv.Dkt. #255), p. 201, L: 23 - 24 ("So it was about $7.4 million I made for them [under the Gates] because I had invested in distress and special situations.").

72    *See* Opinion (Adv.Dkt. #349), pp. 2 -3.

73    "Like Debtors' motion for judgment under Rule 52, the Motions for Judgment and/or Dismissal do not cite or refer to the factual record from trial,…") LMF's Opposition (Adv.Dkt. #293), p. 3 [emphasis added].  *See also* LMF's Opposition (Adv.Dkt. #275), p. 4 ("Neither of their Motions contains a single citation to testimony, trial exhibits admitted at trial, or any other evidence.").

74    *See, e.g.,* LMF's Answer (Adv.Dkt. #183), p. 2, Para 2 ("**By way of further response, LMF has not conducted discovery of the Debtors since October 2012...**") [emphasis in original].

75    *See* LMF's Motion to Continue (Adv.Dkt. #17) [filed July 13, **2012**], *and see* LMF's Memo (Adv.Dkt. #245) [filed August 14, **2015**].  *See also* Orders (Adv.Dkt. #45 & #231) granting their requests.

76    *See, e.g.,* LMF's Opening Statement *starting at* Tr. 11/4/15 (Adv.Dkt. #249), p. 16, L: 23.

77    *See* LMF's Motion for Summary Judgment  (Adv.Dkt. #107).

78    *See, e.g.,* Our Opposition to LMF's Motion for Summary Judgment (Adv.Dkt. #114).

79    *See* Our Hearing Exhibit NN (*also at* LMF's Hearing Exhibit #36).

80    I wasn't even a party to the settlement; consequently, I could have continued my sanctions litigation against them! *See Id.* at p. 1 ("at p. 1 ("...(d) **Lerner and Michele Paige** would enter into an agreement, to be negotiated in good faith, under which **Lerner**  would accept payment of less than the full amount due...") [emphasis added].

81    *See* Our Hearing Exhibit NN (*also at* LMF's Hearing Exhibit #36), p. 2.

82    Tr. 7/13/16 (Adv.Dkt. #340), p. 18, L: 6 - 14.

83    *See* Our Hearing Exhibit NN (*also at* LMF's Hearing Exhibit #36), p. 2.

[84]   *See, e.g.,* LMF's Motion (Adv.Dkt. #194), p. 2 ("Rule 9011 of the Federal Rules of Bankruptcy Procedure does not permit litigants to manufacture incredibly serious accusations of illegal and immoral conduct with no factual support, and then engage in a fishing expedition to find out if any good faith basis for making such allegations happens to exist.").

[85]   *See, e.g.,* Attorney Spott's testimony [Tr. 5/17/19 (Adv.Dkt. #326), p. 174, L: 7 - p. 180, L: 5 (testifying that no questions were asked during the 341s related to LMF's 727 Claims)].

[86]   Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I **personally examined** these debtors with respect to **the new information that they had brought** and the transfers that are -- **were in the papers that were revealed to the trustee**. That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added];

   *But cf.* Tr. 1/4/16 (Adv.Dkt. #287), p. 191, L: 2 - 11 ("[JOHNS]: And just to -- to be clear just in terms of dates, that was a September 11th, 2011 letter where we told you we had requested copies. [ME]: No. It was 2012 letter. September 2012 you told me that you had requested. It was definitely 2012, and I thought it was September 12th, maybe it September 11th, you could be right on that. And — [JOHNS]: **I think you're right. You corrected me on the year. So, about September 11th, 2012** — [ME]: Yes.") [emphasis added].

[87]   *See, e.g.,* LMF's Opening Statement starting at Tr. 11/4/15 (Adv.Dkt. #249), p. 16, L: 23.

[88]   *See, e.g.,* LMF's Answer (Adv.Dkt. #183), p. 2, Para 2 ("**By way of further response, LMF has not conducted discovery of the Debtors since October 2012...**") [emphasis in original].

[89]   *See* Our Hearing Exhibit NN (*also at* LMF's Hearing Exhibit #36), p. 2.

## VIII. APPELLANTS' STATEMENT REGARDING APPENDICES

Before you joined the case, we filed a motion entitled, "APPELLANTS' APPLICATION TO PROCEED WITH THEIR APPEAL TO THE DISTRICT COURT WITHOUT PREPAYING FEES OR INCURRING THE COSTS OF REPRODUCING THE RECORD WITH INCORPORATED AFFIDAVIT AND MEMORANDUM OF LAW" (App.Dkt. #3).

Judge Mannion granted that Motion on January 31, 2017 (App.Dkt. #8).

Consequently, we have not filed an Appendix or any other reproductions of the Record.

We appreciate your consideration in this matter because we need to husband our scarce financial resources for my wife's cancer treatments.

## IX.   CERTIFICATES OF COMPLIANCE & SERVICE

According to my word processing program, this Brief (and its Endnotes) contains 11,127 words, excluding those introductory portions which are not included in the word count by Rule.

By Rule, my wife and I are entitled to file separate Reply Briefs of 7000 words each or 14,000 words in total; consequently, our combined brief is well under the 14,000 word requirement.

Under penalty of perjury, I hereby attest that I served a true and correct copy of the foregoing Notice of Appeal - including any exhibits thereto - upon the person(s) identified below on the date provided below via first-class U.S. mail, postage prepaid:

John Goodchild, Esq.
Morgan Lewis
1701 Market St
Philadelphia, PA 19103-2921

Dated: February 22, 2017          Respectfully submitted,


Christopher Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355


Michele Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355





### UNITED STATES POSTAL SERVICE.

**Retail**

## P

### US POSTAGE PAID
## $6.65

Origin: 11366
Destination: 18503
0 Lb 12.80 Oz
Feb 22, 17
362888004—08          1006

### PRIORITY MAIL ®2-Day

Expected Delivery Day: 02/24/2017     **C002**

### USPS TRACKING NUMBER



9505 5134 1857 7053 0633 73

FROM:
Paige
7578 177 ⁶⁴ St
Fresh Meadows NY 11366

**RECEIVED**
**SCRANTON**

FEB 27 2017

PER _____ DEPUTY CLERK

TO:
Court Clerk
US District Court
    middle District of PA
Wm. J. Nealon Federal Courthouse
235 N. Washington Avenue
Scranton PA 18503

PS00001000014

EP14F July 2013
OD: 12.5 x 9.5

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE


### UNITED STATES
### POSTAL SERVICE.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a ...