# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>CHRISTOPHER PAIGE and<br>MICHELE PAIGE,<br><br>      Debtors | Case No. 3:17-cv-00023-ARC |
| CHRISTOPHER PAIGE,<br>MICHELE PAIGE,<br><br>      Defendants/APPELLANTS<br><br>vs.<br><br>LMF,<br>MORGAN LEWIS, and<br>JOHN GOODCHILD, ESQ.<br><br>      Plaintiff/APPELLEES | **FILED**<br>**SCRANTON**<br>JUL - 7 2017<br>PER _____<br>DEPUTY CLERK |

## APPELLANTS' NOTICE TO THE COURT
## REGARDING THE U.S. SUPREME COURT'S
## RECENT DECISIONS AFFECTING OUR APPEAL

    At this stage of this litigation, this Court is considering only our right to sanctions, not which sanctions to impose, but two (2) recent decisions from the U.S. Supreme Court control the latter question; consequently, we wanted to update this Court on those subsequent developments.

We intend this Notice as a courtesy to the Court, and we apologize if our efforts are misguided or misconstrued in any way.

## I. FACTUAL BACKGROUND: By their own account, these Appellees litigated their allegations for more than five (5) years without producing a single witness in support of any of their allegations!

As you may recall, we successfully defended ourselves[1] against the Appellees' allegations that we stole[2] approximately $39 million dollars of their money[3] — an allegation that was difficult to reconcile with their decision to sue us for approximately $6.6 million.[4] What was the other $33.4 million? A tip?

Likewise, these Appellees requested and attained three (3) extensions[5] totaling nearly four (4) years[6] in order to conduct discovery,[7] which they never actually conducted.[8] Not that they wasted their time — one of their trial attorneys finished law school, took the Bar, got married, had a child, and practiced law for a few years during those lengthy delays.[9]

Similarly, these Appellees' self-proclaimed "lead trial counsel"[10] testified[11] that he "personally examined"[12] us on documents that they subsequently admitted they didn't have[13] and which they subsequently claimed to believe didn't exist.[14] How does an attorney "personally examine" a witness on imaginary documents?

Finally, after what they describe as more than five (5) years of litigation,[15] the Appellees' "efforts" to regain only $6.6 million of the $39 million that we supposedly stole from them culminated in a ten (10) day trial[16] at which they called

no witnesses (everyone they called denied all of their allegations)[17] before resting.[18]

Not surprisingly, therefore, we won — ***before*** we had presented our defense![19] — on a dispositive motion,[20] which merely repeated our previous dispositive motions[21] and which they concede didn't cite to the trial record at all![22] Fortunately, however, they had managed to find their "missing" money during the trial — in their own bank account![23]

Likewise, their 523 Claims were premised upon their assertion that we had no reasonable basis to offer a settlement[24] — despite the fact that they repeatedly threatened to rape and sodomize my wife because she had not acceded to their demands that she send them yet ***another*** written settlement offer.[25] That is, they literally asserted that they were justified in threatening to rape and sodomize my wife because they were "frustrated" by the slow progress of negotiations[26] that they simultaneously asserted never happened.[27] Not that counsel could have known about their client's damning admissions because who reads their own Trial Exhibits,[28] right?

And who could have known how the evidence would manifest at trial because who would have thought that we would deny their allegations, thereby testifying in accordance with our previous testimony,[29] which filled eleven volumes?[30] Because if Perry Mason isn't a documentary on how evidence typically manifests at trial, what is?

3

Remember their entire case assumed that they sincerely, reasonably, and in good-faith believed that their client might have invested $40 million with a person[31] whom their client simultaneously believed might not exist![32] Because doesn't everyone invest their money with potentially imaginary people? Indeed, the Appellees sued me despite the fact that their top executives had testified under oath that I did *NOT* manage their money.[33] But, hey, why should the fact that your client has denied your allegations under oath prevent you from litigating those allegations for more than five (5) years?[34]

**II.     UPDATE: The U.S. Supreme Court has eliminated punitive sanctions, thereby necessarily — albeit implicitly — permitting and requiring compensatory monetary awards to *pro se* parties.**

On April 18, 2017, the U.S. Supreme Court *unanimously* held that sanctions for litigation misconduct must be compensatory, rather than punitive, in nature. Goodyear Tire Rubber Company v. Haeger, 137 S.Ct. 1178, 1186; 197 L.Ed. 2d 585, 593; 2017 U.S. LEXIS 2613, 12 (2017) ("This Court has made clear that such a sanction, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature.").

That is, the U.S. Supreme Court held that punitive sanctions for litigation misconduct are unconstitutional. Id. at 1186; 593; 12 - 13 ("To level that kind of separate penalty, a court would need to provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof. When (as

in this case) those criminal-type protections are missing, a court's shifting of fees is limited to reimbursing the victim.") [internal citations omitted].

In a footnote, the Court further clarified that this aforementioned Constitutional principle articulated in the context of inherent powers sanctions applies to all sanctions, including those imposed under Rule 11 and/or 28 U.S.C. 1927. *See* Id. at 1186, n. 5; 594, n. 5; 13, n. 5. ("Rule-based and statutory sanction regimes similarly require courts to find such a causal connection before shifting fees.").

As long as sanctions were considered punitive in nature, they were quasi-fines that Congress could assign to the government. Now that sanctions must be compensatory, however, sanctions must be assigned to victims, rather than the government, as another recent Supreme Court decision makes clear:

On June 5, 2017, the U.S. Supreme Court further clarified its aforementioned distinction between forbidden punitive sanctions and permissible compensatory sanctions, albeit in a slightly different context. In this second ***unanimous*** decision,[35] the Supreme Court held that a sanction is punitive — rather than compensatory — when it, "… is sought 'for the purpose of punishment, and to deter others from offending in like manner'--as opposed to compensating a victim for his loss." Kokesh vs. SEC, 198 L.Ed. 2d 86, 92; 2017 U.S. LEXIS 3557, *11 (2017) [internal citations omitted)].

Indeed, "To determine whether the statutory damages represented a penalty, this Court noted first that the statute provided 'for a recovery of damages for an act which violates the rights of the plaintiff, and gives the right of action solely to him' rather than the public generally, and second, that 'the whole recovery is given to the proprietor, and the statute does not provide for a recovery by any other person.'" Id. [internal citations omitted]. That is, you must construe rules-based sanctions so as to provide a recovery only to victims (like my wife and I); otherwise, you will have transformed these rules into unconstitutional civil fines!

Quite simply, "When an individual is made to pay a non-compensatory sanction to the Government as a consequence of a legal violation, the payment operates as a penalty." Kokesh vs. SEC, 198 L.Ed. 2d at 94; 2017 U.S. LEXIS at *15 - 16 (2017).

Again, the Court emphasized that sanctions must be justified solely and exclusively by their compensation of victims:

> "True, disgorgement serves compensatory goals in some cases; however, we have emphasized 'the fact that sanctions frequently serve more than one purpose.' *Austin* v. *United States*, 509 U.S. 602, 610, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993). 'A civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.' *Id.,* at 621, 113 S. Ct. 2801, 125 L. Ed. 2d 488; cf. *Bajakajian*, 524 U.S., at 331, n. 6, 118 S. Ct. 2028, 141 L. Ed. 2d 314 ('[A] modern statutory forfeiture is a 'fine' for Eighth Amendment purposes if it constitutes punishment even in part')."
>
> Kokesh vs. SEC, 198 L.Ed. 2d at 95; 2017 U.S. LEXIS at 18 [emphasis in the original].

Reading these decisions together, as we must, the U.S. Supreme Court effectively requires courts to award compensatory monetary sanctions to *pro se* parties because awards to non-parties would constitute an unlawful civil fine.

Literally, if we can't get compensation for our injuries, then there's nothing this Court could do to control the conduct of litigants whose opponents are proceeding *pro se* because every other possible sanction would — by definition — be punitive (unless the malefactor were BOTH caught in the act AND caught under circumstances that left the merits in doubt, so that the court could deny and/or impair the malefactor's right to litigate). Here, these Appellees lied to attain an extension;[36] consequently, unraveling their lies necessarily resolved this case on the merits, thereby rendering all non-monetary sanctions either moot[37] or punitive.

In short, the U.S. Supreme Court has necessarily — albeit implicitly — decided that *pro se* parties are entitled to compensatory monetary awards because the alternative would render courts powerless to control the conduct of litigations whose opponents were proceeding *pro se*.

### III. IMPACT UPON CASE: Although the issue of the appropriate sanction to impose remains open for another court on another day, the Supreme Court's decisions establish the significance of our appeal.

Granted, you would be the first court to make this connection between these recent cases and this issue, but these recent Supreme Court's precedents control

your decision because this Court's power does not depend upon litigants' choice of counsel: you can control your court regardless.

Nevertheless, the precise definition of "compensation" in this context remains to be resolved. On that issue, there's absolutely nothing in these precedents that suggests that "compensation" is limited to attorneys' fees; to the contrary, the Supreme Court expressly authorized courts to impose other forms of compensatory sanctions. Goodyear Tire Rubber Company v. Haeger, 137 S.Ct. at 1186; 197 L.Ed. 2d at 593; 2017 U.S. LEXIS at 11 - 12 (2017) ("That authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.' *Chambers v. NASCO, Inc.*, 501 U. S. 32, 44–45 (1991). And **one permissible sanction** is an 'assessment of attorney's fees'— an order, like the one issued here, instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side. *Id.*, at 45.") [emphasis added].

In other words, the Trial Court will — on remand — need to fashion an appropriate sanction that compensates us for our unique injuries. Under the traditional "eggshell skull doctrine," our unique injuries[38] are substantially greater than a typical victim's (aka. the Lodestar amount), but that's an issue for another court on another day. *See* Goodyear Tire Rubber Company v. Haeger, 137 S.Ct. at 1187; 197 L.Ed. 2d at 595-95; 2017 U.S. LEXIS at 15 (2017) ("But as we stressed in *Fox*, trial courts undertaking that task 'need not, and indeed should not, become

green-eyeshade accountants' (or whatever the contemporary equivalent is). *Id.,* at 838, 131 S. Ct. 2205, 180 L. Ed. 2d 45. 'The essential goal' in shifting fees is 'to do rough justice, not to achieve auditing perfection.' *Ibid.*).

Please note that we vigorously pursued and preserved our compensation theory throughout the proceedings below. *See, e.g.,* Our Post-Hearing Brief (Adv.Dkt. #335), p. 129 ("Throughout this Brief, any discussion of mitigation and/or damages assumes, but does not concede, that mitigation and/or damages matters. To be clear, we think the *only* issue is deterrence, not mitigation, but we are preserving our rights by arguing in the alternative.").

If this Notice proves superfluous, I apologize for any inconvenience, but I appreciate your busy schedule, and I was concerned that you might have missed these developments. From our perspective, we don't believe these developments affect the issues currently before you other than to eliminate any possibility that you might deem our appeal moot. Nevertheless, we thought it appropriate to call your attention to these development as, ultimately, you will decide their significance.

**IV. CONCLUSION: Either courts can grant compensatory monetary awards to *pro se* parties, or there's nothing they can do to control litigants whose opponents are proceeding *pro se*. Obviously, the latter proposition is absurd; consequently, the former is law.**

Unless you are prepared to rule that courts are powerless to control the conduct of litigants whose opponents are proceeding *pro se*, then you must agree

9

that courts can grant compensatory monetary awards to *pro se* parties. That is, non-monetary sanctions (like striking pleadings and/or granting judgment) are meaningless when malefactors lie about dispositive facts. Thus, compensatory monetary sanctions are the ***only*** lawful remedy available when (as here) the victims of litigation abuse are entitled to prevail upon the merits.

In legal terms, the U.S. Supreme Court expressly reaffirmed the ancient maxim: "Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' That authority includes **'the ability to fashion an appropriate sanction** for conduct which abuses the judicial process.'" *See* Goodyear Tire Rubber Company v. Haeger, 137 S.Ct. at 1186; 197 L.Ed. 2d at 593; 2017 U.S. LEXIS at 11 - 12 (2017) [internal citations omitted] [emphasis added].

In lay terms, courts aren't powerless to act merely because a malefactors' claims are both frivolous and fraudulent.

**Dated:** July 5, 2017         Respectfully submitted,

Christopher Paige
Appellant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355


Michele Paige
Appellant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

## ENDNOTES

[1] *See, e.g.,* Order (Adv.Dkt. #350), p. 1 ("**ORDERED** that judgment is entered in favor of the above Debtors/Defendants, Christopher Howard Paige and Michele Anna Paige, and against the Plaintiff, Lerner Master Fund, LLC.").

[2] *See, e.g.,* Adv.Dkt., p. 1 (*Nature(s) of Suit:* 67 Dischargeability - 523(a)(4), fraud as fiduciary, embezzlement, larceny") [emphasis is original].

[3] *See, e.g.,* LMF's Amended Complaint (Adv.Dkt. #81), Para. 10 ("In October 2007, Lerner entrusted the Paiges with $40 million to be invested in the Onshore Fund and Offshore Fund (collectively, 'the Funds')"; *but cf.* LMF's Response (Adv.Dkt. #108), p. 10, fnt. 10 ("After the Chancery Court ruled that Lerner had a right to withdraw its money from the Paiges' hedge fund, the remaining balance of $5.72 in the PCM account was returned to Lerner, along with approximately $363,000 from the POP and POMF accounts, which is all that remained of Lerner's investment after the Paiges used it to pay Chancery Court costs and collect management and incentive fees.").

[4] *See, e.g.,* Complaint (Adv.Dkt. #1), p. 13 ("WHEREFORE, Lerner prays that this Court determine that all debts of Michele and Christopher Paige are non-dischargeable, or in the alternative, that the judgment against Michele and Christopher Paige from the Delaware Court of Chancery, in the amount of **$6,568,400.00**, is a non- dischargeable debt, and award judgment in favor of Lerner and against Michele and Christopher Paige in the amount of **$6,568,400.00** plus post-judgment interest, and award Lerner any other relief as is just.") [emphasis added].

[5] *See, e.g.,* Order (Adv.Dkt. #41) (granting LMF's request for a seventy-eight-day extension to the Congressionally-mandated sixty-day filing deadline); Order (Adv.Dkt. #45) (granting LMF's request for an indefinite continuance of the trial previously-scheduled for August 15, **2012**); *and see* Order (Adv.Dkt. #231) (granting LMF's request for another continuance of the trial).

[6] *See, e.g.,* Opinion (Adv.Dkt. #40), p. 7 ("The deadline was set for December 6, **2011**,...."); *but cf.* Proceeding Memo (Adv.Dkt. #247) (noting that the trial in this matter began nearly four (4) years later on November 4, **2015**).

[7] *See generally* LMF's Motion to Extend (Dkt. #35), *and see* LMF's Motion to Continue (Adv.Dkt. #17).

8 *See, e.g.,* LMF's Answer (Adv.Dkt. #183), p. 2, Para 2 ("**By way of further response, LMF has not conducted discovery of the Debtors since October 2012...**") [emphasis in original];

*And see* Christopher Paige's testimony [Tr. 12/1/15 (Adv.Dkt. #271), p. 6, L: 17 - 19 ("All these transactions that they're asking for are easily accounted for in the records they didn't bother to pick up. So I made a spreadsheet showing the answer."); *and see* Id. p. 18, L: 19 - 21 ("Yes. I produced everything I had. Yes. I'm sorry. I produced everything I had, but you didn't pick it all up."); p. 68, L: 4 - p. 99, L: 25];

*See also* Christopher Paige's testimony [Tr. 1/20/16 (Adv.Dkt. #297), p. 19 L: 21 - 23 ("Q: To be clear, has LMF ever asked you to produce those check stubs? A: Other than the discovery they didn't show up for, no.")].

9 *See, e.g.,* Motion to Appear Pro Hac Vice (Adv.Dkt. #243), *and see* Mr. Johns' official bio at https://www.morganlewis.com/bios/zjohns.

10 *See* Tr. 7/27/15 (Dkt. #223) p. 51, L: 7 - 10 ("With respect to the deposition request, there is a motion to compel my deposition. I -- Your Honor is aware that **lead trial counsel** is extraordinarily rarely deposed.") [emphasis added].

11 *See, e.g.,* Tr. 3/1/12 (Dkt. #86), p. 89, L: 5-10 (COURT: "Do you swear that the statements you have already given to me that are evidentiary as well as the answers to the questions and the answers - and the statements you are going to give are true and correct under penalty of perjury? GOODCHILD: I do.").

12 *See, e.g.,* Tr. 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting at which I **personally examined** these debtors with respect to the new information that they had brought and the transfers that are -- were in the papers that were revealed to the trustee. That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added].

[13] By and through the counsel of their choice in a voluntary admission made in open court, the Appellees admitted they didn't even request the relevant documents until a year later. *See, e.g.,* Tr. 1/4/16 (Adv.Dkt. #287), p. 191, L: 2 - 11 ("[JOHNS]: And just to -- to be clear just in terms of dates, that was a September 11th, 2011 letter where we told you we had requested copies. [ME]: No. It was 2012 letter. September 2012 you told me that you had requested. It was definitely 2012, and I thought it was September 12th, maybe it September 11th, you could be right on that. And — [JOHNS]: **I think you're right. You corrected me on the year. So, about September 11th, 2012** — [ME]: Yes.") [emphasis added].

[14] Surprisingly, the Appellees subsequently claimed that the documents they supposedly examined us upon did not exit. *See, e.g.,* LMF's Response (Adv.Dkt. #275), Exhibit A, Para. 180 ("**Despite this repeated statement to the contrary during discovery**, Debtors claim to have retained copies of the check stubs for their personal and corporate bank accounts, and provided them to the Trustee.") [emphasis added].

[15] *See, e.g.,* LMF's Motion (Adv.Dkt. #309), p. 5 (stating this litigation began "five" years ago). Please note that the case continued for more than (9) months after that admission on March 18, 2016!

[16] *See, e.g.,* Order (Adv.Dkt. #303), p. 2 ("After ten days of trial, LMF has rested.").

[17] *See, e.g.,* Order (Adv.Dkt. #303), p. 2 ("In advancing its case, LMF has called both Debtors and the female Debtor's sister as their only witnesses.").

[18] *See, e.g.,* Order (Adv.Dkt. #303), p. 2 ("After ten days of trial, LMF has rested.").

[19] *See, e.g.,* LMF's Opposition (Adv.Dkt. #275), p. 4 ("...**Debtors have not begun to put on their case.**") [emphasis added].

[20] *See, e.g.,* Order (Adv.Dkt. #303), p. 2 ("The Debtors have countered with a Motion under Rule 52 seeking judgment in their favor on partial findings.").

[21] *See, e.g.,* LMF's Response (Adv.Dkt. #142), p. 1 ("**Apparently frustrated** by the fact that the nine motions they previously filed against Lerner Master Fund, LLC ('LMF') in this adversary proceeding (including motions for summary judgment and for sanctions) remain pending, Debtors Michele Paige and Christopher Paige ('Debtors') have now filed what they acknowledge are three 'highly repetitive motions.' Adv. Dkt. No. 138 at p. 11. **Perhaps to attempt to force a ruling**, the following three recent filings by Debtors primarily repeat the same arguments that they have previously presented to this Court...") [emphasis added]; *and see* Our Dispositive Motions (Adv.Dkt. #4, 22, 24, 26, 28, 30, 32, 50, *but cf.* LMF's Oppositions (Adv.Dkt. #9, 58, 93, 101, 142, 143, 170, 183).

[22] *See* LMF's Opposition (Adv.Dkt. #275), p. 4 ("Neither of their Motions contains a single citation to testimony, trial exhibits admitted at trial, or any other evidence."); *and see* LMF's Opposition (Adv.Dkt. #293), p. 3 ("Like Debtors' motion for judgment under Rule 52, the Motions for Judgment and/or Dismissal **do not cite or refer to the factual record from trial,...**") [emphasis added].

[23] *See, e.g.,* Tr. 11/20/15 (Adv.Dkt. #261), p. 199, L: 24 - p. 203, L: 5 (LMF's attorneys demanding that I account for a *$159,000* check cashed by *LMF!*).

[24] *See, e.g.,* Tr. 1/20/16 (Adv.Dkt. #297), p. 53, L: 2 - 21 ("THE COURT: **When you say they made an assertion, when did they make that assertion?** THE WITNESS: Throughout here they claim that my letter from March 14th was a bolt from the blue, that there was no dispute and no reason for me to make a settlement offer. In fact, there were multiple ongoing settlement talks. THE COURT: What paragraph are you referring to? THE WITNESS: I gotta find the paragraph. It starts at 120 — it's 119, 120, 121, 122, so they're asserting it's a the blue but there are actually ongoing settlement I just --THE COURT: Just a second please, okay? THE WITNESS: Yeah. MS. PAIGE: Yeah, it's in here somewhere. THE WITNESS: 127, they -- I do not credit Christopher Paige's testimony the dispute existed so I'm rebutting that claim. These were ongoing settlement talks. THE COURT: Just a second. MS. PAIGE: Page 23 of their 300 paragraphs. THE COURT: **Okay, I'll overrule the objection.**") [emphasis added];

*And see* LMF's Response (Adv. Dkt. #275), Exhibit A, Para. 119 - 130;

*See also* LMF's Response (Adv.Dkt. #293), Exhibit A, Para. 135 - 143 (falsely claiming we initiated this dispute over the Gates and settlement talks on March 14, 2010).

<sup>25</sup>   *See, e.g.,* Our Hearing Exhibit KK.

<sup>26</sup>   *See, e.g.,* Opinion (Adv.Dkt. #72), p. 6.

<sup>27</sup>   *See* Note 24 *supra*.

<sup>28</sup>   *See, e.g.,* Rob Bolandian email of **February 6, 2010**, at LMF's Trial Exhibit # 43 ("Let's discuss [Michele Paige's attached settlement offer] when you have time."); *and see* Rob Bolandian email dated **March 11, 2010**, at LMF's Trial Exhibit #44. ("We were surprised by the [settlement] documents you sent for our review and confused with the email below.").

<sup>29</sup>   *See, e.g.,* Opinion (Adv.Dkt. #303), p. 8 ("Notwithstanding those shortcomings, their testimony was **consistent**, plausible, and generally corroborated by extrinsic evidence.") [emphasis added].

<sup>30</sup>   *See, e.g.,* Christopher Paige's Testimony [Tr. 5/19/16 (Adv.Dkt. #328), p. 9, L: 18 - p. 10, L: 9 (documenting the volume of our prior testimony, which filled eleven (11) three-ring notebooks)].

<sup>31</sup>   *See, e.g.,* LMF's Amended Complaint (Adv.Dkt. #81), Para. 10 ("In October 2007, Lerner entrusted the Paiges with $40 million to be invested in the Onshore Fund and Offshore Fund (collectively, 'the Funds')").

<sup>32</sup>   *See, e.g.,* Our Hearing Exhibit OOOO [Randy Lerner's deposition], p. 28, L: 19 - 20; 25 ("Can I ask a quick question of you? Is she [Michele] married?"; "I realize I never even knew that.").

<sup>33</sup>   *See, e.g.,* Christopher Paige's testimony [Tr. 12/7/15 (Adv.Dkt. #274), p. 128, L: 17 - p. 129, L: 4 (detailing LMF's prior Affidavits in which LMF's top executives denied under oath that I managed their money)]; *and see* Our Motion to Introduce Exhibit B (Adv.Dkt. #286), *citing* LMF's own production by Bates number (Paige 11804; Paige 17369; Paige 37645; Paige 38920; Paige 38277; Paige 37526) to corroborate my aforementioned testimony.

<sup>34</sup>   *But cf.* LMF's Response (Adv.Dkt. #293), Ex. A, Para. 308 ("Count II [sic] in LMF's Amended Complaint pleads that Mr. Paige is liable under section 523(a)(6) based on his role in *managing* LMF's investment,...") [emphasis added].

<sup>35</sup>   Please note that Justice Gorsuch did not participate in Haeger, so the vote was 8 - 0.

17

[36] *See, e.g.,* Appellants' Opening Brief (App.Dkt. #6), pp. 1 - 2 (documenting the Appellees' misrepresentations of law and fact relating to their Motion to Extend (Dkt. #35)).

[37] *See, e.g.,* Tr. 7/27/12 (Dkt. #141), p. 30, L: 11 - 13 ("THE COURT: If I were to grant your motion [to deny extension] -- MRS. PAIGE: -- okay. THE COURT: -- then that complaint is over.").

[38] Since Mr. Goodchild and his client timed their actions to steal our appeal and to induce a miscarriage, we believe our compensable damages easily justify our requested damages.

## CERTIFICATE OF SERVICE

Under penalty of perjury, I hereby attest that I served a true and correct copy of the foregoing Notice - including any exhibits thereto - upon the person(s) identified below on the date provided below via first-class U.S. mail, postage prepaid:

John Goodchild, Esq.
Morgan Lewis
1701 Market St
Philadelphia, PA 19103-2921

**Dated:** July 5, 2017          Respectfully submitted,

Christopher Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

VERY SPECIFIED*

IG™ INCLUDED*

ICLUDED*

ABLE

ONALLY,
ATION
IRED.

**RECEIVED**

JUL 0 7 2017

PER _____
DEPUTY CLERK

**PRIORITY**
★ MAIL ★

UNITED STATES
POSTAL SERVICE®
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:

Paige
7578 177th St
Flushing NY 11366

TO: Court Clerk
US District Court
William J Nealon Courthouse
235 N Washington Ave
Scranton PA 18503

FOR DOMESTIC AND INTERNATIONAL USE

Label 228, March 2016

EP14 July 2013
OD: 11.625 x 15.125

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE