## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                                          )
                                                )
CHRISTOPHER PAIGE and                           )
MICHELE PAIGE,                                  )
                                                )    Case No. 3:17-cv-00023-ARC
          Debtors                               )
                                                )
_____                 )_____
                                                )
CHRISTOPHER PAIGE,                              )
MICHELE PAIGE,                                  )
                                                )
                                                )         **FILED**
          Defendants/APPELLANTS                 )        **SCRANTON**
                                                )
             vs.                                )        NOV 0 2 2017
                                                )
LMF,                                            )        PER [signature]
MORGAN LEWIS, and                               )            DEPUTY CLERK
JOHN GOODCHILD, ESQ.                            )
                                                )
                                                )
          Plaintiff/APPELLEES                   )
_____                 )_____

## APPELLANTS' NOTICE TO THE COURT
## REGARDING THE THIRD CIRCUIT'S
## RECENT DECISION IN *BAXTER VS. BRESSMAN (IN RE BRESSMAN)*
## (3rd Cir. October 18, 2017) [PRECEDENTIAL]

Once again, another court has confirmed our understanding of the law governing sanctions, thereby necessarily establishing that Judge Thomas abused his discretion by imposing the ***wrong*** legal standard. *See, e.g.,* Cooter & Gell v Hartmax, 496 U.S. 384, 405; 110 S.Ct. 2447; 110 L.Ed.2d 359 (1990) ("A district

court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law....").

I.    **FACTUAL BACKGROUND: These Appellees lied; don't take my word for that proposition, take theirs.**

When this case began, I was thirty-nine-years old; today, I'm forty-six. Obviously, therefore, the Bankruptcy Court flouted its own understanding of its legal duties — and our legal rights — in this case. *See, e.g.*, Tr. 1/5/12 (Dkt. #63), p. 13, L: 4 -7 (THE COURT: "But to me, you've got an obligation to show cause because Congress apparently wants these things [dischargeability complaints] disposed of quickly in Chapter 7, you know? **They don't want these things dragged out.**") [emphasis added].

But why?   Are we supposed to infer that Judge Thomas is an utterly incompetent moron and/or a brazen crook who either would not or could not enforce the law as *he* had described it? *See Id.* Or shall we infer the obvious — that these Appellees lied to prolong this case? *See, e.g.*, Tr. 7/27/15 (Adv.Dkt. #223), p. 11, L: 7 - 8 (refusing to concede that my wife is *NOT* an attorney);[1] *but cf.* (conceding that they had consulted the public records that prove she is *NOT* an attorney and conceding that they had not presented any evidence whatsoever in support of their allegation that she was an attorney).[2]

In other words, the Appellees literally assert — and the Trial Court apparently held — that ascertaining a defendant's Bar status requires more than

2

five (5) years of litigation[3] and ten (10) days of trial,[4] even when the plaintiff presents no evidence whatsoever on that issue![5]  Do you *really* think that's what your colleague believed?  Or do you think that these Appellees lied to him, thereby inducing his facially-ridiculous and obviously-unintentional decision that a defendant's Bar status is a factual question that requires years of litigation and a lengthy trial with *or without* any evidence whatsoever?  Do you *really* think that he's just that dumb, or do you think that they are just that crooked?

According to Pacer, this case is now the longest Chapter 7 personal bankruptcy in the history of the United States! Again, why?

If these Appellees had disclosed the Third Circuit's decision in *Orange Theatre* [the controlling contrary authority that precluded both their "cause" and their contract theories][6] and/or if they had admitted that they had initiated their discovery efforts in 2012 (rather than 2011 as they had claimed through their attorney's perjured testimony),[7] then this case would *NOT* have been filed, and it certainly would *NOT* have continued past March 1, 2012 (when these Appellees lied during their oral arguments in support of their Motion to Extend (Dkt.#35)! *See, e.g.,* Defendants' Motion for Sanctions (Adv.Dkt. #67), *and see* Defendants' Brief (Adv.Dkt. #71). Are you going to ignore those frauds — frauds that led to an erroneous published decision[8] — simply because the Appellees subsequently lost on the merits too?[9]

As the Third Circuit recently re-affirmed, however, a plaintiff's obligation to accurately disclose all material facts applies even when that plaintiff is otherwise entitled to prevail upon the merits!  *See* Exhibit A (*Baxter v. Bressman (In Re Bressman)* (3rd Cir. October 18, 2017) [**PRECEDENTIAL**]), p. 3 ("The Bankruptcy Court determined that Folkenflik had intentionally deceived the court. As a result, the court vacated the default judgment it has previously entered in favor of Folkenflik's clients.").  As noted above, the duty of candor applies even the plaintiff has already prevailed upon the merits!  *See* Id.

Since we — unlike the moving party in *In re Bressman* — prevailed upon the merits, our motions for sanctions are, if anything, far stronger than the successful motion to vacate at issue in *In re Bressman*.[10]  *See, e.g.,* Opinion (Adv.Dkt. #303), *and see* Order (Adv.Dkt. #350) (granting us judgment on all counts).  Thus, the Third Circuit's decision in *In re Bressman* leaves no reasonable doubt whatsoever that we are entitled to prevail on our appeal because the ***material*** factual distinctions between this case and *In re Bressman*, if any, strongly favor us.

In lay terms, we are ***not*** less entitled to equitable relief because we were innocent of the underlying allegations!  To the contrary, Judge Thomas expressly held that this case would have ended "but, for" their fraudulent Motion to Extend (Dkt. #35),[11] thereby necessarily — albeit implicitly — holding that their frauds were the "but, for" cause of all our injuries.

4

II.   In *In re Bressman*, the Third Circuit clearly and unambiguously held <u>both</u> that an attorney's deceptive statements on non-dispositive issues constitute fraud upon the tribunal <u>and</u> that such frauds require swift, severe sanctions *regardless of the underlying merits*.

In *In re Bressman* (Exhibit A), the bankruptcy court reversed a decade-old default judgment in favor of the plaintiffs and granted judgment to the defendant based solely upon the failure of plaintiffs' counsel to disclose a settlement with the other defendants.   *See, e.g.,* Ex. A, p. 14.   The Third Circuit affirmed, thereby imposing a nearly $31 million sanction upon the dishonest, but otherwise correct plaintiff.   *See, e.g.,* Id. at p. 6 ("In declarations appended to Plaintiffs' *ex parte* applications, Folkenflik indicated that, as a result of post-judgment interest, the judgment against Bressman totaled $30,895,913.39.").

Significantly, the defendant in *Bressman* was convicted and served time in prison for the torts at issue.   *See* Id. at p. 5 ("Bressman was incarcerated from 2003 until 2006 in connection with his conviction in New York state court for enterprise corruption and grand larceny.")   In other words, Bressman's liability was *NOT* at issue.

Thus, the sanctioned plaintiffs in *In re Bressman* lied about an issue that would have reduced, but not eliminated the defendant's liability.   *See, e.g.,* Id. at p. 18 (noting that undisclosed settlement would have entitled defendant to a setoff, not a judgment in his favor).

5

In stark contrast, the Appellees in this case lied to attain an extension,[12] thereby making this entire ordeal possible.[13] That is, their lies were *dispositive*!

Since we prevailed upon the merits and since these Appellees lied about a dispositive issue, our claims are far, far stronger than the claims at issue in *In re Bressman*. After all, if guilty defendants are entitled to more than $30 million in sanctions when plaintiffs lie about non-dispositive facts, then how much stronger are the claims of *innocent* defendants when plaintiffs lie about *dispositive* facts?

At the very least, Mr. Goodchild should have told the truth: he should have allowed the Court decide whether or not *Orange Theatre* mattered and whether or not he needed to initiate discovery before the filing deadline. Instead, he chose to lie, and he chose to compound his initial misdeeds through the many years[14] and many filings[15] that followed his initial mis-representations. How much needless suffering might we — and the Bankruptcy Court — have been spared if only Mr. Goodchild had withdrawn his false assertions after they proved no longer tenable? *But cf. Young v. Smith*, 3:07-CV-00854 (M.D. Pa. September 6, 2017) at 104 - 105 ("'[T]he rule emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable.'") [footnotes omitted].

Besides, how can anyone make the same "mistake" in so many filings spread across so many years? Can you stab someone "by accident" 163 times? Can you

"mis-state" the law and facts of a case in multiple filings made over vigorous objections? And wouldn't such a "mistake" constitute gross negligence?

As the Third Circuit reminded us in *In re Bressman*, no dubious legal theory can excuse such misconduct. Just as Mr. Folkenflik (the attorney *In re Bressman*) had to alert the courts below to his dubious interpretation of the settlement agreement's non-disclosure clause, Mr. Goodchild had to alert the Bankruptcy Court to his bizarre claim that *Orange Theatre* is a meaningless nullity that doesn't apply to its own facts. *See* Id. at p. 18 ("Even if he believed that the confidentiality order prohibited him from disclosing to the Bankruptcy Court the existence of the Settlement Agreement, he could have so stated in his affidavit and have asked either — or both — the District Court in the Southern District of New York and the Bankruptcy Court in New Jersey for guidance. His failure to do so is consistent with an intent to defraud the court in order to maximize the recovery.").

That is, Mr. Goodchild could not seek an extension or modification of existing law that forbade the Bankruptcy Court from enforcing the disputed Stipulation (Dkt. #40) without first disclosing the law that he sought to modify or extend. *See, e.g., Thornton v. Wahl*, 787 F. 2d 1151, 1154 (7th Cir. 1986) ("Mrs. Thornton's presentation also cannot be described as a reasoned request for a change in the law. Her brief misrepresents existing law; she does not accurately describe the law **and then call for change**.") [emphasis added]. *See also Hanoverian, Inc.*

*v. Pa. Dept. of Environmental Prot.*, No. 1:07-cv-00658, 2008 U.S. Dist. LEXIS 28865, at *28 (M.D.Pa. March 31, 2008) (citing *Wahl*, 787 F.2d 1151.)   That's particularly true where, as here, Mr. Goodchild had expressly disavowed the legal theory that he now claims to have been pursuing![16]

Likewise, if — as in *In re Bressman* — an attorney's duty of candor is heightened when they are proceeding *ex parte*, then that duty is similarly heightened when an attorney is litigating against an unrepresented party, like my wife and I. *See, e.g.,* Id. at p. 19 ("In fact, Folkenflik's duty to deal with the court honestly and with integrity was particularly important in light of the non-adversarial nature of the *ex parte* proceedings.   In such a proceeding, the court depends on the integrity of appearing counsel because only he can ensure that the court has received the full scope of information pertinent to the merits of its considerations.").   In this case, Judge Thomas expressly warned Mr. Goodchild that he would rely upon Mr. Goodchild to tell the Court which legal issues deserved its attention.[17]   Thus, Mr. Goodchild actually knew his failure to disclose *Orange Theatre* would hamstring the Court, which was relying upon him to identify the relevant legal issues.

Finally, the plaintiffs in *In re Bressman* lost more than $30 million as a result of their attorney's lie. *See, e.g.,* Id. at p. 6.   Thus, the plaintiff in our case can't escape liability for its attorney's lies either.

8

Notice that the sanction imposed (more than $30 million) in *In re Bressman* bore no relationship whatsoever to the defendant's legal fees. Indeed, since the defendant had not participated in the previous ***default*** judgment, he hadn't actually incurred any legal fees. *See, e.g.,* Id. at p. 3. Rather than limiting sanctions to attorneys' fees, the bankruptcy court in *In re Bressman* disgorged the plaintiff's ill-gotten gains, just as we have asked this Court to disgorge this Plaintiff's ill-gotten gains. *See, e.g.,* Defendants' Post Hearing Brief (Adv.Dkt. #335), pp. 8 - 9.

Similarly, there's no reason to think this Court may reverse a $30 million judgment, thereby transferring $30 million from the plaintiff to the defendant, but that it cannot impose monetary sanctions that have the same economic effect. In other words, this Court is not powerless to remedy a fraud against the tribunal merely because the perpetrator ***also*** lost on the merits.

**III.  CONCLUSION: This Court cannot permit these Appellees to attain an extension through fraud, regardless of the ultimate merits of their allegations; consequently, this Court must sanction these Appellees even if everything the Bankruptcy Court held in its Opinion (Adv.Dkt. #349) were true.**

Honestly, I don't know if you care about this Court's integrity and/or the public's confidence therein, but I hope that you aren't just a petty bureaucrat with a penchant for dressing in loose-fitting dark-colored garments. Thus, I pray that you won't allow these Appellees to escape liability for their lies — lies that made this entire ordeal possible[18] — whatever you may think of the ultimate merits of their allegations.

If — as Judge Thomas either implicitly asserts or inadvertently held — a "weak case" excuses any and all frauds committed in furtherance thereof, no other court has recognized that bizarre legal "principle," which effectively transforms litigation into a barroom brawl.

Even if we were to assume the Bankruptcy Court's silence on the extension issue reflects a conscious choice, rather than an obvious error, I don't know how or why the Bankruptcy Court could have suggested that the Appellees' "weak"[19] case somehow excused or justified their frauds; thus, the Bankruptcy Court's decision constitutes reversible error under any conceivable standard of review because nothing could be more arbitrary and capricious than suggesting a "weak case" somehow excuses any and all frauds perpetrated in furtherance thereof.

They lied.  In open court, by and through the counsel of their choice, they admitted that they lied.[20]  Judge Thomas either ignored or overlooked those frauds. Consequently, his decision is arbitrary and capricious.

Let us pray, therefore, that you will defend the integrity of this Court and, thus, the rule of law.

**WHEREFORE,** this Court must reverse the Trial Court's patently-erroneous decision to ignore the process through which this tragedy transpired because the merits of the Appellees' allegations are completely immaterial to our challenge of the process by which they pursued those meritless claims.

**Dated:** October 28, 2017            Respectfully submitted,

Christopher Paige
Appellant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355


Michele Paige
Appellant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

## ENDNOTES

[1]    After years of litigation, Mr. Goodchild continued to insist that my wife was an attorney.   *See, e.g.,* Tr. 7/27/15 (Adv.Dkt. #223), p. 11, L: 7 - 8 (MR. GOODCHILD: "No, we are not conceding anything regarding Ms. Paige.").

[2]    *But cf.* LMF's Motion (Adv.Dkt. #194), p. 5, n. 3 (utilizing public records accessed through the Internet to determine my Bar status: "Although Mr. Paige previously testified that he converted to 'retired' status with the New York bar after litigation in the Delaware Chancery Court began, the New York state bar lists Mr. Paige as "currently registered." New York Attorney State Unified Court System, Attorney Detail, http://iapps.courts.state.ny.us/attorney/AttorneyDetails?attorneyId=5533778.");

*And see* LMF's Proposed Findings of Fact (Adv.Dkt. #275 & #293) (conceding that LMF failed to present a scintilla of evidence suggesting that my wife is an attorney); *and see* LMF's Proposed Findings of Fact (Adv.Dkt. #275 & #293) (summarizing their version of the evidence presented at trial and, thus, conceding that they failed to present a scintilla of evidence suggesting that my wife is an attorney).

[3]    According to the Appellees, this litigation lasted more than five (5) years. *See, e.g.,* LMF's Response (Adv.Dkt. #309), p. 5 ("Although they have never previously sought Ms. DiMattio's deposition despite their acknowledgement that she has been involved in  this  bankruptcy case and adversary proceeding since it

began in 2011, Debtors state that *after five years* they now need to depose Ms. DiMattio because 'she's a necessary and proper witness to' attorney-client privileged and work-product protected decisions regarding LMF's litigation strategy.") [emphasis added].

[4]    *See, e.g.,* Opinion (Adv.Dkt. #303), p. 2 ("After ten days of trial, LMF has rested.").

[5]    *See, e.g.,* LMF's Proposed Findings of Fact (Adv.Dkt. #275 & #293) (summarizing their version of the evidence presented at trial and, thus, conceding that they failed to present a scintilla of evidence suggesting that my wife is an attorney).

[6]    Of course, <u>Orange Theatre</u> forbade the enforcement of any alleged stipulation among the parties to extend the filing deadline. *See, e.g.,* <u>Orange Theatre v. Rayhertz Amusement Corp.</u>, 130 F.2d 185, 187 (3rd Cir. 1942) ("And our conclusion is that the Rules require court approval to make effective such stipulations as those here involved."); *and see* 1-6 Moore's Federal Practice - Civil 6.06(b) (citing <u>Orange Theatre</u>) ("A stipulation may serve as a basis for the court order that grants the requested relief, but it may not stand alone. Because the court bears ultimate responsibility for its docket, the court must exercise full control over extensions of time.").

That principle is, if anything, more applicable to adversary proceedings, like the case at issue here, than non-bankruptcy litigation because this extension affected the rights of our other creditors, who are still waiting for this bankruptcy to end.

[7]    *See, e.g.,* Tr 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I **personally examined** these debtors with respect to **the new information that they had brought** and the transfers that are -- **were in the papers that were revealed to the trustee**. That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added];

*But cf.* Tr. 1/4/16 (Adv.Dkt. #287), p. 191, L: 2 - 11 ("[JOHNS]: And just to -- to be clear just in terms of dates, that was a September 11th, 2011 letter where we told you we had requested copies. [ME]: No. It was 2012 letter. September 2012 you told me that you had requested. It was definitely 2012, and I thought it was September 12th, maybe it September 11th, you could be right on that. And — [JOHNS]: **I think you're right. You corrected me on the year. So, about September 11th, 2012** — [ME]: Yes.") [emphasis added].

[8]    *See* <u>Lerner Master Fund, LLC v. Paige (In re Paige)</u>, 476 B.R. 867 (Bankr. M.D.Pa. 2012).

[9]    *See, e.g.,* Opinion (Adv.Dkt. #303), p. 16 ("Succinctly, LMF has simply not met its burden of proof in this Complaint, and a ruling is required in favor of the Debtors."); *and see* Judgment (Adv.Dkt. #350).

[10]     In its Opinion, the Court expressly reserved the question of whether or not a motion for sanctions would have been adjudicated under a different standard than a motion to vacate. Exhibit A at p. 17, n. 40.

Please note, however, that the Opinion also held that both motions arise from the court's inherent equitable powers. *See, e.g., Id.* at pp. 10 - 11 ("As with other forms of equitable relief, our review of the Bankruptcy Court's decision to vacate the underlying default judgment is for abuse of discretion."); *and see Id.* at p. 12 ("This concept that the inherent power of federal courts to vacate a fraudulently obtained judgment — even years after the judgment was entered — has long been recognized by the Supreme Court.").

[11]     *See, e.g.,* Tr. 6/13/12 (Dkt. #130), p. 16, L: 7 - 11 (THE COURT: "In other words, I'm going to give special attention to this motion one way or another. If it's [the Complaint (Adv.Dkt. #1)] late obviously it throws the complaint out.").

[12]     *See, e.g.,* Tr 3/1/12 (Dkt. #86), p. 79, L: 13 - 20 ("Now after the meeting with Your Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I **personally examined** these debtors with respect to **the new information that they had brought** and the transfers that are -- **were in the papers that were revealed to the trustee.** That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added];

*But cf.* Tr. 1/4/16 (Adv.Dkt. #287), p. 191, L: 2 - 11 ("[JOHNS]: And just to -- to be clear just in terms of dates, that was a September 11th, 2011 letter where we told you we had requested copies. [ME]: No. It was 2012 letter. September 2012 you told me that you had requested. It was definitely 2012, and I thought it was September 12th, maybe it September 11th, you could be right on that. And — [JOHNS]: **I think you're right. You corrected me on the year. So, about September 11th, 2012** — [ME]: Yes.") [emphasis added].

[13]     *See, e.g.,* Tr. 6/13/12 (Dkt. #130), p. 16, L: 7 - 11 (THE COURT: "In other words, I'm going to give special attention to this motion one way or another. If it's [the Complaint (Adv.Dkt. #1)] late obviously it throws the complaint out.").

[14]     *See, e.g.,* Order (Adv.Dkt. #41) issued on August 1, **2012!**

[15]    *But cf.* LMF's Response (Adv.Dkt. #58), filed on August 14, 2012; LMF's Memorandum (Adv.Dkt. #74), filed on April 1, 2013; LMF's Response (Adv.Dkt. #89), filed on May 28, 2013; LMF's Response (Adv.Dkt. #142), filed on January 5, 2015; LMF's Response (Adv.Dkt. #185), filed on May 29, 2015 — all of which reassert LMF's old frauds.

[16]    *See* LMF's Response (Adv.Dkt. #58), p. 3, n. 2 ("Debtors' argument that a stipulation between counsel cannot form the basis for 'cause' to extend the filing deadline misunderstands that the cause analysis is separate and apart from the question of whether to enforce the joint stipulation.") [internal citations omitted].

[17]    *See, e.g.,* Tr. 6/13/12 (Dkt. #130), p. 18, L: 9 - 12 ("THE COURT: You know what's relevant and what's not. I don't intend to blind side or sandbag anybody. So, think things are not worthy of response, you know, be reasonable.").

[18]    *See, e.g.,* Tr. 6/13/12 (Dkt. #130), p. 16, L: 7 - 11 (THE COURT: "In other words, I'm going to give special attention to this motion one way or another. If it's [the Complaint (Adv.Dkt. #1)] late obviously it throws the complaint out.").

[19]    *See, e.g.,* Opinion (Adv.Dkt. #349), p. 8 (describing the Appellees' case as "weak.").

[20]    Honor on the 5th, the next day was the 341 meeting; the continued part of the 341 meeting, at which I **personally examined** these debtors with respect to **the new information that they had brought** and the transfers that are -- **were in the papers that were revealed to the trustee.** That testimony had nothing to do with anything that happened in the Chancery Court.") [emphasis added];

   *But cf.* Tr. 1/4/16 (Adv.Dkt. #287), p. 191, L: 2 - 11 ("[JOHNS]: And just to -- to be clear just in terms of dates, that was a September 11th, 2011 letter where we told you we had requested copies. [ME]: No. It was 2012 letter. September 2012 you told me that you had requested. It was definitely 2012, and I thought it was September 12th, maybe it September 11th, you could be right on that. And — [JOHNS]: **I think you're right. You corrected me on the year. So, about September 11th, 2012** — [ME]: Yes.") [emphasis added].

## CERTIFICATE OF SERVICE

Under penalty of perjury, I hereby attest that I served a true and correct copy of the foregoing Update - including any exhibits thereto - upon the person(s) identified below on the date provided below via first-class U.S. mail, postage prepaid:

John Goodchild, Esq.
Morgan Lewis
1701 Market St
Philadelphia, PA 19103-2921

**Dated:** October 28, 2017          Respectfully submitted,

Christopher Paige
Debtor-Defendant
*Pro Se*
75 78 177th St.
Fresh Meadows, NY 11366
718.591.6355

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 16-3244

———————

IN RE: ANDREW E. BRESSMAN,
                                        Debtor

JAMES A. BAXTER; ANDREW BAXTER;
J.A. BAXTER LIFE INVESTMENT TRUST;
RICHARD KATZ; ROBERT THOMAS;
EGI 1985 RETIREMENT BENEFIT TRUST

v.

ANDREW E. BRESSMAN

JAMES A. BAXTER, individually and as successor-in-
interest to the James A. Baxter Life Investment Trust;
RICHARD KATZ; ROBERT THOMAS,
                                        Appellants

———————

On Appeal from the United States District Court
for the District of New Jersey
(D. N.J. No. 2-14-cv-05314)
District Judge:  Honorable Kevin McNulty

———————

Argued on March 20, 2017

Before: AMBRO, JORDAN and ROTH, <u>Circuit Judges</u>

(Opinion filed: October 18, 2017)

Max Folkenflik          [Argued]
Folkenflik & McGerity
1500 Broad Street
21ˢᵗ Floor
New York, NY 10036
                    *Counsel for Appellants*

Ryan T. Jareck
Cole Schotz
1325 Avenue of the Americas
New York, NY 10019

Michael D. Sirota        [Argued]
Warren A. Usatine
Cole Schotz
25 Main Street
Court Plaza North, P.O. Box 800
Hackensack, NJ 07601
                    *Counsel for Appellee*

_____

**OPINION**
_____

2

ROTH, Circuit Judge

In this appeal we are asked to decide whether Max Folkenflik, Esq., committed fraud on the court. The Bankruptcy Court determined that Folkenflik had intentionally deceived the court. As a result, the court vacated the default judgment it had previously entered in favor of Folkenflik's clients. The District Court affirmed. Finding no error, we will affirm.

I.

This action was commenced as an adversary complaint in a Chapter 11 bankruptcy proceeding brought by Andrew Bressman. The Plaintiffs are victims of fraudulent activities by Bressman. In the 1990's, Bressman and others had engaged in manipulation of stock prices. The Plaintiffs brought civil securities fraud and Racketeer Influenced and Corrupt Organizations Act (RICO) claims against Bressman and his co-defendants in the United States District Court for the Southern District of New York. The Plaintiffs were represented by Folkenflik. These civil actions against Bressman were stayed when Bressman filed for bankruptcy in the Bankruptcy Court for the District of New Jersey. In response, the Plaintiffs filed the adversary complaint against Bressman.

The civil securities fraud and RICO claims continued against Bressman's co-defendants before Judge John Koeltl in the Southern District of New York. On August 13, 1998, claims against the co-defendants in one of the suits were settled for ███████ On August 28, Folkenflik, as attorney for Plaintiffs, received the full settlement amount, minus a $75,000 prompt payment discount. The parties' Settlement Agreement,

3

approved by Judge Koeltl, was subject to a confidentiality order, which incorporated the following language from the parties' stipulated confidentiality agreement:

> It is hereby stipulated, consented and agreed to by counsel for the parties in this action, that they will not disseminate and/or publicize the existence of or disclose the financial terms of any settlement agreement with any defendants, except as further set forth in this Stipulation and order; that this confidentiality provision does not prohibit or restrict the parties from responding to any inquiry about the documents produced or their underlying facts and circumstances by any state or federal regulatory agency, including the Securities and Exchange Commission or any self-regulatory organization . . ..[1]

The adversary proceeding continued against Bressman in the Bankruptcy Court.

Several months after the Settlement Agreement was reached and the funds received, the Plaintiffs sought a default judgment in the Bankruptcy Court against Bressman. The court ordered them to submit an affidavit detailing their damages. In March 1999, Folkenflik, as their attorney, submitted an affidavit that recounted the history of the proceedings against Bressman and his co-defendants. The affidavit indicated that the damages totaled $5,195,081 plus interest. Although Folkenflik's affidavit provided a comprehensive account of the underlying proceedings, it made

---

[1] App. A38.

no mention of the $▮▮▮▮▮▮ settlement that he had obtained against Bressman's co-defendants or even of the fact of the settlement. Explicitly noting its reliance on Folkenflik's affidavit, the Bankruptcy Court entered a default judgment against Bressman for $5,195,081 on February 7, 2000. The Bankruptcy Court ordered Folkenflik to submit a separate application for RICO damages. In September 2002, the Plaintiffs filed an application for RICO damages and attorneys' fees. No mention was made in that application that the Plaintiffs had already been paid ▮▮▮▮▮▮ on account of their losses. In July 2003, still unaware of the Settlement Agreement, the Bankruptcy Court entered a RICO judgment for treble damages, totaling $15,585,243. The court noted that this "amount constitute[d] treble the damages found and awarded by this Court as Plaintiff's out-of-pocket losses . . .."[2] The court also awarded $910,855.93 in attorneys' fees.[3]

Bressman was incarcerated from 2003 until 2006 in connection with his conviction in New York state court for enterprise corruption and grand larceny. During that time and the seven years that followed, Folkenflik made no attempt to recover on the default judgment because, in his view, the likelihood of Bressman having substantial assets was remote. In 2013, however, Folkenflik learned that Bressman was going to receive a potential payment of $10 million, so Folkenflik set out to have the $15,585,243 judgment satisfied. He filed *ex parte* applications on behalf of the Plaintiffs in the Southern District of New York and in the District of New Jersey to appoint a receiver to search for and seize Bressman's assets.

---

[2] App. A267-68.
[3] App. A268.

The court in New Jersey expressed skepticism that emergency *ex parte* relief was warranted, given Folkenflik's failure to collect for ten years. The application was denied in open court and was withdrawn the same day. In New York, Judge Ramos granted the application on September 26, 2013. On October 2, Folkenflik filed a new application in the District of New Jersey asking the court to authorize the receiver, who had been appointed by the Southern District of New York, to act in New Jersey. Contrary to Local Rule, Folkenflik did not mark on the civil cover sheet that this action was related to the unsuccessful application that he had filed in the District of New Jersey several days earlier.[4] As a result, the case was assigned to a different judge who granted the *ex parte* application. Searches and seizures were executed in New York and New Jersey on October 11.

In declarations appended to Plaintiffs' *ex parte* applications, Folkenflik indicated that, as a result of post-judgment interest, the judgment against Bressman totaled $30,895,913.39. Nothing in these submissions indicated that Folkenflik had already collected $████████ on behalf of the Plaintiffs. Indeed, in his brief in support of his application in the Southern District of New York, Folkenflik stated: "With post judgment interest, the Judgment's current value is $30,895,913.39. To date – more than ten years later – Plaintiffs have not seen a dime of this amount."[5]

---

[4] During a sanctions hearing before the Southern District of New York, the court found "deeply troubling the suggestion that [Folkenflik] did not completely, fairly, and accurately disclose to [the District of New Jersey] the application they had previously made . . .." App. A43.

[5] App. A41.

Then, on October 13, 2013, Bressman's attorney, David Wander, wrote to Folkenflik, asking if anyone had made payments on the judgment.[6] Folkenflik certified that it was not until then that he looked at the docket sheet and saw that the settlement was listed.  On October 16, Folkenflik replied to Wander, stating "[t]he complete and accurate response to your specific question is no, there have not been any payments from any source regarding the Bressman Judgment."[7]  Folkenflik added, in connection with this letter: "I . . . advised him of all of the facts I thought I was allowed to advise him of, given the public disclosure of the existence of the settlement, and that was what I was able to say,"[8] namely, that certain defendants were dismissed from one of the civil actions, "subject to a settlement agreement that was submitted to Judge Koeltl with the confidentiality 'so ordered' and the agreement sealed by the order of the Court in or about October 1998."[9]  That action was then marked closed.  Folkenflik certified that he was not aware of the reference to the settlement in the court docket until October 2013.[10]

October 2013 was the first time that the Bankruptcy Court, the District Courts in New York and New Jersey, and

---

[6] App. A368.
[7] App. A41.
[8] App. A368.
[9] App. A509-10.
[10] App. A42.

7

Bressman[11] learned that Folkenflik had successfully negotiated a settlement agreement with Bressman's co-defendants. The orders granting the Plaintiffs' *ex parte* applications were then vacated in both courts and the seized materials were returned.

On January 7, 2014, Judge Koeltl in the Southern District of New York held a hearing to determine whether Folkenflik was obligated to disclose the Settlement Agreement and to whom. Folkenflik argued that, absent the confidentiality order, he would have informed the Bankruptcy Court of the Settlement Agreement even though he believed it was "immaterial" and irrelevant to the underlying default judgement.[12] By oral order, the court instructed the parties to provide counsel and all involved judges with details of the Settlement Agreement.

---

[11] Although Bressman claims he was unaware of the Settlement Agreement until October 16, 2013, Folkenflik argues Bressman was aware of the Agreement as early as "sometime in the 90's." Folkenflik also contends that Bressman had constructive notice of the Settlement Agreement's existence because it was inadvertently disclosed on the Southern District of New York's public docket. The Bankruptcy Court did not credit this assertion because "Folkenflik certifie[d] that he, himself, was not aware of this public reference until October 2013." App. A42. In any event, the date when Bressman became aware of the Agreement is not germane to the merits of our discussion. The inquiry here is primarily focused on the representations that Folkenflik made to the Bankruptcy Court when he appeared *ex parte* in 1999 and which he continued to present to the Bankruptcy Court and the District Courts in the following years.

[12] App. A384.

On January 9, 2014, a hearing was held by Judge Ramos in the Southern District of New York to determine whether Folkenflik's decision to file the *ex parte* application to collect on the default judgment with no mention of the Settlement Agreement constituted sanctionable misconduct. The judge noted that the validity of the default judgment against Bressman was not at issue in that hearing.[13] At the conclusion of the hearing, the court declined to impose sanctions.

Bressman then asked the Bankruptcy Court for the District of New Jersey to reopen the proceeding related to the Plaintiffs' adversary complaint, vacate the underlying default and RICO judgments, and dismiss the Plaintiffs' complaint with prejudice on the grounds that the judgment was fraudulently obtained. On March 20, 2014, the Bankruptcy Court held a hearing. Bressman's counsel argued that "if there were ever a case to vacate a judgment based upon fraud on the Court, it's this case. There is no question that Mr. Folkenflik intentionally concealed and affirmatively misrepresented critical facts to this Court in an effort to obtain undeserved double recovery for his clients and enormous fees for himself."[14]

Folkenflik urged that he would have informed the Bankruptcy Court of the Settlement Agreement if doing so had not been prohibited by the confidentiality order. In the alternative, Folkenflik argued that Bressman's motion was untimely. The Bankruptcy Court rejected Folkenflik's contentions. Finding that Folkenflik's conduct was intentional

---

[13] App. A497-98.
[14] App. A617.

9

and was the type of egregious misconduct that constitutes fraud on the court, the Bankruptcy Court vacated the default judgment and dismissed the adversary complaint with prejudice. The District Court affirmed the Bankruptcy Court's order, and this appeal followed.

## II.

The District Court had jurisdiction to consider Folkenflik's appeal of the Bankruptcy Court's order under 28 U.S.C. § 158(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 158(d) and 28 U.S.C. § 1291.

The Plaintiffs raise three arguments on appeal. First, they contend that Bressman's motion to vacate the default judgment was time barred. Whether the underlying motion was barred is a question of law, and as such our review is plenary.[15] Second, the Plaintiffs contend that Folkenflik's conduct does not rise to the level of egregious misconduct that constitutes intentional fraud on the court. Because the facts are not in dispute, we exercise plenary review of whether Folkenflik committed intentional fraud.[16] Finally, the Plaintiffs claim that that the sanction of dismissal with prejudice was an abuse of the Bankruptcy Court's discretion. As with other forms of equitable relief, our review of the Bankruptcy Court's decision to vacate the underlying default

---

[15] *United States v. Hull*, 456 F.3d 133, 137 (3d Cir. 2006) (citation omitted).
[16] *Id.* (citation omitted).

judgment is for abuse of discretion.[17]  We review its findings
of fact for clear error.[18]

### III.

### A.

The Plaintiffs first contend that the Bankruptcy Court's
grant of relief was procedurally barred because Bressman's
motion was filed more than ten years after the alleged
fraudulent conduct.  In the alternative, the Plaintiffs assert that
the action was barred by the doctrine of laches.  We disagree
with both contentions.

Federal Rule of Civil Procedure 60(b) authorizes relief
from a final judgment on six separate grounds.[19]  Rule 60(b)(3)
specifically permits a court to relieve a party from a final
judgment for "fraud[,] . . . misrepresentation, or
misconduct[,]"[20] and subsection 6 permits courts to do so for
"any other reason that justifies relief."[21]  As the Plaintiffs note,
Rule 60 motions alleging fraud are ordinarily subject to a one-
year limitations period.[22]  Although they correctly recite the
Rule's time bar, they do so to no avail.  Rule 60 has no
applicability where, as here, a party requests relief from a final

---

[17] *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S.
238, 248 (1944); *Groupe SEB USA, Inc. v. Euro-Pro Operating
LLC*, 774 F.3d 192, 197 (3d Cir. 2014).

[18] *Chemetron Corp. v. Jones*, 72 F.3d 341, 345 (3d Cir. 1995).

[19] Fed. R. Civ. P. 60(b).

[20] Fed. R. Civ. P. 60(b)(3).

[21] Fed. R. Civ. P. 60(b)(6).

[22] Fed. R. Civ. P. 60(c)(1).

judgment in response to an opponent's alleged fraud on the court. We settled this issue in *Averbach v. Rival Mfg. Co.*, where we held that "the one year time limit in the rule, by virtue of the rule's very text, does not apply to independent actions" such as those for fraud on the court.[23] Our decision in *Herring v. United States* reaffirmed our holding in *Averbach*: "an independent action alleging fraud upon the court is completely distinct from a motion under Rule 60(b)."[24]

This concept that the inherent power of federal courts to vacate a fraudulently obtained judgment—even years after the judgment was entered—has long been recognized by the Supreme Court.[25]   Consistent with this precedent, the bankruptcy court here granted the requested relief because it found that Folkenflik committed fraud on the court. We therefore see no basis to conclude that the time limits of Rule 60 barred the court's consideration of the appellee's motion to vacate the underlying default judgment.

The Plaintiffs' contention that the doctrine of laches counsels against vacating the underlying default judgment similarly fails. "Laches is 'a defense developed by courts of

---

[23] 809 F.2d 1016, 1020 (3d Cir. 1987). Although *Averbach* was an independent action, we noted there that "the elements for a cause of action for such relief in an independent action are not different from those elements in a Rule 60(b)(3) motion . . .." *Id.* at 1022-23.

[24] 424 F.3d 384, 389 (3d Cir. 2005) (citation omitted).

[25] *See Hazel-Atlas Glass Co.*, 322 U.S. at 248-49 (recognizing that federal courts possess inherent power to vacate a judgment obtained by fraud on the court); *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 233-34 (1995) (same).

12

equity' to protect defendants against 'unreasonable, prejudicial delay in commencing suit.'"[26]  The defense "applies in those extraordinary cases where the plaintiff 'unreasonably delays in filing a suit,' and, as a result, causes 'unjust hardship' to the defendant. Its purpose is to avoid 'inequity.'"[27]  The Plaintiffs bear the burden of proving that the elements of laches— "inexcusable delay in instituting suit and prejudice resulting to the respondent from such delay"—are met.[28]  Arguing that Bressman unjustifiably slept on his rights for ten years, the Plaintiffs challenge the District Court's conclusion that the elements of laches are not present.  However, because "[b]y its very nature the doctrine [of laches] addresses itself to the sound discretion of the trial judge[,] . . . absent an abuse of discretion, we will not disturb the court's determination."[29]

The Bankruptcy Court did not credit Folkenflik's assertion that Bressman was aware of the payment as early as 1999.  On appeal, the District Court affirmed that laches were not applicable here, stating:

---

[26] *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 960 (2017) (citing *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967, 1973 (2014)).

[27] *Petrella*, 134 S. Ct. at 1979 (Breyer, J., dissenting) (citations omitted).

[28] *Kane v. Union of Soviet Socialist Republics*, 189 F.2d 303, 305 (3d Cir. 1951) (en banc); *see also Waddell v. Small Tube Prod., Inc.*, 799 F.2d 69, 74 (3d Cir. 1986) ("The party asserting the defense . . . bears the burden of proof." (citation omitted)).

[29] *Gruca v. U.S. Steel Corp.*, 495 F.2d 1252, 1258 (3d Cir. 1974) (citation omitted).

> A vague statement about what Bressman "heard" at some unspecified time and place during the decade of the 1990's is not much to go on. But in any event, I find that [the Bankruptcy Court] acted here within the law and the bounds of his discretion. . . . This was not an adversarial proceeding but an application for a default judgment. . . . Under the circumstances, [the Bankruptcy Court] could permissibly make an equitably based ruling "that a fraud committed upon the court could be time barred offends all notions of integrity and equity. There can be no protections against such intentional conduct."[30]

We agree. Accordingly, we cannot say the Bankruptcy Court abused its discretion in concluding that Bressman's motion was not barred by the doctrine of laches.

## B.

We next address whether Folkenflik's failure to disclose the Settlement Agreement rises to the level of intentional fraud. As officers of the court, attorneys are required "to conduct themselves in a manner compatible with the role of courts in the administration of justice."[31]   This responsibility is sometimes—albeit rarely—disregarded.   When, however,

---

[30] App. A9-10, citing the Bankruptcy Court, App. A45.
[31] *In re Snyder*, 472 U.S. 634, 644-45 (1985); *see also Demjanjuk v. Petrovsky*, 10 F.3d 338, 352 (6th Cir. 1993) ("As an officer of the court, every attorney has a duty to be completely honest in conducting litigation.").

counsel has failed to act with candor, preservation of the integrity of the judicial process may require courts to depart from their usual adherence to the principle that final judgments should be left undisturbed.[32]  We confront one such situation here.

A court may set aside a judgment based upon its finding of fraud on the court when an officer of the court has engaged in "egregious misconduct."[33]  We have said that such a finding "'must be supported by clear, unequivocal and convincing evidence'"[34] of "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself . . .."[35]  In addition, fraud on the court may be found only where the misconduct at issue has successfully deceived the court.[36] Folkenflik contests the Bankruptcy Court's findings on two

---

[32] *See Hazel-Atlas Glass Co.*, 322 U.S. at 244 (recognizing that that "under certain circumstances, one of which is after-discovered fraud," a court may exercise its equitable powers to vacate judgments "to fulfill a universally recognized need for correcting injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence" to the finality of judgments).

[33] *Herring v. United States*, 424 F.3d 384, 390 (3d Cir. 2005) (quoting *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 195 (8th Cir. 1976) (internal quotation marks omitted)).

[34] *Id.* at 387 (quoting *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d at 195).

[35] *Id.* at 390.

[36] *Id.*

15

grounds; First, he claims that any fraud was not intentional,[37] and second, he argues that the alleged deceit does not constitute the kind of egregious misconduct that the fraud on the court doctrine aims to address. Both contentions are belied by the properly found facts.

Although direct evidence of intent will rarely be available, it may be inferred from the surrounding circumstances. Folkenflik's intentions were clear: He set out to recover the full amount of the default judgment without any offset for the settlement with the co-defendants. Folkenflik's scheme manifested itself in early March of 1999 when he filed an affidavit to support the default judgment he sought against Bressman. The affidavit was comprehensive: It recounted the history of the related proceedings, scrupulously detailed the damages each Plaintiff sought, provided a calculation of interest, and carefully described Folkenflik's involvement in the matter. Conspicuously, the affidavit omitted any mention of the $███████ Folkenflik recovered on behalf his clients several months earlier. As Folkenflik was aware, the Bankruptcy Court was not presented with any information from Plaintiffs' adversaries or from any nonparty because Folkenflik was appearing *ex parte*.

While Folkenflik claims that he never intended to collect on the judgment without first ensuring that the appropriate offset would be applied, the record provides strong support for a conclusion to the contrary. First, this contention is discredited by Folkenflik's own assertion that he was under no obligation to inform the court of Bressman's right to a set

---

[37] By considering this argument, we are in no way conceding that fraud is not an intentional tort.

off.[38]  Second, Folkenflik indicated in his brief, supporting his
*ex parte* application for a receiver in the Southern District of
New York that "[w]ith post-judgment interest, the Judgment's
current value is $30,895,913.39" and that "[t]o date – more
than ten years later – Plaintiffs have not seen a dime of this
amount."[39]   This declaration, as with Folkenflik's other
attestations throughout the underlying proceedings, is grossly
misleading and illustrates an intent to receive an unjustified
recovery.

Folkenflik made a deceptive representation to the court
in his affidavit, obtained a default judgment, had it trebled, and
was awarded interest and attorneys' fees.  We have no trouble
concluding that his failure to disclose the settlement reflects his
intent to commit fraud on the court.[40]

Folkenflik also asserts—indefatigably—that he would
have informed the court of the settlement payment had he not

---

[38] App. A384, A537-38.

[39] App. A303-04.

[40] The New York and New Jersey District Courts declined
Bressman's invitation to impose sanctions in response to
Folkenflik's lack of candor with respect to the 2013 *ex parte*
enforcement proceedings.  Folkenflik argues that the courts'
refusal to impose sanctions demonstrates that he did not act
with the requisite intent.  This argument is of no moment since
our determination is based on the deceptive representations
Folkenflik made in the 1999 Affidavit and not with his *ex parte*
enforcement applications.  Further, it is not clear whether
considerations concerning sanctionable conduct are identical
or analogous to those concerning fraud on the court.  We need
not make this determination today.

17

been barred from doing so by the confidentiality order. This contention is unconvincing. Folkenflik was not, as he suggests, left only with the options of concealment or impermissible disclosure. He was aware that relevant facts were being omitted from his affidavit. Even if he believed that the confidentiality order prohibited him from disclosing to the Bankruptcy Court the existence of the Settlement Agreement, he could have so stated in his affidavit and have asked either – or both – the District Court in the Southern District of New York and the Bankruptcy Court in New Jersey for guidance. His failure to do so is consistent with an intent to defraud the court in order to maximize the recovery.

Folkenflik's alternative attempts to justify his nondisclosure fare no better. He contends that he cannot be held responsible for his omissions because he was not obligated to inform the court of Bressman's right to a setoff.[41] In his view, Bressman had notice of the adversary proceedings, failed to act, and therefore waived any defenses. Bressman denies that he had any knowledge of the settlement until October 2013. However, whether Bressman did or did not have knowledge does not forgive Folkenflik for his misrepresentations to the court. Moreover in this regard, any right to set off is not relevant to Folkenflik's failure to inform the court of the fact of the settlement. In addition, Folkenflik's position is further compromised by the fact that Bressman was absent. The *ex parte* nature of the proceedings was not a license for Folkenflik to deceive the court by deliberately failing to bring the material fact of the settlement to the court's attention.

---

[41] App. A537-38.

18

In fact, Folkenflik's duty to deal with the court honestly and with integrity was particularly important in light of the non-adversarial nature of the *ex parte* proceedings. In such a proceeding, the court depends on the integrity of appearing counsel because only he can ensure that the court has received the full scope of information pertinent to the merits of its considerations. Folkenflik was not only obligated to submit truthful information, but he was also required to disclose to the court any material information of which he was aware. Because his failure to do so has sufficiently undermined the judicial process, we conclude that a finding of fraud on the court will lie.

This determination brings us to Folkenflik's next argument: that a "fraud on the court"-based claim can succeed only when it is based on perjurious misconduct. This suggestion is based on an incorrect reading of our *Herring* opinion, which establishes that perjury by a witness does not, by itself, constitute fraud on the court.[42] Understood in its proper context, *Herring*'s pronouncement was appropriately narrow and has no relevance here since Bressman's motion does not pertain to a witness who has allegedly committed perjury. There is an important distinction between perjury that is committed by a witness and fraudulent conduct that is directed at the court by one of its own officers. The latter has a much greater likelihood of undermining the working of the normal process of adjudication because courts rely on the integrity of their officers. Folkenflik is a licensed attorney who exploited his privilege to practice before the courts by not revealing the details of a relevant settlement payment. This

---

[42] 424 F.3d at 390.

19

deceit maximized his clients' recovery—and, in turn, his fee. *Herring* is distinguishable.

Having determined that the record evidences an intentional scheme to improperly influence the court, we next address whether Folkenflik's ploy is the kind of misconduct that the fraud on the court doctrine seeks to address. We conclude that it is. The Supreme Court has warned that fraud on the court actions must be "reserved for those cases of 'injustices which, in certain instances, are deemed sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata."[43] Taking heed of this instruction, we held in *Herring* that only "'egregious misconduct . . . such as bribery of a judge or jury or fabrication of evidence by counsel'" can be characterized as the kind of fraud that warrants relief from a judgment.[44]

The facts here demonstrate "a deliberately planned and carefully executed scheme to defraud . . .."[45] In his affidavit supporting his petition for a default judgment, Folkenflik omitted that Bressman's co-defendants had settled their claims in one of the New York actions: conduct which is incapable of innocent explanation. Folkenflik, in his capacity as an officer of the court, made sworn averments to obtain a default judgment and damages. Knowing that the averments had omitted a material fact, Folkenflik nevertheless allowed the Bankruptcy Court to rely upon their truthfulness. The court's reliance on the affidavit impugned its integrity.

---

[43] *United States v. Beggerly*, 524 U.S. 38, 46 (1998) (citing *Hazel-Atlas Glass Co.*, 322 U.S. at 244).

[44] 424 F.3d at 390 (citation omitted).

[45] *See Hazel-Atlas Glass*, 322 U.S. at 245.

We conclude that the misconduct at issue here is sufficiently egregious. Because there is clear, unequivocal, and convincing evidence showing that Folkenflik committed fraud on the court, we will affirm the judgment of the District Court.

### C.

Finally, Plaintiffs contend that the Bankruptcy Court could not grant relief from the default judgment without first weighing the factors set forth in *Poulis v. State Farm Fire & Casualty Co.*[46] This argument requires little discussion. "In *Poulis*, we held that a district court must consider six factors before it may dismiss a case as a sanction . . .."[47] We have since required consideration of *Poulis* in only a limited number of additional contexts.[48] "Our application of *Poulis* in those contexts comports with the underlying concern that *Poulis* sought to address, namely that dismissal as a sanction before adjudication of the merits deprives a party of her day in court."[49] Our precedents have reaffirmed that the *Poulis* factors are required to "preserve the ability of the parties to try their cases on the merits."[50] These concerns are not present here. In fact, the principle underlying *Poulis*, that disputes should be decided on their merits, is the very basis for our

---

[46] 747 F.2d 863 (3d Cir. 1984).

[47] *Knoll v. City of Allentown*, 707 F.3d 406, 408 (3d Cir. 2013).

[48] *Id.* at 409 (listing cases).

[49] *Id.*

[50] *Id.* at 410.

disfavor of default judgments.[51]  As set forth above, our review of the decision to vacate a default judgment under the circumstances presented here asks whether a court has abused its discretion.  Because the Bankruptcy Court has not done so, we will affirm.[52]

## IV.

"Membership in the bar is a privilege burdened with conditions."[53]  Among the most oft-cited is the condition that attorneys will honor the duty of loyalty they owe to each of their clients.  In so doing, attorneys must not—and in most cases do not—disregard their inherent obligation to the system of justice.[54]  Because Folkenflik has conducted himself in a way that has improperly interfered with the administration of justice, protection of the court's integrity requires us to act.  In light of this responsibility, we will affirm the judgment of the District Court.

---

[51] *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 982 (3d Cir. 1988) (noting that we have "adopted a policy disfavoring default judgments and encouraging decisions on the merits" (citation omitted)).

[52] To the extent that Plaintiffs seek to use *Poulis* to challenge the Bankruptcy Court's decision to dismiss their underlying action with prejudice, the *Poulis* factors are plainly satisfied. In *Poulis*, we developed factors to consider when determining if misconduct is grave enough to warrant the drastic sanction of dismissal. *Poulis*, 747 F.2d at 868. A fraud on the court is unquestionably such misconduct.

[53] *In re Snyder*, 472 U.S. at 644 (citation and internal quotation marks omitted).

[54] *Id.*

22



**HANOVERIAN, INC. et al., Plaintiffs v. PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION, Defendant**

**Civil Action No. 1:07-cv-00658**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
PENNSYLVANIA**

*2008 U.S. Dist. LEXIS 28865*

**March 31, 2008, Decided
March 31, 2008, Filed**

**COUNSEL:** [*1] For Hanoverian, Inc., doing business as Quaker Alloy, doing business as Quaker Alloy, Inc., Plaintiff: Donald Litman, LEAD ATTORNEY, EDWARDS & LITMAN, Quakertown, PA.

For Pennsylvania Department of Environmental Protection, Defendant: James F Bohan, LEAD ATTORNEY, Office of Chief Counsel, PA DEP, Harrisburg, PA.

**JUDGES:** Yvette Kane, Chief Judge.

**OPINION BY:** Yvette Kane

**OPINION**

**MEMORANDUM**

Before the court are the Pennsylvania Department of Environmental Protection's motion to remand the above-captioned action to the Pennsylvania Environmental Hearing Board (Doc. No. 6) and its motion for sanctions, including attorney's fees incurred in connection with the removal of the action, against Hanoverian, Inc., Donald Metzger, the 200 Cascade Drive Ordinary Trust, plaintiffs' counsel Donald Litman, and the law firm of Edwards and Litman with which Donald Litman is affiliated (Doc. No. 20). For the

reasons that follow, the Court will grant the motion to remand, deny the motion for sanctions with respect to Hanoverian, Inc., Donald Metzger, and the 200 Cascade Drive Ordinary Trust, and grant the motion for sanctions with respect to Donald Litman and the law firm of Litman and Edwards.

**I. BACKGROUND**

In 1981, the Pennsylvania Department [*2] of Environmental Protection ("Department") issued a solid waste permit ("Permit") to Quaker Alloy Casting Company ("Quaker Casting") for a landfill at 200 East Richland Avenue in Myerstown, Pennsylvania ("Landfill"). (Doc. No. 9-3, at 5.) The Department modified the permit on several occasions thereafter, most notably on September 29, 1986, to authorize the transfer of the Landfill's ownership from Quaker Casting to Quaker Alloy, Inc., (Id., at 12) ("Quaker Alloy") and on July 5, 2000, to allow captive processing of residual waste (Id., at 24; see also id., at 26). The application (id., at 30, 37) for the latter modification identifies the applicant as "Quaker Alloy, Inc." and includes Quaker Alloy's employer and taxpayer identification numbers (id., at 31, 37).

**A. The Bankruptcy Proceedings**

On August 4, 2003, Atchison Casting Corporation

102F9M

**Send to:**   PAIGE, MICHELE
         YALE LAW SCHOOL - LIBRARY
         127 WALL ST
         NEW HAVEN, CT 06511

**Time of Request:** Thursday, March 07, 2013   03:44:23 EST
**Client ID/Project Name:**
**Number of Lines:** 610
**Job Number:**        1828:398031681

Research Information

**Service:**   LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 2008 U.S. Dist. LEXIS 28865

("Atchison") and twelve of its domestic subsidiaries, including Quaker Alloy, ("Debtors") filed voluntary petitions for Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Western District of Missouri ("Bankruptcy Court"). (Doc. No. 9-5; see also Doc. No. 9-7, at 3.) Quaker Alloy's petition identifies the debtor as "Quaker Alloy, [*3] Inc." and, like the application for the July 2000 modification, includes Quaker Alloy's taxpayer identification number. (Id., at 2.) That same day, the Bankruptcy Court issued an order authorizing the joint administration of the Debtors' cases, and directing that all pleadings be filed at the docket number for the Atchison case. (Doc. No. 9-6, at 2.) On January 15, 2004, the Bankruptcy Court entered an order authorizing the sale of Quaker Alloy's assets ("Sale Order") (Doc. No. 9-10), and, one week later, appointed Erlene Krigel ("Krigel") as the trustee in bankruptcy for the Debtors (id.).

The Sale Order authorized the sale of Quaker Alloy's remaining assets subject to, inter alia, the following terms and conditions:

C. The sale of the Assets shall be free and clear of liens and all other claims whatsoever pursuant to *section 363(f) of the Bankruptcy Code*, whether known or unknown, including, but not limited to, any existing right(s) of first refusal or similar protective right alleged by any party, except as specifically referenced herein, any liens and claims of any of the Debtors' creditors, vendors, supplies, employees or lessors, and the buyers shall not be liable in any way for [*4] any claims that any of the foregoing or ally other third party may have against the Debtors or the Assets. Any and all alleged liens and claims on such Assets shall be transferred, affixed, and attached to the proceeds of the sale, with the same validity, priority, force, and effect as such liens had been upon the Assets immediately prior to the sale.

E. Subject to the payment by the buyer(s) to Debtors of the purchase price for the Assets, the sale of the Assets by the Debtors to the buyer(s) shall constitute a legal, valid and effective transfer of the

Assets and shall vest buyer(s) with all right, title, and interest of the Debtors in and to the Assets, free and clear of all liens pursuant to *section 363(g) of the Bankruptcy Code*.

(Doc. No. 1-7, at 27-28.) At a public auction held March 23, 2004, Hanoverian, Inc. ("Hanoverian") submitted the winning bid of $540,000 for the Landfill. (Doc. No. 27, at 8; Doc. No. 27-2, at 2; Doc. No. 1-4, at 9.) On April 8, 2004, Linda Houseal, the solid waste supervisor at the Department's Southcentral Regional Office, informed Thomas Marks, an environmental consultant in the employ of Hanoverian, that, pursuant to Pennsylvania law, the Department [*5] would require any purchaser of the Landfill to obtain a permit reissuance and bond the Landfill. (Doc. No. 9-3, at 4.) Krigel sold the Landfill to Hanoverian by a quitclaim deed dated April 9, 2004. (Doc. No. 1-7; Doc. No. 1-4, at 11.)

Sometime after purchasing the Landfill, Hanoverian contacted Krigel and expressed an interest in purchasing the corporate name of "Quaker Alloy, Inc." ("Corporate Name"). See In re Atchison Casting Corp., No. 03-50965, Trustee's Motion for Order Authorizing Sale of Corporate Name, at 2 (Bank. W.D. Mo. June 30, 2004). On June 30, 2004, Krigel moved the Bankruptcy Court for authorization to sell the Corporate Name to Hanoverian for $1,500. Id. The Bankruptcy Court subsequently issued an order authorizing the sale (Doc. No. 1-4, at 21), and, by a bill of sale dated August 3, 2004, Krigel transferred "unto Hanoverian, Inc., Trustee for the 200 Cascade Drive Ordinary Trust . . . all of Seller's right, title and interest in and to the corporate name of Quaker Alloy, Inc." (Id., at 25). As the Department observes in its brief, neither the order nor the bill of sale contemplate "the sale of the corporation known up until that time as 'Quaker Alloy, Inc.' or [*6] the sale of any rights that corporation had under the Permit." (Doc. No. 9, at 10.) On August 9, 2004, the Debtor previously known as "Quaker Alloy, Inc." filed a notice with the Bankruptcy Court indicating that "it ha[d] changed its corporate name to Quaker Administration, Inc., such name change being occasioned as a result of the sale of the Debtor's corporate name to Hanoverian, Inc., Trustee for the 200 Cascade Drive Ordinary Trust . . . ." (Doc. No. 1-4, at 23.)

**B. The Environmental Hearing Board Appeals**

Case 3:17-cv-00023-ARC   Document 75   Filed 11/02/17   Page 42 of 54

Page 3
2008 U.S. Dist. LEXIS 28865, *6

On April 24, 2006, Hanoverian's general counsel Craig Edwards ("Edwards") sent a letter to the Department's assistant counsel James Bohan ("Bohan") in which he stated: "With regard to the ownership of [the Landfill], the deeded owner is Hanoverian, Inc. as trustee. The landfill parcel is being transferred to Quaker Alloy, Inc. (which was a name obtained from the bankruptcy trustee). . . . To my knowledge, as [t]rustee for the 200 Cascade Drive Ordinary Trust, Hanoverian, Inc. is not required to be registered to do business in Pennsylvania." (Doc. No. 1-10, at 17.) Fifteen days later, the Department sent a letter to Krigel, notifying her that the Permit had been revoked "[b]y virtue [*7] of Quaker Alloy, Inc.'s . . . dissolution, and Quaker Alloy abandoning the permitted facility without providing for final closure." (Doc. No. 9-4, at 5.) The Department sent a copy of the letter to Quaker Alloy at its address of record in Myerstown, Pennsylvania, that same day. (Id., at 3, 8.) Two days later, the letter to Quaker Alloy came back to the Department marked "not deliverable as addressed; unable to forward." (Id.) In addition to the letters, the Department published notice of the revocation in the July 29, 2006, issue of the *Pennsylvania Bulletin*. (Doc. No. 9-20, at 2.)

**1. The Permit Revocation and Bond Forfeiture Appeals**

On August 28, 2006, Hanoverian filed a notice of appeal with the Pennsylvania Environmental Hearing Board ("EHB") challenging the Department's decision to revoke the Permit ("Permit Appeal"). (Doc. No. 1-5, at 6.) In early September, the Department declared the bond for the Landfill, submitted by "Quaker Alloy, Inc." in 1986, forfeited and proceeded to collect thereon. (Doc. No. 9-3, at 15; see also id., at 22; Doc. No. 1-5, at 17.) On October 4, 2006, the Department served Hanoverian with its first set of interrogatories and first request for production [*8] of documents in connection with the Permit Appeal. (Doc. No. 9-16.) A good number of the interrogatories questioned Hanoverian's authority to do business in Pennsylvania, either under the name "Hanoverian" or under fictitious names with the words "Quaker" or "Alloy." In particular, the Department requested that Hanoverian:

> 1. Please list each state: (a) In which Hanoverian has been incorporated as well as the date of incorporation in each state. (b) In which Hanoverian is legally

qualified to conduct business.

> . . .

> 2. Please list all trade or other names under which Hanoverian has done business from the date of [Hanoverian's] incorporation to the present; and the state(s) in which Hanoverian has done business under each name.

> . . .

> 8. In what state(s) does Hanoverian contend that it is doing business as "Quaker Alloy"? . . . If Hanoverian contends that it is doing business as "Quaker Alloy" in Pennsylvania, please: (i) State the factual basis for this contention. (ii) Identify all persons with knowledge or information supporting this contention. (iii) Identify any and all documents containing information relevant to this contention.

(Doc. No. 9-16, at 5, 6, 8.) On November 15, 2006--forty-two [*9] days after serving Hanoverian with its first interrogatories--the Department filed a motion to compel discovery with the EHB. (Doc. No. 9-17, at 2.) Five days later, Hanoverian filed a notice of appeal with the EHB, contesting the forfeiture of the bond ("Bond Appeal"). (Doc. No. 1-5, at 12.) On November 22, 2006, Hanoverian filed an application for a certificate of authority (Doc. No. 9-21) and an application for registration of the fictitious name "Quaker Alloy" (Doc. No. 9-22) with the Corporations Bureau of the Pennsylvania Department of State. Edwards executed both applications in his capacity as Hanoverian's general counsel. (Doc. No. 9-21, at 3; Doc. No. 9-22, at 3.)

**2. The Administrative Order and the Articles of Amendment**

On December 7, 2006, the EHB issued two orders, one granting the Department's motion to compel discovery (Doc. No. 1-8) and another consolidating Hanoverian's appeals under the docket number for the Permit Appeal (Doc. No. 9-17, at 3). That same day, the Department issued an administrative order ("Administrative Order") to Hanoverian and its president Donald Metzger ("Metzger") (Doc. No. 9, at 15), for past

and ongoing violations at the Landfill, namely, owning [*10] and operating the Landfill without first obtaining a permit reissuance or submitting a bond, and failing to implement an approved closure plan or a provide adequate sampling and analysis (Doc. No. 9-24, at 10-12). Litman responded to the order in a letter sent to Bohan the following week, wherein he asserted, among other things, that "Quaker Alloy, Inc. is *no longer the* [sic] *bankrupt entity*, as Quaker Alloy, Inc. (along with all right title [sic] and interest of the name--including the permit) belongs to my client, Hanoverian, Inc." and "Quaker Alloy is alive and well . . . ." (Doc. No. 1-8, at 22.)

On December 26, 2006, Edwards filed articles of amendment to Quaker Alloy's articles of incorporation--more precisely, the articles of incorporation filed by a Missouri attorney in 1994--with the Pennsylvania Corporation Bureau. (Doc. No. 9-23, at 2, 10.) In the filing form that accompanied the articles, Edwards indicated that Quaker Alloy's registered office was "c/o Hanoverian, Inc." in Coopersburg, Pennsylvania, (id.) and attested that "[t]he amendment was adopted by the board of directors pursuant to *15 Pa. C[ons]. S[tat]. § 1914(c)*" (id.). The first two articles provide as follows:

QUAKER [*11] ALLOY, INC.

(formerly known as the Atchison Casting Corp.)

As amended pursuant to the sale from the United States Trustee Erlene W. Krigel to conform with the provisions of the Order of the US Bankruptcy Court in the matter of IN RE ATCHISON

CASTING CORP., No. 03-50965-jwv7

US Bankruptcy Ct., WD Missouri (Copy attached)

These Articles of Amendment were approved by majority vote of the Board of Directors and sole shareholder Donald C. Metzger on April 29, 2005; a quorum was present at such meeting; the amendment received at least two-thirds of the votes entitled to be cast at such meeting.

The undersigned, the president and secretary of the corporation known as the [sic] "Quaker Alloy, Inc." and each being a natural person of the age of 21 years or more, does hereby verify and file these Articles of Amendment pursuant to the Pennsylvania Business Corporation Law of 1988.

ARTICLE OF AMENDMENT I

The name of the corporation shall be "Quaker Alloy, Inc." and Article I is hereby amended to delete all prior names, and the new name includes the usage of "Quaker Alloy" as the name of the corporation.

ARTICLE OF AMENDMENT II

The following provisions shall be substituted to Article V of the Articles of [*12] Incorporation and inserted in its stead:

The Corporation shall have the following officers:

Donald C. Metzger PRESIDENT, SECRETARY & TREASURER

1930 Rt. 309

Coopersburg, PA 18036

Bucks County

(Id., at 12.) A third article of amendment restructured the capitalization of the corporation from "1,500,000 shares of Common Stock consisting of 1,000,000 shares of Class A Common Stock, $ 1.00 par value per share, and 500,000 shares of Class B Non-voting Common Stock, $ 1.00 par value per share" (id., at 7) to "one class of stock: 100,000 shares [at] $ 0.10 Par Value" (id., at 12). Edwards executed the filing form (id., at 11) and Metzger executed the articles of amendment (id., at 12).

**3. The Order Appeal**

On January 8, 2007, Hanoverian, Metzger, and the 200 Cascade Drive Ordinary Trust ("Trust"), of which Hanoverian is the sole trustee (Doc. No. 1-9, at 19), filed

a third notice of appeal with the EHB ("Order Appeal"), charging that the Department "has been engaged in unlawful conduct under federal bankruptcy law by taking adverse actions contrary to the automatic stay pursuant to federal law against the bankruptcy entity Quaker Alloy, Inc., without first obtaining the allowance of court in the matter [*13] of IN RE ATCHISON CASTING CORP. . . . in accordance with *11 [U.S.C.] § 362(d)*," (Doc. No. 1-5, at 21-22). The unlawful conduct, appellants allege, includes "unlawfully, willfully and deliberately commenc[ing] to revoke [the Permit] and forfeit the bond without affording any direct notice to Appellee, but [sic] ch[oosing] instead to forward the same to the bankruptcy trustee" and "ch[oosing] instead to engage in a slanderous public press release that improperly impugned the reputation, name and character of the Appellants and the bankrupt entity." (Id., at 22-23.) Appellants further charge that "Donald Metzger as a beneficiary is not a proper party to this matter, and preliminarily objects pursuant to the Pennsylvania Rules of Civil Procedure to being named in [the Administrative] Order, and moves herein to be dismissed with prejudice pursuant to *[Pa. R. Civ. P.] 1028*." (Id., at 23.) Lastly, Hanoverian individually objects, without further explanation, "to the Administrative Order of the Department, because said action deprives said Appellant of their [sic] due process rights as equitable owner of the permit." (Doc. No. 1-5, at 25.) On January 12, 2007, the EHB issued an order consolidating [*14] all three appeals under the docket number for the Permit Appeal. (Doc. No. 9-19, at 2-3.)

### C. Plaintiffs' Notice of Removal

On April 9, 2007--ninety-one days after the Order Appeal had commenced--Litman filed a "Notice of Removal of State Court Action to U.S. District Court" and civil cover sheet with the Middle District Clerk of Court. (Doc. Nos. 1, 1-2.) Both documents name the same four plaintiffs, here listed in full for the sake of accuracy, but hereafter referred to as "Plaintiffs" for the sake of convenience: Hanoverian, Inc. dba Quaker Alloy, Quaker Alloy, inc., 200 Cascade Drive Ordinary Trust, and Donald Metzger. (Doc. No. 1, at 1; Doc. No. 1-2, at 2.) The disclosure statement appended to the notice of removal avers that the "Petitioner, Hanoverian, Inc., a Delaware Corporation, is a nongovernmental corporate party herein that is not publicly traded, and is the parent corporation of Quaker Alloy, Inc., a Pennsylvania Corporation, which is not publicly traded." (Doc. No. 1, at 6.) The business entity filing history for Quaker Alloy,

Inc.; provided by the Corporations Bureau and filed as an exhibit to the notice of removal, gives an entity creation date of April 11, 1994, and [*15] lists Dinny Kinloch of 200 Richland Avenue, Myerstown, Pennsylvania, as president and Kevin McDermed of the same address as secretary and treasurer. (Doc. No. 1-11, at 18.)

In the cause-of-action section of the civil cover sheet, Plaintiffs cite *§ 363 of the Bankruptcy Code, 11 U.S.C. § 363*, as the basis for bringing suit and, by way of further explanation, state that the "PA DEP has violated US Bankruptcy law by asserting claims against sold [sic] under Order of the Bankruptcy Court (WD Missouri) that were not asserted by claim or adversary proceeding in the Bankruptcy Court." (Doc. No. 1-2, at 1.) The notice of removal, however, states otherwise:

> [P]laintiffs ("collectively referred to as Quaker Alloy"), through its undersigned counsel, hereby files [sic] this Notice of Removal pursuant to *28 U.S.C. § 1452(a)* and *Federal Rule of Bankruptcy Procedure 9027(a)*. Quaker Alloy hereby removes to the Middle District Court of Pennsylvania all claims and causes of action in the state action styled Hanoverian, Inc. Et Al [sic] v. Pennsylvania Department of Environmental Protection EHB Docket Nos. 2007028, 2006256, and 2006192, now pending in the Pennsylvania Environmental Hearing Board (the "State [*16] Court Action").

(Doc. No. 1, at 1-2.) Plaintiffs' principle claim upon removal is that the Department "engaged in unlawful actions in violation of the US Bankruptcy Court Orders and federal law by taking actions against the Petitioner concerning [the Permit] that were required to be raised before the Bankruptcy Court before the authorized sales to Petitioner" and, "[a]lthough [the Department] failed to object or otherwise file an adversary proceeding against Quaker Alloy, Inc., for the intended sale of the landfill and permit, . . . in April 2006 [the Department] notified incorrectly the US Trustee only of their [sic] intention to forfeit the bond on [the Permit], and failed to notify the Plaintiffs." (Id., at 3-4.) Fundamental to Plaintiffs' claim are the allegations that "[w]ithout objection or condition of the [Department], in 2004 the United States Trustee for Quaker Alloy, Inc. obtained approval from the US

Bankruptcy Court to liquidate the assets of Quaker Alloy, Inc., including scheduled bank deposits constituting a collateral bond of $ 27,125 relating to [the Permit]" and that "[i]n July 27, 2004 pursuant to US Bankruptcy Court order, the US Trustee sold all the right, title [*17] and interest to the corporate entity Quaker Alloy, Inc. to the Plaintiffs/Petitioner, including the right to any and all personalty belonging to Quaker Alloy, Inc. such as [the Permit]." (Id., at 3.) Plaintiffs claim unspecified damages in excess of $ 1,000,000 and pray that the Department will "reinstate the bond and permit to Quaker Alloy, Inc. and be enjoined from further acts in violation of federal law with regard to [the Permit]." (Id., at 5-6.)

## II. DISCUSSION

### A. The Department's Motion to Remand (Doc. No. 6)

The Department advances four distinct grounds in support of its motion to remand the action to the EHB: (1) The notice of removal was untimely filed; (2) "Quaker Alloy, Inc." is improperly named as a party to the action; (3) Plaintiffs filed the notice of removal in bad faith; and (4) the EHB is not a "state court" and an appeal to the EHB is not a "civil action" for the purposes of removal under 28 U.S.C. § 1452(a). (Doc. No. 6, at 2-3.) The Department adds a fifth ground to the list via its brief in reply, namely, that Plaintiffs failed to timely file their brief in opposition and, pursuant to Local Rule 7.6, the Court should grant its motion as unopposed. (Doc. No. 17, at [*18] 7-11.) See M.D. Pa. L.R. 7.6 ("Any respondent who fails to [timely file a responsive brief] shall be deemed not to oppose such motion.").

Plaintiffs' brief in opposition--which was, in fact, untimely filed--is in large part unresponsive, arguing from the premise that "[t]he only issue before this Court is the matter of a governmental agency asserting claims against a good faith purchaser of property that were required to be raised before a federal court of which they [sic] had notice that the agency object or otherwise require such sale with conditions." (Doc. No. 16, at 1.) Following this obliquity is a page-long quotation from Pennsylvania's Solid Waste Management Act (id., at 2-3); a string of incredible factual contentions, such as "the Respondent admits that they enjoyed a biased administrative judge" in the EHB (id., at 3) and "Respondent argues in their memorandum that the [EHB] is not a tribunal but an administrative governmental unit enforcing police powers in this matter that are criminal rather than civil in nature" (id., at 4); vague intimations of

federal questions lurking in the shadows--stating, for instance, that the Department's actions "appear to violate the commerce clause" [*19] or "appear to violate due process protections" (id., at 4-5); and numerous impenetrable conclusions of law, of which the following is typical:

> Supremacy clause mandates that policy decision by Congress to subject all creditors including states to general presumption against postpetition [sic] additions, pursuant to its bankruptcy power, displace normal operation of state's statutory provision for additions to local property taxes for penalties accruing on delinquent property taxes after filing bankruptcy petition to extent latter command result contrary to federal statute; bankruptcy court's lack of power to address state tax liens would seriously impair its power to administer estate and promulgate reorganization plan.

(Id., at 7.) Finally, in three short paragraphs at the close of their brief, under the heading "The Notice Was Timely Filed," Plaintiffs confront the issue of timeliness:

> It is the fault of Respondent that a Petition for Removal was not filed within sixty days of the first appeal to the EHB, as the Respondent never afforded direct notice of the permit being revoked to Petitioner and refused to comply with discovery until April 2007. As to the second appeal to the EHB, [*20] the DEP sent the notice to a trustee in Missouri rather than to the real party in interest, and this clearly evidences a lack of good faith which forbids DEP to raise a timeliness argument now on equitable grounds.... [I]t was the delay by DEP to submit their discovery replies until April 2007 that hindered counsel to seek removal in good faith. DEP should not now benefit by their bad faith actions and inequitable conduct.

(Id., at 7-8.) Notwithstanding the gravity of these claims, Plaintiffs cite no legal authority in their support. More remarkable still, there is not a single citation to the record--a 377-page jumble of filings, letters, and instruments, some of which appear in duplicate and

triplicate--anywhere in their brief. (See generally id.) What is more, by omitting a counter statement of the facts, Plaintiffs have effectively conceded the Department's version of the events preceding removal. *M.D. Pa. L.R. 7.8* ("If a counter statement of facts or questions involved are not filed, the statements of the moving party will be deemed adopted."). While these failings alone are cause enough to grant the Department's motion, the Court will nevertheless examine the merits of Plaintiffs' [*21] arguments. See *D'Angio v. Borough of Nescopeck, 56 F. Supp. 2d 502, 504 (M.D. Pa. 1999)* ("A litigant who fails to press a point by supporting it with authority or by showing why it is a good point despite a lack of authority . . . forfeits the point." (citations omitted)); see also *M.D. Pa. L.R. 7.8* ("Briefs shall contain complete citations of all authorities relied upon . . . .").

According to the notice of removal, Plaintiffs relied upon *28 U.S.C. § 1452(a)* and *Federal Rule of Bankruptcy Procedure 9027(a)* in removing the appeals. (Doc. No. 1, at 1-2.) *Section 1452(a)* provides that a "party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction . . . ." *28 U.S.C. § 1452(a).* Subsection 3 of *Federal Rule of Bankruptcy Procedure 9027(a)* prescribes the time for filing a notice of removal:

> If a claim or cause of action is asserted in another court after the commencement of a case under the [Bankruptcy] Code, a [*22] notice of removal may be filed with the clerk [of court] only within the shorter of (A) 30 days after receipt, through service or otherwise, of a copy of the initial pleading setting forth the claim or cause of action sought to be removed, or (B) 30 days after receipt of the summons if the initial pleading has been filed with the court but not served with the summons."

*Fed. R. Bankr. P. 9027(a)(3).* Under *§ 1452(b),* a "court to which [a] claim or cause of action is removed may remand such claim or cause of action on any equitable ground." *28 U.S.C. § 1452(b).*

Forgetting for a moment that *Rule 9027(a)(3)* speaks of courts, cases, pleadings, and defendants, and not boards, appeals, notices, or appellants, Plaintiffs in this case were required to file a notice of removal within thirty days of commencing their most recent appeal. See *Fed. R. Bankr. P. 9027(a)(3).* In fact, Plaintiffs filed the notice of removal on April 9, 2007, or, using the appeals as points of reference, 224, 140, and 91 days after commencing the Permit, Bond, and Order Appeals, respectively. (See Doc. No. 1-5, at 6 (Permit Appeal commenced Aug. 28, 2006); id., at 12 (Bond Appeal commenced Nov. 20, 2006); id., at 21-22 (Order [*23] Appeal commenced Jan. 8, 2007).) Thus, under the best of circumstances, the Clerk of Court received the notice two months too late. Plaintiffs, however, as previously mentioned, fault the Department for the delay: first, for providing "direct notice" of the permit revocation and bond forfeiture to the Trustee instead of "the real party in interest," i.e., the Plaintiffs, and, second, for "refus[ing] to comply with discovery until April 2007." (Doc. No. 16, at 7-8.) More particularly, Plaintiffs contend that "it was the delay by DEP to submit their discovery replies until April 2007 that hindered counsel to seek removal in good faith." (Id., at 8.)

Whether or not the Department provided the Plaintiffs with actual notice of the permit revocation or bond forfeiture is completely inapposite to any equitable arguments Plaintiffs might now make. Plaintiffs commenced their most recent appeal on January 8, 2007. Under *Rule 9027(a)(3),* the parties had until February 7, 2007, to file notice of removing the appeal, actual notice or not. Moreover, even if actual notice had some bearing upon the matter, which it does not, there is ample evidence that the Plaintiffs had constructive notice of the [*24] permit revocation well before the February 7, 2007, filing deadline. (See, e.g., Doc. No. 1-8, at 22 (Letter dated December 13, 2006, from Edwards to Bohan addressing, inter alia, permit revocation).) Indeed, Hanoverian unequivocally states in its notice of appeal filed August 28, 2006, that it "became aware of the revocation action from publication in the *Pennsylvania Bulletin.*" (Doc. No. 1-5, at 7; see also Doc. No. 1-8, at 5 (Bond Appeal filed November 20, 2006) ("Appellant . . . was indirectly advised of the bond forfeiture action within thirty days of the date of this appeal."); Doc. No. 1-5, at 22 (Order Appeal filed January 8, 2007) ("[T]he Appellee unlawfully, willfully, and deliberately commenced to revoke [the Permit] and forfeit the bond . . . .").)

As a matter of law, the Permit was not appurtenant to the Landfill or freely transferable. See *25 Pa. Code § 287.221(a)* (2008) ("A transfer, assignment or sale of rights granted under a permit may not be made without obtaining permit reissuance."); *35 P.S. § 6018.610(9)* (2007) ("It shall be unlawful for any person or municipality to . . . [c]ause or assist in the violation of . . . any order of the department or [*25] any term or condition of any permit."). Sending notice by letter to the court-appointed Trustee in Missouri and the permittee Quaker Alloy, Inc. in Myerstown, Pennsylvania--its address of record--instead of Hanoverian, the Trust, Metzger, or the fictitious name "Quaker Alloy, Inc." does not therefore "clearly evidence a lack of good faith," but rather an abundance of common sense and strict adherence to the state's environmental regulations. (Doc. No. 16, at 8.) See *25 Pa. Code § 287.422(b)* (2008) (providing, exclusively, that "[t]he Department will publish in the *Pennsylvania Bulletin* notice of the revocation or suspension of a permit"); cf. id. *§ 287.414(a)* (2008) (providing that service of civil penalty assessments "will be by registered or certified mail, or by personal service. . . . tendered at the address of that person set forth in the application for a permit").

Perhaps unsurprisingly, Plaintiffs' assertion that the Department "refused to comply with discovery until April 2007" finds not a shred of support in the record. (Doc. No. 16, at 7-8.) On the contrary, the record unambiguously shows that it was Plaintiffs, not the Department, that failed to comply with discovery. To [*26] begin with, the Department, not Hanoverian, filed a motion to compel discovery with the EHB on November 11, 2006. (Doc. No. 1-5; see also Doc. No. 1-4, at 36 (Docket for consolidated appeals).) The following month, the EHB issued an order granting the Department's motion and directing Hanoverian "to serve full and complete answers to [the Department's] discovery requests on or before January 12, 2007." (Doc. No. 1-8, at 16.) On January 22, 2007, ten days after the discovery deadline had come and gone, the Department filed a motion for sanctions, exhaustively cataloguing Plaintiffs' numerous "discovery abuses." (Doc. No. 1-5, at 44.) The EHB eventually dismissed the motion as moot, having brokered a revised discovery schedule. (Id., at 3.) To conclude, nowhere in the record is there the slightest indication that the Department in any way delayed or refused to comply with discovery. Having found that the notice of removal was untimely filed, the Court need not consider the Department's other grounds for remand. The

Court will grant the motion to remand.

**B. Motion for Sanctions**

In its motion for sanctions, the Department seeks an order directing Litman, the law firm of Edwards and Litman, [*27] and Plaintiffs to reimburse the Department for its reasonable expenses, including attorney's fees, and imposing any other sanctions that the Court might deem appropriate under *Federal Rule of Civil Procedure 11* and *Federal Rule of Bankruptcy Procedure 9011(b)*. (Doc. No. 20, at 1-2.) *Rule 11* provides in relevant part that:

> By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. . . .

*Fed. R. Civ. P. 11(b)(1)-(3)*. [*28] *Rule 11* further provides that "[i]f, after notice and a reasonable opportunity to respond, the court determines that *Rule 11(b)* has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." *Id. 11(c)(1)*. The rule therefore not only protects against a party presenting a paper for an improper purpose, but "imposes on any party who signs a document submitted to the court an affirmative duty to conduct a reasonable inquiry into the facts and law before filing." *Bradgate*

*Assocs., Inc. v. Fellows, Read & Assocs., Inc., 999 F.2d 745, 751 (3d Cir. 1993).* In short, the rule cautions litigants "to look before leaping." *Lieb v. Topstone Indus., Inc., 788 F.2d 151, 157 (3d Cir. 1986);* see also *Thornton v. Wahl, 787 F.2d 1151, 1154 (7th Cir. 1986)* ("The point . . . is that every lawyer must do the necessary work to find the law *before* filing the brief."). Because the Federal Rules of Bankruptcy Procedure govern procedure in courts of bankruptcy exclusively, the Court will disregard Defendant's arguments predicated thereupon, *Rule 9011(b)* included. See generally *Fed. R. Bankr. P. 1001.*

The Third Circuit [*29] has consistently held that, in scrutinizing a paper against the requirements of *Rule 11,* "courts must apply an objective standard of reasonableness under the circumstances." *Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 94 (3d Cir. 1988);* see also *Bradgate Assocs., Inc., 999 F.2d at 752; Lieb, 788 F.2d at 157.* Thus, when examining the sufficiency of an attorney's investigation of facts and law, courts are "expected to avoid the wisdom of hindsight and . . . test the signer's conduct by inquiring what reasonable to believe at the time the pleading, motion, or other paper was submitted." *CTC Imports and Exps. v. Nigerian Petroleum Corp., 951 F.2d 573, 578 (3d Cir. 1991)* (citation omitted). "Notwithstanding the emphasis on the time of initial submission, however, parties will not be entitled to continuing immunity if they acquire or should acquire knowledge under the Rule's standard before a later filing." *Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3d Cir. 1987).* And neither may the parties "escape liability because [they] did not intend to bring about additional delay or expense." *Lieb, 788 F.2d at 157.*

According to the Third Circuit, what constitutes a reasonable inquiry may depend [*30] on such factors as: (1) the amount of time available to the signer for conducting a factual and legal investigation; (2) the necessity of relying on a client for the underlying factual information; (3) the plausibility of the legal position advocated; (4) the complexity of the legal and factual issues implicated; (5) whether the signer depended on forwarding counsel or another member of the bar; and (6) whether the signer was in a position to know or acquire the relevant factual details. See *CTC Imports and Exps., 951 F.2d at 578; Lingle, 847 F.2d at 95; Colburn v. Upper Darby Twp., 838 F.2d 663, 667 (3d Cir.),* cert. denied *489 U.S. 1065, 109 S. Ct. 1338, 103 L. Ed. 2d 808 (1988).* Above all else, "a district court must ensure that there is an adequate factual predicate for flexing its

substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified." *Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1994).*

In its brief in support, the Department argues that, "[h]ad Litman conducted a reasonable inquiry into the legal contentions and evidentiary support in the Notice of Removal, he would have known that removal was improper." (Doc. [*31] No. 21, at 4.) "Furthermore," it contends, "the totality of the circumstances surrounding the Notice of Removal show that it was filed for an improper purpose." (Id., at 5.) What follows is a lengthy but non-exhaustive list of Litman's transgressions, meticulously supported by citations to existing law and the record. Regarding Litman's legal contentions, the Department claims that a reasonable inquiry would have revealed, first, that the appeals were not "civil actions" for the purpose of *28 U.S.C. § 1452(a)* and therefore not removable under *§ 1441* and, second, that, even if they were, the opportunity for removal under *Rule 9027(a)(3)* had long since evaporated by the time Litman filed the notice. (Id., at 14-19.) Regarding Litman's factual contentions, the Department likewise asserts that a reasonable inquiry would have revealed a lack of evidentiary support for his contentions that: (1) Quaker Alloy, Inc. is properly named as a party to the instant action; (2) the Bankruptcy Court authorized the sale of the "corporate entity" that owned and operated the Landfill under the Permit; (3) the "Trustee sold all right, title, and interest [in] the corporate entity Quaker Alloy, Inc. to [*32] the [Plaintiffs], including the rights to any and all personalty belonging to Quaker Alloy, Inc. such as [the Permit]"; (4) each of the Plaintiffs is incorporated in and has a principal place of business in a state other than Pennsylvania; and (5) that "Quaker Alloy Fire [sic] [had] provided written notice of [the] Notice of Removal to counsel of record for all parties and [that] a true and complete copy of [the] Notice of removal [had] been filed in the State Court [sic] Action" prior to April 2, 2007. (Id., at 19-25 (citing Doc. Nos. 1, 1-2).)

Finally, the Department marshals considerable evidence in support of its contention that "the Notice of Removal was not merely ill-conceived, but was deliberately crafted to mislead the Court and harass the Department." (Id., at 25.) Such evidence includes not only the foregoing legal and factual contentions, but record proof that: (1) of the named plaintiffs, only Hanoverian appealed the permit revocation or the bond

forfeiture; (2) Litman used the phrase "Quaker Alloy" as a "shorthand" for Plaintiffs in the notice of removal whenever he wished to "imply[] that [the Landfill's] previous owner, a debtor in bankruptcy proceeding, is a party to [*33] the EHB proceedings," but "where confusion between his clients and the previous owner might potentially hurt his clients, Litman was careful to refer to his clients as 'Petitioner' or 'Plaintiffs,' rather than 'Quaker Alloy'"; (3) the damages to Plaintiffs could not have been "in excess of $ 1,000,000," as claimed in the notice of removal; and (4) Litman refused to withdraw or amend his papers even after the Department had belied his various "misrepresentations and obfuscations" and twice advised him by letter of its intention to file a motion for sanctions unless he withdrew the notice of removal. (Id., at 25-28 (citing Doc. Nos. 1, 1-2); see also Doc. No. 9, at 25-27; Doc. No. 9-25, at 7; id., at 10.)

In a brief in opposition filed ten days late, Litman sidesteps the Department's arguments and accuses the movant of "corruption, mismanagement, and extortion," alleging that, "[d]espite reasonable efforts to set a bond that would be appropriate under the circumstances, [the Department] surreptitiously tried to steal Petitioners' existing bond and extort money to allow the sale to proceed in a common scheme of government corruption." (Doc. No. 27, at 1-2.) The Department, he contends, [*34] "now seeks to sanction a property owner, Hanoverian Inc. dba Quaker Alloy, Inc., and beneficial owners of the property, for buying a bankrupt company and all of its assets including its landfill and associated permits under a federal court Order, which saved DEP from a catastrophe arising from their incompetence and mismanagement of the solid residual waste rules governing a foundry sand captive landfill." (Id., at 3.) On a related note, Litman vilifies the Department for "striving to destroy the Pennsylvania Foundry Industry" and "depress[ing] the industry while at the same time foreign industry was invading the United States." (Id.)

After a digressive account of Atchison's collapse, Litman trains his invective on the Department's employees:

> Clearly, rouge [sic] employees of [the Department] have set upon themselves the task to violate their obligation to serve the Commonwealth of Pennsylvania with fidelity and instead further their objective of a corrupt scheme to act contrary to

federal court orders and agency policy, by extorting unreasonable sums of money through surreptitious notices designed to hide so-called lawful permit revocations, misdirected notices of bond forfeitures designed [*35] to avoid timely contest, and administrative orders to trust beneficiaries and other non-sensical entities designed to intimidate and coerse [sic] the payment of money into a [Department] fund used for other unlawful activities. The rouge [sic] employees of [the Department] have engaged in a corrupt enterprise with such magnitude that they have opened themselves up to personal liability.

(Id., at 8-9.) Litman casts aspersions upon the EHB as well, which he repeatedly refers to as a "state court": "If this court should remand this case to a state court whose record in this case evidences bias in favor of the agency involved, then any state agency can disobey federal court orders and be not subject to federal court scrutiny for such blatant misconduct." (Id., at 14.) In Litman's view, it is the Department "who are in contempt of court and should be sanctioned not only for filing such frivolous motions, but also to seek relief under *Rule 11* to further disguise their real objective--corrupt and/or inept government agency cover-up of their misconduct and mismanagement." (Id., at 15; see also Doc. No. 26, at 2 ("[P]etitioners [sic] allegations are not baseless . . . it is Defendant's instant [*36] motion that is baseless . . . .").) Support for this contention consists of a two-page quotation from the Pennsylvania General Assembly's findings of facts for the state's Corrupt Organizations Act and the argument that "[j]ust because the statutory crime of bribery, under former *18 P[a]. [Cons.] S[tat]. § 4303* . . ., does not proscribe the same conduct as the common law offense of misfeasance, malfeasance, and nonfeasance in office, does not mean that [the Department] is not guilty of corruption and they [sic] who should be sanctioned." (Doc. No. 27, at 12-13, 15 (citing *Commonwealth v. Dolny, 235 Pa. Super. 241, 342 A.2d 399 (Pa. Super. Ct. 1975)*).) Plaintiffs sought removal, Litman explains, "to address the overwhelming atrocities being done by [the Department] to engage [sic] in a scheme to commit extortion from Petitioners." (Id., at 11.)

Consistent with his previous filings, Litman has not

given his brief the benefit of even one citation to the record. However, rather than retreat from his previous positions, he persists in advancing factual contentions that are entirely lacking in evidentiary support and, more often than not, clearly contradicted by the record. Most egregious among these are the [*37] contentions that: (1) the "federal court was motioned [sic] to allow the sale, including the 'permitted landfill,'"; (2) the Department "did not require a pre-sale approval of the landfill permit, nor did they contest the sale of the permit and all of Quaker Alloy's assets to Atchison in 1991"; (3) "[i]n 2003-2004 [Bankruptcy] Judge Venters granted motions to sell the permitted landfill and sell the corporation's identity to Petitioners"; (4) the Department "allow[ed] the permit and landfill to be sold under federal court order without doing anything to place conditions upon its transfer"; and (5) the Department "chose to ignore all Court notices and after transfer to Hanoverian, Inc. improperly and untimely raised claims that were required to be asserted before the sale." (Id., at 4, 5, 6, 7.) Likewise, Litman clings to legal contentions that are both frivolous and unwarranted, such as the contentions that: (1) "Atchison owned and operated the landfill under its tradename wholly owned subsidiary--Quaker Alloy, Inc."; (2) "[s]ince 1991 Atchison was the owner and operator of the landfill, but it's [sic] permit remained in the tradename of Quaker Alloy, Inc."; (3) Plaintiffs are "protected [*38] good faith purchasers free and clear of the claims of [the Department]"; (4) "[t]hroughout the entire process the permit has been in the name of Quaker Alloy, Inc., but the parent company over Quaker Alloy, Inc. has changed"; (5) "[o]nce the bankruptcy proceeding was begun [sic], [the Department] should have sought a secured claim against the landfill"; and (6) Quaker Alloy, Inc. is properly named as a party to the instant action. (Id., at 1, 4, 5.)

With regard to this last point, Litman's continued insistence that the fictitious name "Quaker Alloy, Inc." was and is the permittee or that it can rightly count itself amongst the Plaintiffs is not only surreal, it is a gross misrepresentation of existing law. See Fed. R. Civ. P. 17(a)(1) ("An action must be prosecuted in the name of the real party in interest."); 17 James Wm. Moore et al., Moore's Federal Practice § 10.02[2][c] (3d ed. 2007) ("A corporation or other entity will not be permitted to proceed under a pseudonym, but must sue under its own name as the real party in interest."). Furthermore, the underlying contention that "Petitioners" somehow purchased Quaker Alloy's "corporate identity" hardly

qualifies as the sort of "nonfrivolous [*39] argument for extending, modifying, or reversing existing law or for establishing new law" contemplated by Rule 11, novelty notwithstanding. (Doc. No. 16, at 4; Doc. No. 27, at 4, 5.) See Thornton v. Wahl, 787 F.2d 1151, 1154 (7th Cir. 1986) ("It is not acceptable to make an assertion of law and hope that it will turn out to be true.").

As with his prior filings, Litman's failure to cite the record "has required the court to engage in the type of circuitous research and fact-finding that the United States Court of Appeals for the Third Circuit has repeatedly deemed unnecessary and taxing on judicial resources." Ober v. Miller, No. 04-CV-1669, 2007 U.S. Dist. LEXIS 93236, 2007 WL 4443256, at *1 n.2 (M.D. Pa. Dec. 18, 2007) (citing Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006)). In addition, while "[m]inor grammatical errors are inevitable," id., even the most cursory examination of Plaintiffs' brief reveals a troubling disregard for both the basic rules of grammar and the needs of the average reader, as typified by the following sentence: "Coercion and extortion by [the Department] to post-federal court order seeking money from Petitioners in the guise of inordinate bonding requirements [*40] never before sought in order to address [the Department's] fraud upon the public perpetrated over years before of having set bonding for the landfill adequate for closure costs at the time it was initially built," (Doc. No. 27, at 14.) See M.D. Pa. L.R. 83.23.2 (adopting the Pennsylvania Rules of Professional Conduct); Pa. R. Prof'l Conduct R. 1.1 ("Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.").

In its brief in reply, the Department, after marveling at the "sheer volume of falsehoods and scandalous matter squeezed into Plaintiffs' [brief]," surmises that the "most striking aspect of Plaintiffs' filings--even in the short time that this matter has been before this Court--is the frequency, nonchalance, and sheer audacity with which they have misrepresented central facts to the Court . . . and the depths to which Litman has dug in his heels when confronted with misrepresentations." (Doc. No. 28, at 19, 23.) "What we have here," the Department concludes, "are not mere 'mistakes' but rather a pattern of deliberate misrepresentation used as a litigation tool." (Id., at 23.) Suffice to say, the Court [*41] wholeheartedly agrees.

Like all litigants, Litman had "an affirmative duty to

conduct a reasonable inquiry into the facts and law" before filing papers in this Court. *Bradgate Assocs., Inc. v. Fellows, Read & Assocs., Inc., 999 F.2d 745, 751 (3d Cir. 1993).* Had he done so, he most certainly would have learned that the lion's share of his legal and factual contentions had no basis in either existing law or the evidence, respectively. There are no mitigating factors at play: Litman had ample time--224 days between commencing the Permit Appeal and filing the notice of removal--in which to conduct a factual and legal investigation; he relied upon his client for only a small fraction of the underlying factual information, all of it undisputed; the issues at bar are not especially complex; he was the sole signatory to all papers and, one may reasonably infer, did not depend upon another attorney in their preparation; and he, more than anyone else, was in an ideal position to know and acquire the relevant factual details. See *CTC Imports and Exps. v. Nigerian Petroleum Corp., 951 F.2d 573, 578 (3d Cir. 1991); Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir. 1988); Colburn v. Upper Darby Twp., 838 F.2d 663, 667 (3d Cir.),* [*42] cert. denied *489 U.S. 1065, 109 S. Ct. 1338, 103 L. Ed. 2d 808 (1988).* Furthermore, Litman had ample opportunity to amend or withdraw his filings after the Department apprised him of his errors, something it did on repeated occasions. See *Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3d Cir. 1987)* ("[P]arties will not be entitled to continuing immunity if they acquire or should acquire knowledge under the Rule's standard before a later filing.").

Whether intentionally or not--and the Court has no reason to believe that Litman's conduct was anything but intentional--Litman has unnecessarily delayed and needlessly increased the cost of litigation for the Department and, by extension, the citizens of the Commonwealth. *Lieb v. Topstone Indus., Inc., 788 F.2d 151, 157 (3d Cir. 1986)* ("The pleader may not escape liability because lie did not intend to bring about additional delay or expense."). He has practiced a fraud upon the Court, from his first filing to his last. Nowhere is that fraud more pronounced than in the notice of removal itself, which absent its falsehoods, half-truths, and distortions, would have given the Court ample cause to remand the action of its own accord pursuant *28 U.S.C. § 1447.* See *28 U.S.C. § 1447* ("If [*43] at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). "In this regard, if a court finds 'that fraud has been practiced upon it . . .,' it may assess attorney's

fees against the responsible party, as it may when a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'" *Chambers v. NASCO, Inc., 501 U.S. 32, 46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)* (citing *Universal Oil Prods. Co. v. Root Ref. Co., 328 U.S. 575, 580, 66 S. Ct. 1176, 90 L. Ed. 1447 (1946); Hutto v. Finney, 437 U.S. 678, 689 n.14, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978)).*

*Rule 11* authorizes district courts to sanction litigants by issuing "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from [a] violation" of the rule. *Fed. R. Civ. P. 11(c)(4)*; see also *28 U.S.C. § 1447* ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."); *M.D. Pa. L.R. 83.3.1* ("[A] judge may . . . assess reasonable costs directly against counsel whose action has obstructed the effective administration of the court's business, or suspend [*44] counsel from practicing in this court for a specified period of time not exceeding six (6) months."). *Rule 11*'s "reasonableness requirement by its nature hinges on the particular facts and circumstances presented in a given case and looks not only to the hours and billing rate involved in responding to the other party's sanctionable conduct, but also to the appropriateness of the response taken." *Dubisky v. Owens, 849 F.2d 1034, 1037 (7th Cir. 1988).* In calculating an award, district courts must "consider various mitigating factors," including the sanctioned party's ability to pay, the sanctioned party's "good reputation," whether the violation was to some extent non-frivolous, and whether the violation was in any way unintentional. *Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 195-196, 197 and 197 n.6 (3d Cir. 1988).* Speaking of sanctions generally, the Third Circuit has stated: "Obviously, a pattern of wrongdoing may require a stiffer sanction than an isolated incident; a grave wrongdoing may compel a more severe sanction than might a minor infraction; and wrongdoing that actually prejudices the wrongdoer's opponent or hinders the administration of justice may [*45] demand a stronger response than wrongdoing that, through good fortune or diligence of court or counsel, fails to achieve its untoward object." *Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1994).*

"The starting point for a determination of attorney's fees, the lodestar calculation, is the product of the number

of hours reasonably expended in responding to the frivolous paper times an hourly fee based on the prevailing market rate." *Doering, 857 F.2d at 195*. In this case, the Department has provided the Court with a detailed accounting of its attorney's fees directly resulting from Litman's violations. As of April 30, 2007, Bohan had expended 107.7 hours of his time in preparing the motion for remand, the motion for sanctions, and the various briefs and letters in support of those motions. (Doc. No. 9-25, at 2-4; Doc. No. 21-25, at 13; Doc. No. 28-8, at 3.) As a state attorney, Bohan's hourly rate of $ 51.58 is significantly lower than the prevailing market rate and manyfold lower than Litman's own rate of $ 200 to $ 350. (Doc. No. 9-25, at 5.) See Avvo Profile for Donald Litman, http://www.avvo.com/attorneys/18951-pa-d onald-litman-716667.html (last visited [*46] Mar. 25, 2008). [1] In the final analysis, Litman's conduct cost the Department $ 5,555.17 in attorney's fees, an amount that strikes the Court as eminently reasonable under the circumstances. This seems especially so given the Third Circuit's stated position that there is "no difference between the situation of an Assistant U.S. Attorney and that of a public interest lawyer whose services, the Supreme Court has held, are to be valued at a market rate, even though he or she, like Assistant U.S. Attorneys, had no regular billing rate." *Napier v. Thirty or More Unidentified Fed. Agents, 855 F.2d 1080, 1092 (3d Cir. 1988)* (citing *Blum v. Stenson, 465 U.S. 886, 895, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)* (holding "that the district court did not abuse its discretion by awarding the government's attorney $ 100 per hour" on the basis of then prevailing market rates); see also *Hamer v. Lake County, 819 F.2d 1362, 1371 (7th Cir. 1987)* (affirming district court's decision to award state's attorney $ 85 per hour). Had Litman brought any mitigating factors to the Court's attention, it would certainly consider them; Litman, however, did not.

1 Since Litman himself has claimed and verified his Avvo profile, the Court regards his profile [*47] as "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" and, therefore, justly noticed. *Fed. R. Evid. 201(b)* ("A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

The Court is particularly mindful of the Supreme Court's admonition that "[l]ike other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." *Roadway Exp., Inc. v. Piper, 447 U.S. 752, 767, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980)*. Here, Litman was given fair notice and an opportunity to respond, but elected to squander that opportunity by devoting his brief to scandalous and immaterial allegations rather than responsive arguments in his defense. Indeed, in so doing, Litman effectively conceded the Department's motion. Cf *Beazer East, Inc. v. Mead Corp., 412 F.3d 429, 437 n.11 (3d Cir. 2005)* (An appellee "waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the [appellant]." (citation omitted)); see also *Williams v. Savage, No. 07-0583, 538 F. Supp. 2d 34, 2008 U.S. Dist. LEXIS 17682, 2008 WL 628003, at *5 (D.D.C. Mar. 10, 2008)* [*48] ("[W]hen a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded." (citation omitted)).

There is nothing in the record to indicate that Metzger, either individually or in his capacity as Hanoverian's president, bears any responsibility for Litman's conduct in these proceedings. Ordinarily, "if an attorney, rather than a client, is at fault, the sanction should . . . target the culpable attorney." *Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1994)*. The Court will therefore deny the Department's motion for sanctions with respect to Metzger, Hanoverian, and the Trust. *Rule 11*, however, provides that "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." *Fed. R. Civ. P. 11(c)(1)*. Litman has not pled any such circumstances. Accordingly, the Court will grant the Department's motion with respect to Litman and the law firm of Litman and Edwards, imposing a monetary sanction of $ 5,555.17 payable to the Department not less than sixty (60) days from the date of the [*49] accompanying order.

**ORDER**

**AND NOW**, on this 31st day of March 2008, for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

Case 3:17-cv-00023-ARC   Document 75   Filed 11/02/17   Page 53 of 54

Page 14
2008 U.S. Dist. LEXIS 28865, *49

1. The Defendant's motion to remand the above-captioned action to the Pennsylvania Environmental Hearing Board (Doc. No. 6) is **GRANTED.**

The Clerk of Court shall mail a certified copy of this order to the Secretary to the Board.

2. The Defendant's motion for sanctions (Doc. No. 20) is **DENIED** with respect to Hanoverian, Inc., Donald Metzger, and the 200 Cascade Drive Ordinary Trust.

3. The Defendant's motion for sanctions (Doc. No. 20) is **GRANTED** with respect to Donald Litman and the law firm of Litman and Edwards. Payment shall be made by certified check or the like for $ 5,555.17 made payable to the "Department of Environmental Protection" and delivered, within not less than sixty (60) days from the date of this order, to Martin Sokolow, Regional Counsel, Office of Chief Counsel, Southcentral Regional Office, Department of Environmental Protection, 909 Elmerton Avenue, Harrisburg, Pennsylvania 17110-8200.

4. The Clerk of Court shall **CLOSE** the file.

*/s/ Yvette Kane*

Yvette Kane, Chief Judge

United States District Court

Middle District of Pennsylvania

**PRIORITY**

**MAIL ★**

PRIORITY MAIL®

‡F DELIVERY SPECIFIED *

RACKING™ INCLUDED *

INCE INCLUDED *

AVAILABLE

fic

ERNATIONALLY,
ECLARATION
E REQUIRED.

Delivery Day: 11/02/2017

**RACKING NUMBER**

141 1858 7304 1108 40

RECEIVED

NOV 0 2 2017

PER

DEPUTY CLERK

**FROM:**

7778 177th St

Fish Meadows NY11366

**TO:**

Court Clerk
US District Court
Middle District of PA
William J Nealon Federal Bldg
+ Courthouse
235 N. Washington Ave
Scranton PA 18503

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNITED STATES
POSTAL SERVICE®

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misus
violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.